UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x



UNITED STATES OF AMERICA                    :

        -v-                                 :          **INDICTMENT**

JOHN B. OHLE III and                        :          **S2 08 Cr. 1109 (LBS)**
WILLIAM E. BRADLEY,

                                            :
                **Defendants.**

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy – The HOMER Tax Shelter – Defendant JOHN B. OHLE III)

The Grand Jury charges:

### Background

1.      At all times relevant to this Indictment, JOHN B. OHLE III, the defendant, was an attorney, certified public accountant, and resident of Wilmette, Illinois, and New Orleans, Louisiana.

2.      From in or about November 1999 through early 2002, JOHN B. OHLE III, the defendant, was employed by a national bank ("Bank A") in its "Innovative Strategies Group" ("ISG"), which maintained its principal office in Chicago, Illinois.  The ISG provided estate planning and tax shelter strategies for high net worth clients, including a tax shelter known as "Hedge Option Monetization of Economic Remainder" or "HOMER."  For most of his tenure at ISG, OHLE supervised certain activities of the group, including the

sales of HOMER, and was its lead salesperson.

   3.  From in or about February 2002 until approximately 2004, JOHN B. OHLE III, the defendant, co-owned and operated Dumaine Group LLC ("Dumaine"), which maintained its principal office in Chicago, Illinois. Formed in or about February 2002 by OHLE together with several former ISG employees who left Bank A as a result of its termination of the ISG's creation, sale, and implementation of tax shelters, including HOMER, Dumaine was involved principally in the creation, sale, and implementation of tax shelters for high net worth clients.

   4.  At all times relevant to this Indictment, Jenkens & Gilchrist, P.C., ("J&G") was a law firm and professional corporation with offices in Dallas, Texas, and Chicago, Illinois, among other locations. In or about late December1998, Lawyer A, an attorney, certified public accountant, and co-conspirator not named as a defendant herein, resigned together with several other attorneys from another Chicago law firm, and became a shareholder of J&G's newly-formed Chicago office. From in or about early January 1999 until in or about April 1, 2004, Lawyer A served as the managing shareholder of J&G's Chicago office and head of its Chicago tax practice. Lawyer A's practice centered around the creation, sale, and implementation of tax shelters.

   5.  Lawyer B, a co-conspirator not named as a defendant herein, was an associate attorney in J&G's Chicago tax practice from June 1999 to November 2004. During his tenure at J&G, Lawyer B, who had a Master's Degree in taxation, worked primarily for

Lawyer A and another tax partner in J&G's Chicago office.

6.      Individual A, a co-conspirator not named as a defendant herein, was a childhood friend of JOHN B. OHLE III, the defendant.  OHLE enlisted Individual A to participate in the HOMER tax shelter as the purported unrelated third-party "buyer" of certain assets, as described below.

7.      Bank B, a foreign bank with United States headquarters in New York ("Bank B"), implemented the financial transactions used in the HOMER tax shelter, as described below.

## The HOMER Tax Shelter

8.      In 2001, members of Bank A's ISG, including JOHN B. OHLE III, the defendant, together with other members of ISG, Lawyers A and B at J&G, and Bank B, engaged in the design, marketing, and implementation of tax shelters, including the HOMER tax shelter.  During 2001, OHLE and his co-conspirators implemented 36 HOMER tax shelters for high net worth clients of Bank A and J&G.  In 2002, OHLE implemented two additional HOMER tax shelters through his newly-created business, Dumaine.

9.      JOHN B. OHLE III, the defendant, and the co-conspirators designed and marketed the HOMER tax shelter as a means for wealthy clients of Bank A and J&G to eliminate or reduce the amount of U.S. income taxes the clients would have to pay to the IRS, and to generate extraordinary fee income for Bank A and J&G, as well as for OHLE and his co-conspirators.  Rather than paying U.S. income taxes generally ranging from 20% to 35%

of their taxable gains, HOMER clients could choose instead to pay total fees calculated as a percentage of the desired tax loss generated by the tax shelter.  The HOMER clients were required to pay fees generally totaling 6%, or 600 basis points, of the tax loss that the clients were seeking to generate through their respective HOMER shelters.  The fees were divided among Bank A, J&G, Bank B, and Individual A, among others. OHLE and other ISG members earned bonuses based on, among other things, the amount of fees each generated through their sale of HOMER shelters.

  10. JOHN B. OHLE III and his co-conspirators marketed the HOMER tax shelter as a way to eliminate clients' taxes, claiming that it was legitimate because it was also an estate planning technique that, through the use of a trust and the implementation of financial transactions involving a loan and pairs of options, had the ability to produce investment profits for the HOMER clients.  In truth and fact, the HOMER tax shelter was a tax elimination shelter designed to produce tax losses for the clients through a contrived and preordained series of steps that invariably resulted in: losses from the options flowing to the Homer clients in order to offset their taxable income; gains from the options being left with a purportedly unrelated third party who was inserted into the transaction and controlled and funded by OHLE; and no reasonable opportunity for the HOMER clients to make a profit, given the structure of the options used in the HOMER tax shelter and the fees required to be paid to obtain the losses.  Moreover, the HOMER clients did not engage in the HOMER tax shelter to make a gift of approximately $10,000 to a beneficiary, much less pay hundreds of

4

thousands or millions of dollars of fees to OHLE and his co-conspirators to do so.

   11. JOHN B. OHLE III, the defendant, and his co-conspirators understood that if the IRS were to detect the clients' use of the HOMER tax shelter and learn the true facts and circumstances surrounding its design, marketing, and implementation, the IRS would aggressively challenge the claimed tax benefits, including seeking to impose substantial penalties, in addition to the tax and interest owed. Accordingly, OHLE and his co-conspirators undertook to prevent the IRS from: (a) detecting their clients' use of these shelters; (b) understanding how the steps of the transaction operated to produce the purported tax benefits claimed by the clients; (c) learning that these shelters were marketed as cookie-cutter products that would significantly reduce or eliminate the clients' tax obligations; (d) learning that any potential gain from the options used in the HOMER tax shelters could never overcome the total fees required to engage in the HOMER tax shelters; (e) learning that the clients were not genuinely seeking profit-making investment opportunities, but were, instead, seeking huge tax benefits, and (f) learning that from the outset the clients intended to complete a preplanned series of steps that had been designed by OHLE and his co-conspirators to lead to the specific tax losses sought by the clients.

   12. In order to maximize the appearance that the HOMER tax shelter was an investment undertaken to generate profits, and to minimize the likelihood that the IRS would learn that the HOMER tax shelter was actually designed to create tax losses, JOHN B. OHLE III, the defendant, and his co-conspirators created, assisted in creating, and

reviewed transactional documents and other materials containing false and fraudulent information, including false and fraudulent descriptions of the clients' motivations for entering into the HOMER financial transactions and for taking the various steps that would yield the tax benefits.

13.    The HOMER tax shelter included the following essential steps:

a.    The client would purchase from Bank B four so-called "barrier options," which were specialized foreign currency or bond options. The four options consisted of two "knock-out" options (which would become worthless, *i.e.*, "knock out," if a specified currency or bond exchange rate crossed a specified barrier), and two "knock-in" options (which would not become effective, *i.e.*, "knock in," unless a specified currency or bond exchange rate crossed a specified barrier). By design, two options would win (that is, be "in the money") and two would lose (that is, be "out of the money"). As its fee for implementing the HOMER financial transactions, Bank B would charge a premium of 1.25% of the desired tax loss, which represented Bank B's profit and the costs of implementing the options. Bank B would loan the client virtually all of the funds necessary to purchase the options, with the client providing the small balance. The loan posed no risk to Bank B, however, as the options and other collateral were required to be pledged at all times to fully secure the loan.

b.    After the options were purchased, they would be transferred to a grantor retained trust that had been formed by J&G for the client to implement the HOMER

6

tax shelter. The client would then gift a small interest in the trust to a beneficiary of the client's choosing (the "Unitrust Beneficiaries"), with the client retaining the remainder interest. Because the client would retain the remainder interest, he would remain grantor of the trust, the terms of which also provided that at a future point the client could reacquire trust assets by substituting assets of equal value. The client would thereafter sell his remainder interest to a purportedly unrelated third-party partnership owned by Individual A and his wife, receiving in exchange a promissory note secured by the remainder interest. The trust would then no longer be a grantor trust as to the client. Shortly after the sale of the remainder interest, the client's power to substitute assets would spring into existence, thus once again rendering the trust a grantor trust as to the client, and allowing the options' losses to flow to the client.

          c.     On the so-called "observation date" specified in the options contracts, Bank B would determine which two barrier options were the losers. The amount to be paid under the winning options could not be determined until a later date, prior to which the Unitrust Beneficiaries would have sold their interest in the trust to the purportedly unrelated third-party partnership owned by Individual A, for an amount generally less than $10,000. The third-party partnership would then be the sole beneficiary of the trust and be the recipient of the proceeds of the winning options. Thus, the gains from the transaction were left with Individual A, the third-party buyer.

d.    The trust would then be terminated and its major assets (that is, the winning options), would be distributed to Individual A's third-party partnership, and thereafter distributed to its partners, the corporations owned by Individual A and his wife, in liquidation of the third-party partnership. Individual A would use the proceeds of the settled options to pay off the promissory note to the client, who would then use the proceeds to repay the loan from Bank B for the initial options' purchase. The HOMER tax shelter was carefully constructed so that (1) the total premiums paid by the customer on the options were almost equivalent to the payout on the winning options, (2) neither Bank B, the client (except for the net premiums paid for the options), nor Individual A were at risk of meaningful loss at any stage of the transaction; and (3) each pair of barrier options was always transferred as a pair and the two barrier options within that pair were never transferred or assigned independently of one another.

14.    In recruiting Individual A to be the third-party buyer in the HOMER tax shelter, JOHN B. OHLE III, the defendant, advised Individual A that he had "hit the lottery" in being selected by OHLE to act as the third-party buyer. OHLE advised Individual A that OHLE would provide him with the approximate $375,000 necessary to fund the third-party partnership purchases of the Unitrust Beneficiaries' interests. OHLE further advised that Individual A would be required to split equally with OHLE any moneys earned by Individual A in acting as the third-party buyer, after OHLE was repaid the $375,000. On OHLE's instructions and with the assistance of J&G, Individual A established eight partnerships —

8

Waterford Financial Partners, Whittaker Financial Partners, Lexington Financial Partners, Leamington Financial Partners, Brighton Financial Partners, Essex Financial Partners, Gresham Financial Partners, and Leland Financial Partners — for use in the HOMER tax shelter. Individual A and his wife, also with the assistance of J&G, each formed a corporation, respectively named Waterford Capital Investors, Inc., and Gravier Financial Ltd., to act as the partners of the eight partnerships used in the HOMER tax shelters.

15.    J&G charged the HOMER clients (with one exception) 6% of the desired tax losses to be generated, of which J&G retained 2.6%. Taking into account the total fees, including the premium paid to Bank B, the client had no chance of earning a profit in excess of the fees charged. Indeed, there was only a very small chance that the client could earn more than Bank B's fees alone. Nor could the transaction be justified as a valid estate-planning tool, as the client would end up paying hundreds of thousands of dollars, or more, simply to give a $10,000 gift to a beneficiary.

16.    The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer — ranging from 20% to 40% of the underpayment attributable to the shelter — unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely than not" would survive IRS challenge. Thus, in order to encourage clients to participate in the HOMER tax shelters, with the agreement of JOHN

B. OHLE III, the defendant, J&G provided a "more likely than not" opinion letter ("the opinion letter") to HOMER clients. However, OHLE and his co-conspirators, including J&G Lawyers A and B, knew the HOMER opinion letters were based on false and fraudulent statements, and omitted material facts. By helping clients obtain the false and fraudulent opinion letters, with the understanding and intent that they would be presented to the IRS in defense of the transaction, if and when the clients were audited, OHLE and his co-conspirators sought not only to undermine the ability of the IRS to ascertain the clients' true tax liabilities, but also to undermine the IRS's ability to determine whether penalties should be imposed.

17.    The opinion letters contained the following false and fraudulent representations:

a.    The opinion stated, "[T]he Trust was created for the purposes of effectuating a gift to the Unitrust Beneficiary and conserving and protecting the assets of the Trust for the benefit of the Trust's beneficiaries[;]" when, in truth and fact, the clients created the trust at the direction of J&G for the purpose of executing the HOMER tax shelter, and not for genuine estate planning reasons.

b.    The opinion stated, "You [the client] entered into the Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the relevant bond prices would changes; and (ii) your belief that the most direct way, with the most leverage, to realize gain from expected changes in

currency prices was the Options."  In truth and fact, the clients purchased the options —
which were designed by the joint efforts of J&G lawyers and employees of Bank B pursuant
to predetermined parameters and durations — in order to obtain the desired tax benefits, and
thus the clients had no substantial nontax business reasons for entering into the options.

        c.     The opinion stated, "You [the client] entered into the
Transactions, other than the creation of the Trust, for substantial nontax business reasons,
including (without limitation) your belief that the potential economic benefits of owning the
Note [the promissory note provided by the third-party buyer] outweighed the potential
economic benefits of retaining the Remainder Interest, and a desire to maximize profits and
minimize risks with respect to your various investment activities."  In truth and fact, the
clients sold the options to the third-party buyer because JOHN B. OHLE III, the defendant,
and his co-conspirators advised the clients that such a sale was a necessary step to achieve
the tax benefits. The clients were generally not provided with information about the financial
health and credit-worthiness of the third-party buyer in order to be able to assess whether
selling the Remainder Interest in exchange for the Note was an economically sound decision.

        d.     The opinion letter stated, "Neither you, the Trust, the Buyer, nor
the Unitrust Beneficiary were obligated to engage in any transaction to which our opinion
related upon the completion of any other of such transaction," when in truth and fact, JOHN
B. OHLE III, the defendant, and his co-conspirators had marketed to Bank A and J&G's
clients, and the clients had paid fees to obtain, a strategy that, while not legally compelling

a participant to complete any particular part of the transaction, consisted of a preplanned series of steps designed to result in the predetermined tax benefit, for which the client was paying large fees.

18.      The HOMER tax shelters engaged in by J&G, Bank A, and Dumaine resulted in taxpayers claiming approximately $429,250,000 in false and fraudulent tax losses, resulting in the evasion of more than $103,000,000 in taxes.  J&G earned approximately $12.1 million in fees from the HOMER tax shelters, while Bank A earned approximately $5.2 million.

### Statutory Allegations

19.      From in or about 2001 until in or about 2004, in the Southern District of New York and elsewhere,  JOHN B. OHLE III, the defendant, together with others known and unknown to the grand jury, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 18, United States Code, Section 1343, and Title 26, United States Code, Section 7201.

### Objects of the Conspiracy

20.      It was a part and object of the conspiracy that, from in or about 2001 until in or about 2004, JOHN B. OHLE III, the defendant, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating,

and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

21.     It was a further part and object of the conspiracy that, from in or about 2001 until in or about 2004, JOHN B. OHLE III, the defendant, together with others known and unknown to the grand jury, unlawfully, willfully, and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the IRS through the design, marketing, and implementation of the fraudulent HOMER tax shelter, and for the purpose of executing such scheme and artifice and attempting so to do, would and did transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes, and e-mails, in violation of Title 18, United States Code, Section 1343.

22.     It was a further part and object of the conspiracy that, from in or about late 2001 through in or about 2004, JOHN B. OHLE III, the defendant, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing by the HOMER clients, in violation of Title 26, United States Code, Section 7201.

## Means and Methods of the Conspiracy

23.     Among the means and methods by which JOHN B. OHLE III, the defendant. and others known and unknown to the grand jury would and did carry out the objectives of the conspiracy were the following:

a.     They would and did design, market, and implement the HOMER tax shelter, and create false and fraudulent factual scenarios to support the HOMER tax shelter, so that wealthy individuals could pay a percentage of their income or gain in fees to J&G, Bank A, Bank B, and the other participants in the HOMER tax shelter, rather than paying a substantially greater amount in taxes to the IRS;

b.     They would and did design, market, and implement the HOMER tax shelter in ways that made it difficult for the IRS to detect it and determine its true nature;

c.     They would and did cause J&G to create eight different partnerships and two different corporations for use by Individual A to create the appearance that a number of unrelated third-party buyers were participating in the HOMER shelters;

d.     They would and did design, market and implement the HOMER tax shelter in ways that disguised the fact that the HOMER tax shelter was tax-motivated, and lacked a substantial nontax business purpose;

e.     They would and did seek to prevent the IRS from learning that they had marketed a tax shelter consisting of preplanned steps leading to predetermined tax benefits;

14

f.      They would and did prepare and assist in preparing, and cause to be prepared, false and fraudulent documents in order to deceive the IRS, including but not limited to, transactional documents and correspondence;

g.      They would and did assist in crafting legal opinions for use by HOMER clients in defending the HOMER tax shelter and shielding the clients from penalties, knowing that these opinions contained false, fraudulent, and misleading information and omitted other information, all of which was material to a determination of whether the claimed tax results were allowable; and

h.      They would and did cause to be prepared tax returns for the HOMER clients that were false and fraudulent because, among other things, they claimed fraudulent tax losses and thereby substantially understated the tax due and owing by the HOMER clients.

### Overt Acts

24.     In furtherance of the conspiracy and to effect the illegal objects thereof, JOHN B. OHLE III, the defendant, and his co-conspirators, committed and caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.      On or about May 16, 2001, J&G Lawyer B sent an interstate e-mail to a co-conspirator not named as a defendant herein, Broker A for Bank B, in which Lawyer B stated:

Here's the summary for the HOMER deal we discussed. Also, I attached a chart showing the terms I had in mind for the two kinds of options we talked about earlier. I'll look at the stuff you forwarded from [a trader at Bank B], and see if that changes anything. It sounds pretty similar. Let's talk about [the trader at Bank B]'s options.

        b.      On or about May 21, 2001, Lawyer B sent an interstate e-mail to a second trader on Bank B's foreign currency exchange desk in Manhattan, New York, with whom he was discussing various proposed financial instruments to be used in the HOMER tax shelter, in which Lawyer B stated:

There's a bit of a problem with your recent suggestion. We'd thought about doing the options with one long and one short, but it raises a handful of tax issues we'd just as soon avoid. The options will likely be moved around a bit. The Tax treatment of the various entities involved is such that both options need to be purchased by the client, which is why discussion last week related to purchasing two options, and borrowing the premium amount.

Also, to the extent possible, we would prefer the payouts to be fixed in amount for various possibile [sic] market states, rather than using payouts which fluctuate with the markets. This permits easier explanation of the trade, as the number of possible outcomes is so small, and also seems to make people more comfortable because there is a maximum amount of value at risk. I do, however, think that the principal is sound.

        c.      In or about May 2001, JOHN B. OHLE III, the defendant, and Lawyer A instructed a member of Bank A's ISG about the HOMER tax shelter in order for the member to be able to pitch the transaction to her clients.

        d.      In or about mid 2001, Lawyers A and B drafted and assisted in drafting a legal opinion for the HOMER tax shelter.

        e.      In or about September 2001, JOHN B. OHLE III, the defendant,

Lawyer A, and Individual A met in Chicago to discuss Individual A's role as the third-party buyer in the HOMER tax shelter.

        f.     On or about October 2, 2001, Lawyer A participated in a telephone conference call with representatives of Bank B in Manhattan, New York, regarding J&G's intent and willingness to provide a "more likely than not" legal opinion on the HOMER tax shelter.

        g.     In or about October 2001, JOHN B. OHLE III, the defendant, and other members of ISG met with a client at Bank A's office in Chicago to pitch the HOMER tax shelter.

        h.     On or about November 2, 2001, JOHN B. OHLE III, the defendant, caused three Louisiana-based businessmen who were acquaintances to enter into HOMER tax shelters in which each of the three acquaintances made another of the three the Unitrust Beneficiary of their respective trusts, thus effectively gifting money to each other in a circular transfer of funds.

        i.     On or about November 14, 2001, JOHN B. OHLE III caused J&G to establish Individual A's eight different partnerships for use as the third-party buyers in the HOMER tax shelters.

        j.     On or about November 30, 2001, Lawyer A sent a confidentiality agreement to Individual A, requiring his signature, which affirmed that Individual A would use "confidential proprietary information" involving "certain financing structures []

17

developed by J&G and/or its clients, consultants or co-counsel, that provide economic, financial, business and tax advantages for individual and companies through the use of the Structures" only to evaluate the Structures and a potential relationship with J&G.

        k.     On or about December 4, 2001, JOHN B. OHLE III, the defendant, caused a $125,000 wire transfer to be sent to the personal checking account of Individual A to partially fund Individual A's role as the third-party buyer in the HOMER tax shelter.

        l.     On or about December 10, 2001, JOHN B. OHLE III, the defendant, caused a $250,000 wire transfer to be sent to the personal checking account of Individual A to partially fund Individual A's role as the third-party buyer in the HOMER tax shelter.

        m.     On or about December 9, 2002, a HOMER client signed and filed with the IRS a false and fraudulent U.S. Individual Income Tax Return that reported approximately $4,004,000 in ordinary losses and approximately $7,992,000 in capital losses stemming from the execution of a HOMER tax shelter.

        n.     On or about June 4, 2003, J&G sent a HOMER client a "more likely than not" opinion letter for a HOMER tax shelter.

        o.     On or about August 15, 2004, a HOMER client signed and filed with the IRS a false and fraudulent U.S. Individual Income Tax Return that reported approximately $2,686,399 in carry-forward capital losses stemming from the execution of

a HOMER tax shelter.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Tax Evasion: HOMER Client D.W. – Defendant JOHN B. OHLE III )

The Grand Jury further charges:

25.     Paragraphs 1-18, 23, and 24 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

26.     Among the Bank A clients who participated in a HOMER tax shelter was D.W., who, at all times relevant to the Indictment, owned a firm that specialized in exchange traded options in Chicago, Illinois.

27.     In or about October 2001, D.W. was introduced to JOHN B. OHLE III, the defendant, through a mutual acquaintance. D.W. met with OHLE and other ISG members in Chicago and was presented with a tax elimination strategy D.W. later came to know as the HOMER tax shelter. OHLE and the other ISG members described the tax shelter as one that they had invented and that was secret and proprietary. In response to specific inquiries by OHLE and others about the nature of D.W.'s income during the 2001 tax year, D.W. advised that it consisted of long-term and short-term capital gains. The ISG representatives also advised that J&G would provide a legal opinion on the transaction.

28.     Subsequently, D.W. met twice with Lawyer A and another lawyer from J&G. JOHN B. OHLE, the defendant, and other ISG personnel were present at the second meeting. During the first meeting, Lawyer A provided D.W. with and reviewed an

19

"Executive Summary" that outlined the steps of the HOMER tax shelter. D.W. understood that in order to achieve the desired tax benefits, the steps would have to be executed in the proper order. During one of these meetings, the fees were described to D.W. as a percentage of the income or gain to be sheltered.

29.    Based on conversations with Bank A and J&G personnel, D.W. understood that the HOMER tax shelter would include four options on a German bond: a knock-in call option, a knock-out put option, a knock-in put option, and a knock-out call option. Despite his experience as an options trader, D.W. had no experience in trading the type of options used in the HOMER tax shelter. J&G personnel chose the German bond as the options investment for D.W.'s HOMER tax shelter. Neither ISG personnel, including JOHN B. OHLE III, the defendant, nor the J&G personal discussed the probabilities of success or the expected value of the options in D.W.'s HOMER tax shelter, although it was conveyed to D.W. that he could make some money on the options. However, D.W. knew at the time he entered into the HOMER tax shelter that the expected value of the options was negative. D.W. understood that, notwithstanding the outcome of the financial bet on the options, he would receive the tax benefits generated by the HOMER tax shelter.

30.    D.W. understood from his meetings with JOHN B. OHLE III, the defendant, Lawyer A, and the others that, in order to generate a tax loss of approximately $69,000,000, the cash collateral required to purchase the options from Bank B would be approximately $1 million, and that the fees to J&G would be approximately $3 million.

20

D.W. asked OHLE whether those should be taken into account relative to the economics of the overall transaction. In response, OHLE told him that he should not consider the fees paid to J&G because of the "donative intent" of the grantor trust. However, D.W. did not personally have a donative intent relative to his tax shelter. Instead, D.W. carried out the gifting step of the tax shelter because it was required in order to obtain the tax benefit. D.W. gifted the unitrust beneficial interest, which was ultimately worth $9,941, to his business partner's adopted child as part of D.W.'s HOMER tax shelter.

31.    On or about November 20, 2001, J&G arranged for D.W. to acquire two pairs of German bond options. The loan from Bank B to D.W. to purchase the options totaled approximately $137,137, 500, and was collateralized by the options. The cost to D.W. of the two option pairs (the "net premium") was approximately $862,500. The fees to J&G were $1,794,000 and the fees to Bank A were approximately $1,242,000. Given these fees and the structure of the HOMER options, D.W. had no realistic possibility to make a profit on the HOMER tax shelter.

32.    On or about November 26, 2001, D.W.'s option pairs were transferred to the grantor trust in accordance with the preplanned series of steps constituting the HOMER tax shelter, and the gift made to the Unitrust Beneficiary. On or about December 7, 2001, D.W. sold his remainder interest in the trust to Whittaker Financial Partners, one of Individual A's partnerships, receiving in return a promissory note with a principal amount of $137,287,536. D.W. was never advised that Individual A was a friend of JOHN B. OHLE

III, the defendant, who funded Individual A's participation in the HOMER tax shelter.

33.    On or about December 10, 2001, pursuant to the terms of the Trust Agreement, D.W.'s power of substitution of assets sprang into existence, thereby rendering the trust as grantor trust as to D.W. again.

34.    On or about December 13, 2001, on the options' observation date, two of the four options expired worthless, producing the purported tax loss that flowed to the client.

35.    On or about December 14, 2001, Whittaker Financial Partners, the entity owned by Individual A, acquired the Unitrust Interest from the Unitrust Beneficiary for approximately $9,941. Thereafter, the trust terminated and the trust assets consisting of the remaining two options and cash were distributed to Whittaker Financial Partners.

36.    On or about December 17, 2001, Whittaker Financial Partners was liquidated, the note was assumed by Whittaker Financial Partner's partners (Waterford Capital Investors and Gravier Financial Ltd.), and Whittaker's assets were distributed to the partners.

37.    On or about December 19, 2001, the winning options — now held by Waterford Capital Investors and Gravier Financial Ltd. — expired. On or about December 21, 2001, they paid $137,396,985.13 to D.W. in payment of the promissory note for the purchase of the remainder interest. On or about December 21, 2001, D.W. repaid Bank B $137,356,158.13 for the loan to purchase the options initially.

38.     On or about October 17, 2002, D.W. filed a U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which claimed the false and fraudulent HOMER losses, thereby resulting in a substantial understatement of D.W.'s taxable income and tax due and owing.

39.     In exchange for the $1,794,000 fee, J&G issued a legal opinion that included representations purportedly made by D.W., but which in fact were not made by D.W. (or anyone acting on D.W.'s behalf) and were, in truth and fact, false and misleading.

## **Statutory Allegations**

40.     From in or about January 2001 through at least on or about October 17, 2002, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by D.W. to the United States of America for calendar year 2001 by various means, including among others, (a) designing and implementing a HOMER tax shelter that he knew had no reasonable possibility of generating a profit; (b) using the HOMER tax shelter to generate approximately $69,000,000 in false and fraudulent tax losses he knew could not properly be deducted on D.W.'s returns; (c) creating a trust entity that served no legitimate trust purpose, but was used merely to obtain tax benefits; and (d) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed by D.W., a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which was filed with the IRS on or about October 17, 2002,

which substantially understated D.W.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201, and
Title 18, United States Code, Section 2)

## COUNT THREE
(Tax Evasion: HOMER Client C.P. – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

41.     Paragraphs 1-18, 23, and 24 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

42.     Among the Bank A clients who participated in a HOMER tax shelter was C.P., who, at all times relevant to the Indictment, was a resident of Denham Springs, Louisiana, and the owner of several businesses, including truck stops.

43.     In or about October 2001, C.P. was introduced to JOHN B. OHLE III, the defendant, through C.P.'s banker at Bank A.  On or about October 8, 2001, C.P., together with certain employees and advisors, met with OHLE and other ISG members in New Orleans and was presented with the HOMER strategy as a means to eliminate the taxes C.P. expected to owe as a result of the sale of several truck stops.  OHLE explained that the fees were based on a percentage of the tax loss expected to be generated, and that Bank A and J&G would be paid out of these fees.  OHLE also advised C.P. that J&G would provide a legal opinion on the tax shelter, which he understood would provide him with protection if the IRS identified the tax shelter.

24

44.    Notwithstanding the fact that C.P. had preexisting trusts available for providing gifts to his estate-planning beneficiaries, JOHN B. OHLE III, the defendant, and J&G required him to establish a new trust for the purpose of executing the HOMER tax shelter. C.P.'s employee was named the Unitrust Beneficiary, and was ultimately gifted $19,875 in the HOMER tax shelter.

45.    On or about November 19, 2001, J&G arranged for C.P. to acquire two pairs of Euro/U.S. dollar currency options and two pairs of German bond options. The loan from Bank B to C.P. to purchase the options totaled approximately $23,850,000, and was collateralized by the options. The cost to C.P. of the options (the "net premium") was approximately $150,000. The fees to J&G were approximately $312,000. The fees to Bank A were approximately $156,000. JOHN B. OHLE III, the defendant, also caused $60,000 to be paid to C.P.'s attorney as a referral fee. Given these fees and the structure of the HOMER options, C.P. had no realistic possibility to make a profit on his HOMER tax shelter.

46.    On or about November 21, 2001, C.P.'s option pairs were transferred to the grantor trust in accordance with the preplanned series of steps constituting the HOMER tax shelter, and the $19,875 gift made to the Unitrust Beneficiary. On or about December 7, 2001, C.P. sold his remainder interest in the trust to Gresham Financial Partners, one of Individual A's partnerships, receiving in return a promissory note with a principal amount of $23,871,713. C.P. was never advised that Individual A was a friend of