JOHN B. OHLE III, the defendant, who funded Individual A's participation in the HOMER tax shelter.

47. On or about December 10, 2001, pursuant to the terms of the Trust Agreement, C.P.'s power of substitution of assets sprang into existence.

48. On or about December 13, 2001, on the options' observation date, two of the four options' pairs expired worthless, producing the purported tax loss that flowed to the client.

49. On or about December 14, 2001, Gresham Financial Partners acquired the Unitrust Interest from the Unitrust Beneficiary for $19,875.22. Thereafter, the trust terminated and the trust assets consisting of the remaining two options and cash were distributed to Gresham Financial Partners.

50. On or about December 17, 2001, Gresham Financial Partners was liquidated, the note was assumed by Gresham Financial Partner's partners (Waterford Capital Investors and Gravier Financial Ltd.), and Gresham's assets were distributed to the partners.

51. On or about December 19, 2001, the winning options – now held by Waterford Capital Investors and Gravier Financial Ltd. – expired. On or about December 21, 2001, they paid $23,890,743.75 to C.P. in payment of the promissory note for the purchase of the remainder interest. On or about December 21, 2001, C.P. repaid Bank B $23,890,743.75 for the loan to purchase the options initially.

52. On or about December 9, 2002, C.P. filed a U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which claimed the false and fraudulent HOMER losses, thereby resulting in a substantial understatement of C.P.'s taxable income and tax due and owing.

53. In exchange for the $312,000 fee, J&G issued a legal opinion that included representations purportedly made by C.P., but which in fact were not made by C.P. (or anyone acting on C.P.'s behalf) and were, in truth and fact, false and misleading.

54. At no time did C.P. understand the HOMER strategy or the options used in his HOMER tax shelter. He had little experience in stock market investments, and none with derivatives or options prior to the implementation of the HOMER tax shelter.

### Statutory Allegations

55. From in or about January 2001 through at least on or about December 9, 2002, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by C.P. to the United States of America for calendar year 2001 by various means, including among others, (a) designing and implementing a HOMER tax shelter that he knew had no reasonable possibility of generating a profit; (b) using the HOMER tax shelter to generate approximately $11,996,000 in false and fraudulent tax losses he knew could not properly be deducted on C.P.'s return; (c) creating a trust entity that served no legitimate trust purpose, but was used merely to obtain tax benefits; and (d)

27

preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed by C.P., a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which was filed with the IRS on or about December 9, 2002, which substantially understated C.P.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201, and
Title 18, United States Code, Section 2)

### COUNT FOUR
(Tax Evasion: HOMER Client D.D. – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

56. Paragraphs 1-18, 23, and 24 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

57. Among the individuals who participated in a HOMER tax shelter was D.D., who, at all times relevant to the Indictment, was the co-owner, together with certain family members, of several businesses in New Orleans, Louisiana, and elsewhere, including real estate partnerships and parking lots.

58. In or about the early fall of 2001, D.D. received a cold call from JOHN B. OHLE III, the defendant, who told D.D. that he had a tax planning mechanism that he would like to discuss with D.D. Shortly thereafter, D.D. met with OHLE in D.D.'s office in New Orleans, Louisiana. OHLE described the HOMER tax shelter to D.D. as a novel and "bulletproof" structure that was proprietary to Bank A and J&G.

59. In or about October 2001, D.D. again met with JOHN B. OHLE III, the defendant, along with, among others, another ISG member and D.D.'s Chief Financial Officer. As a result of the two meetings with OHLE, D.D. understood that the HOMER tax shelter would act to eliminate taxes due by D.D. and other members of his family as a result of the sale of several businesses in 2001. D.D. further understood that the size of the fees to enter the HOMER tax shelter were tied to the amount of the tax savings created, the amount of which D.D. could choose.

60. Based on his discussions with JOHN B. OHLE III the defendant, and Bank B, D.D. understood that there was no real potential to make money on the options transactions effectuated by Bank B as part of D.D.'s HOMER tax shelter. D.D. further understood that the HOMER tax shelter made economic sense only if the tax benefits were considered. D.D. understood that his economic risk was limited to the out-of-pocket costs to enter the HOMER tax shelter. OHLE provided D.D. a worst case scenario in which, even if the IRS disallowed the tax shelter's tax benefits, it would likely settle for a percentage of the taxes due.

61. In or about November 2001, D.D. was made aware of the need to sign a form of guaranty in connection with the loan from Bank B to purchase the options used in implementing the HOMER tax shelter. D.D. spoke with Broker A at Bank B about D.D.'s concerns about signing a guaranty with respect to a tax shelter he did not fully understand. Broker A advised D.D. that his risk with respect to the guaranty was immaterial. D.D. was

also assured by OHLE and others at Bank A that the guaranty was something about which he should not be financially concerned.

62. D.D. understood that J&G would provide an opinion letter for the HOMER tax shelter that could be shown to the IRS as a "line of defense" if the HOMER tax shelter was challenged by the IRS.

63. On or about November 29, 2001, J&G arranged for D.D. to acquire two pairs of German bond options. The loan from Bank B to D.D. to purchase the options totaled approximately $11,925,000, and was collateralized by the options. The cost to D.D. of the two option pairs (the "net premium") was approximately $75,000. The fees to J&G were approximately $156,000. The fees to Bank A were approximately $76,500. JOHN B. OHLE III, the defendant, also caused additional amounts to be paid to D.D.'s attorney and to the BRADLEY law firm as referral fees. Given these fees and the structure of the HOMER options, D.D. had no realistic possibility to make a profit on the HOMER tax shelter.

64. On or about December 4, 2001, D.D.'s option pairs were transferred to the grantor trust in accordance with the preplanned series of steps constituting the HOMER tax shelter, and the gift made to the Unitrust Beneficiary. On or about December 7, 2001, D.D. sold his remainder interest in the trust to Brighton Financial Partners, one of Individual A's partnerships, receiving in return a promissory note with a principal amount of $11,927,714. D.D. was never advised that Individual A was a friend of OHLE, who had funded Individual A's participation in the HOMER tax shelter.

30

65. On or about December 10, 2001, pursuant to the terms of the Trust Agreement, D.D.'s power of substitution of assets sprang into existence.

66. On or about December 13, 2001, on the options' observation date, two of the four options expired worthless, producing the purported tax loss that flowed to the client.

67. On or about December 14, 2001, Brighton Financial Partners acquired the Unitrust Interest from the Unitrust Beneficiary for approximately $4,969. Thereafter, the trust terminated and the trust assets consisting of the remaining two options and cash were distributed to Brighton Financial Partners.

68. On or about December 17, 2001, Brighton Financial Partners was liquidated, the note was assumed by Brighton Financial Partner's partners (Waterford Capital Investors and Gravier Financial Ltd.), and Brighton's assets were distributed to the partners.

69. On or about December 19, 2001, the winning options — now held by Waterford Capital Investors and Gravier Financial Ltd. — expired. On or about December 21, 2001, they paid $11,937,223.13 to D.D. in payment of the promissory note for the purchase of the remainder interest. On or about December 21, 2001, D.D. repaid Bank B $11,937,223.13 for the loan to purchase the options initially.

70. On or about October 21, 2002, D.D. filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which claimed the false and fraudulent HOMER losses, thereby resulting in a substantial understatement of D.D.'s

taxable income and tax due and owing.

71.     In exchange for the $156,000 fee, J&G issued a legal opinion that included representations purportedly made by D.D., but which in fact were not made by D.D. (or anyone acting on D.D.'s behalf) and were, in truth and fact, false and misleading.

### Statutory Allegations

72.     From in or about January 2001 through at least on or about October 21, 2002, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by D.D. to the United States of America for calendar year 2001 by various means, including among others, (a) designing and implementing a HOMER tax shelter that he knew had no reasonable possibility of generating a profit; (b) using the HOMER tax shelter to generate approximately $5,944,000 in false and fraudulent tax losses he knew could not properly be deducted on D.D.'s return; (c) creating a trust entity that served no legitimate trust purpose, but was used merely to obtain tax benefits; and (d) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 2001, which was filed with the IRS on or about October 21, 2002, which substantially understated D.D.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201, and
Title 18, United States Code, Section 2)

## COUNT FIVE
(The Mail and Wire Fraud and Personal Income Tax Fraud Conspiracy
– Defendants JOHN B. OHLE III and WILLIAM BRADLEY)

The Grand Jury further charges:

73.    Paragraphs 1-18 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### Introduction

74.    JOHN B. OHLE III, the defendant, with the assistance of WILLIAM BRADLEY, the defendant, and co-conspirators Douglas Steger and Individual C, committed fraud by obtaining funds to which OHLE was not entitled, which funds OHLE shared with BRADLEY, Steger, and Individual C, and thereafter defrauded the IRS by, among other things, failing to report those funds as income on OHLE's individual income tax returns and aiding and causing others to file false income tax returns. More specifically, OHLE embezzled funds from a client, "Client E," and used some of the money to fund Individual A's participation in the HOMER tax shelter. In addition, OHLE obtained by fraud from Bank A referral fees related to the HOMER tax shelter, the majority of which OHLE kept. Thereafter, OHLE defrauded the IRS by concealing the receipt and disbursement of those ill-gotten fees; by failing to report as income on his individual income tax returns those fees as well as the funds embezzled from Client E; and by causing his co-conspirators to file false individual income tax returns with respect to the ill-gotten referral fees. As a result, OHLE willfully evaded taxes on at least $1,760,000 in income in 2001 and at least $4,439,046 in

33

income in 2002.

## Background

75.	At all times relevant to the Indictment, defendant WILLIAM E. BRADLEY was an attorney in private practice in Hammond, Louisiana, doing business as a sole practitioner under the name "Bradley Law Firm LLC." BRADLEY, whose primary practice area was personal injury law, became acquainted with defendant JOHN B. OHLE III during their preparation for the Louisiana bar examination.

76.	Douglas Steger, a co-conspirator not named as a defendant herein, was a resident of Northfield, Illinois. From approximately 1989 until approximately late 2001, Douglas Steger owned and operated American Financial Capital Corporation ("AmCap"), which was engaged in the business of raising money for hedge funds, including a Bermuda-based hedge fund with an office in Manhattan, New York ("Carpe Diem"). AmCap maintained a bank account at North Shore Community Bank, Wilmette, Illinois.

77.	Individual B was an investment advisor who resided, at certain times relevant to this Indictment, in San Francisco, California. Individual B became acquainted with JOHN B. OHLE III, the defendant, when both worked in New Orleans, Louisiana. In late 2001, Individual B worked as an investment advisor, providing investment consulting services to clients.

78.	Individual C was a business associate of JOHN B. OHLE III, the defendant. Individual C became acquainted with OHLE while both worked at Bank A.

34

Individual C was the owner of JDC Group, Inc. In or about February 2002, Individual C became a partner in Dumaine.

79. As part of their efforts to market, sell, and implement HOMER tax shelters, JOHN B. OHLE III, the defendant, other members of Bank A's ISG, and attorneys at J&G agreed to pay referral fees to third parties who referred a client who ultimately entered into a HOMER tax shelter. Generally, the referral fees were paid after the third-party referral sources sent invoices to J&G, leading it to pay the fees to the third parties based on the amounts stated in the invoices. J&G would also issue to the third parties, where appropriate, IRS Forms 1099-MISC, reflecting the payment of the referral fees as non-employee compensation to the third parties. When a referral fee was paid in connection with a particular HOMER tax shelter, it served to reduce the total fee that Bank A would otherwise be paid for that tax shelter. Pursuant to Bank A's code of conduct for employees, ISG members were not permitted to receive or accept referral or third-party fees, either directly or indirectly, in connection with the sale and implementation of the HOMER tax shelters or any other ISG tax strategies.

### Statutory Allegations

80. From in or about 2001 until at least in or about February 15, 2004, in the Southern District of New York and elsewhere, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, together with Douglas Steger and Individual C, co-conspirators not named as defendants herein, and others known and unknown, unlawfully, willfully, and

35

knowingly did combine, conspire, confederate, and agree together and with others to defraud the United States and an agency thereof, to wit, the IRS of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 18, United States Code, Sections 1341 and 1343, and Title 26, United States Code, Section 7201.

### Objects of the Conspiracy

81.  It was a part and object of the conspiracy that, from in or about 2001 through in or about 2004, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, and others, unlawfully, willfully, and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes owed by OHLE, BRADLEY, and others, in relation to their unlawful receipt of referral fee and other income.

82.  It was a further part and object of the conspiracy that, from in or about 2001 through in or about 2004, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, together with others, unlawfully, knowingly, and intentionally having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property from Bank A by means of false and fraudulent pretenses, representations, and promises, to wit (i) the creation and submission of false and fraudulent invoices to the J&G law firm for payment of third-party referral fees to which the purported service providers listed on the invoices were not entitled, in order that J&G would pay said referral fees to the

36

unlawful financial benefit of OHLE, BRADLEY, and others; and (ii) the unlawful diversion and embezzlement of funds belonging to a Client E, a wealthy trust client of OHLE, and for the purpose of executing such scheme and artifice and attempting so to do, would and did place and caused to be placed in the mails various items, and transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes, and e-mails, in violation of Title 18, United States Code, Sections 1341 and 1343.

83.  It was a further part and object of the conspiracy that, from in or about 2001 through in or about 2003, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, and others, unlawfully, willfully, and knowingly, would and did attempt to evade and defeat a substantial part of the income taxes due and owing by OHLE and others, in violation of Title 26, United States Code, Section 7201.

## Means and Methods of the Conspiracy

84.  Among the means and methods used by JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, and their co-conspirators, to achieve the objects of the conspiracy were the following:

I.  **THE FALSE AND FRAUDULENT HOMER REFERRAL FEE INVOICES**

   A.  **The False and Fraudulent HOMER Referral Fee Invoices Related to Douglas Steger**

       a.  In or about December 2001, JOHN B. OHLE III, the defendant,

37