UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br><br>                v.<br><br><br><br>JOHN B. OHLE III and WILLIAM E. BRADLEY,<br><br><br>                    Defendants. | **MEMORANDUM &<br>ORDER**<br><br>S2 08 Cr. 1109 (LBS) |

SAND, J.

On August 11, 2009, the Government filed the Second Superseding Indictment

("Indictment") against Defendant John B. Ohle III ("Ohle") and Defendant William E.

Bradley ("Bradley"). The Indictment, which includes eight counts, charges Ohle and

Bradley with various tax and fraud offenses. The Indictment alleges that between 2001

and 2004, Ohle and various co-conspirators engaged in a massive scheme to cheat the

Government out of over $100 million by causing dozens of United States taxpayers to

engage in fraudulent tax shelter transactions and fraudulently report the results of those

shelters on their tax returns. Ohle is alleged to have formed two conspiracies, charged in

Count One and Count Five. Bradley is only alleged to have been a member of the Count

Five conspiracy.

The Count One conspiracy (the "HOMER conspiracy") charges Ohle and others

with conspiring to defraud the United States and to commit various tax crimes and mail

and wire fraud. Ohle and his co-conspirators are charged with developing and

implementing an allegedly fraudulent tax shelter known as "Hedge Option Monetization of Economic Remainder" ("HOMER").  Ohle, a certified public accountant and attorney, is charged with helping to design, market, and implement HOMER while he was working for a national bank ("Bank A"), which maintained its principal offices in Chicago, Illinois.  The scheme was allegedly designed to eliminate or reduce the amount of U.S. income taxes paid by wealthy clients of Bank A and law firm Jenkens & Gilchrist, P.C. ("J&G").  The scheme generated extraordinary fee income for Bank A, J&G, Ohle, and his co-conspirators.  The Indictment also alleges that Ohle and other members of the Innovative Strategies Group ("ING") at Bank A received bonuses based in part on the amount of fees each generated through their sale of the HOMER tax shelters.  Ohle is charged with substantive tax evasion as to various clients in Count Two (Client D.W.), Count Three (Client C.P.), and Count 4 (Client D.D.).

The Count Five conspiracy, referred to in the Indictment as "The Mail and Wire Fraud and Personal Income Tax Fraud Conspiracy", charges Ohle, Bradley, and co-conspirators Douglas Steger and Individual C with conspiracy to commit fraud.  The conspiracy alleged in Count Five consists of two schemes: the referral fees and Carpe Diem.  The Indictment alleges that as part of an effort to market, sell, and implement HOMER tax shelters, Ohle, other members of Bank A's ISG, and attorneys from J&G agreed to pay referral fees to third parties who referred a client who ultimately entered into a HOMER tax shelter.  Third-party referral sources sent invoices to J&G, who would then pay referral fees to those third parties based on the amounts stated in the invoices. The Indictment alleges that J&G would issue IRS Forms 1099-MISC, when appropriate, to the third parties to reflect the payment of the referral fees as non-employee

compensation to the third parties.  As part of the referral scheme, Ohle is alleged, along with Steger and Bradley, to have prepared fraudulent invoices to obtain referral fees from Bank A, which they were not entitled to receive under the fee arrangement.  Ohle is alleged to have contacted Bradley to prepare invoices for referral fees in connection with Client Group 1's HOMER tax shelter, despite the fact that Bradley performed no services in connection with that deal.  Bradley is also alleged to have prepared fraudulent invoices related to two of Bank A's HOMER clients.

Second, the Carpe Diem scheme alleges that Ohle approached Client E, with whom Ohle had an established business relationship, to invest in Carpe Diem, a Bermuda-based hedge fund for whom Steger was an independent salesman.  Client E invested $7 million in Carpe Diem.  The Indictment alleges that Ohle also met with Client F and Client G, both of whom were HOMER clients of Bank A.  Client F and Client G invested $1 million each in Carpe Diem.  Ohle is alleged to have received a 5% commission on each of the Carpe Diem transactions, even though he told Client E that he would not receive any commission on her investments.  The Indictment also alleges, related to the Carpe Diem fees, that Ohle unlawfully diverted funds from Client E's trust account to be used for Ohle's personal benefit.  When Client E informed Ohle that she and her lawyer wished to discuss the finances of the trust, Ohle, with the assistance of Bradley, replaced a portion of the funds that had been unlawfully diverted from the trust bank account.

In Counts Six and Seven, Ohle is charged with personal tax evasion for the tax years 2001 and 2002, respectively.  Count Eight of the Indictment alleges that Ohle obstructed and impeded the due administration of the internal revenue laws.  With this

background, the Court now addresses Defendant Ohle's and Defendant Bradley's various

pretrial motions. For the purposes of these motions, all of the allegations in the

Indictment are accepted as true.

## I. Discussion

### a. Use of the Mail Fraud Statute (Count One)

Ohle argues that Count One of the indictment impermissibly uses the wire fraud

statute to reach an alleged criminal tax conspiracy, citing *United States v. Henderson*, 386

F. Supp. 1048 (S.D.N.Y. 1974). *Henderson* held that the mail fraud statute (the scope of

which is identical to the wire fraud statute, *United States v. Schwartz*, 924 F.2d 410, 417

(2d Cir. 1991)), was not intended to reach cases of alleged tax evasion and was

superseded by the comprehensive system of penalties Congress later enacted in the

Internal Revenue Code. *Henderson*, 386 F. Supp. 1048. Though it has never explicitly

disapproved *Henderson*, the Court of Appeals for the Second Circuit has recently stated

that "*Henderson*—which other circuits have rejected, . . . provides weak authority for the

proposition that schemes aimed at defrauding the government of taxes do not fall within

the scope of the mail and wire fraud statutes." *Fountain v. United States*, 357 F.3d 250,

258 (2d Cir. 2004).[1]  We agree with the many courts of appeals[2] and courts within this

---

[1] *See also United States v. DeFiore*, 720 F.2d 757 (2d Cir. 1983) (distinguishing *Henderson* in prosecution for wire fraud where state tax laws were violated, and noting that the Court of Appeals for the Ninth Circuit had rejected *Henderson*), *cert. denied*, 466 U.S. 906 (1984); *United States v. Mangan*, 575 F.2d 32, 49 (2d Cir.) (distinguishing *Henderson* in prosecution for wire fraud and federal tax evasion), *cert. denied*, 439 U.S. 931 (1978).

[2] *See, e.g.*, *United States v. Dale*, 991 F.2d 819, 849 (D.C. Cir. 1993) (rejecting *Henderson* in prosecution for wire fraud and federal tax evasion); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1187 n.13 (4th Cir. 1982) (rejecting *Henderson* in prosecution for mail and wire fraud and making false claims to the government), *cert. denied*, 459 U.S. 1105 (1983), *overruled in nonrelevant part by Busby v. Crown Supply, Inc.*, 896 F.2d 833, 841 (4th Cir. 1990); *United States v. Shermetaro*, 625 F.2d 104, 110-11 (6th Cir. 1980) (rejecting *Henderson* in prosecution for conspiracy to defraud the United States and federal tax evasion); *United States v. Weatherspoon*, 581 F.2d 595, 599-600 (7th Cir. 1978) (distinguishing *Henderson* in prosecution for mail fraud and making false statements to the government); *United States v. Miller*, 545 F.2d 1204, 1216 n.17 (9th Cir. 1975) (rejecting *Henderson* in prosecution for mail fraud and federal tax

District[3] that have declined to follow *Henderson*. Ohle's motion to dismiss the wire

fraud allegations is denied.[4]

### b. Duplicity (Count Five)

Ohle and Bradley both move to dismiss Count Five as duplicitous. An

indictment is duplicitous if it joins two or more distinct crimes in a single count. *United*

*States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). Duplicitous pleading is not

presumptively invalid; rather, it is impermissible only if it prejudices the defendant.

*United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006). Duplicity is only properly

invoked when a challenged indictment affects one of the doctrine's underlying policy

concerns: (1) avoiding the uncertainty of a general guilty verdict, which may conceal a

finding of guilty as to one crime and not guilty as to other, (2) avoiding the risk that

---

evasion), *cert. denied*, 430 U.S. 930 (1977), *overruled on other ground by*, *Boulware v. United States*, 552 U.S. 421 (2008); *see also United States v. LaBar*, 506 F. Supp. 1267, 1274 (M.D. Pa. 1981) (distinguishing *Henderson* in prosecution for mail fraud and making false statements to the government), *aff'd mem.*, 688 F.2d 826 (3d Cir.), *cert. denied*, 459 U.S. 945 (1982).

[3] *See United States v. Regan*, 713 F. Supp. 629 (S.D.N.Y. 1989) (upholding inclusion of mail fraud allegations charging tax fraud as RICO predicates); *United States v. Standard Drywall Corp.*, 617 F. Supp. 1283, 1295-96 (S.D.N.Y. 1985) (noting that "[a]lthough never rejected by the Second Circuit, *Henderson* has not carried the day in that court either"); *United States v. Abrahams*, 493 F. Supp. 296 (S.D.N.Y. 1980) (noting *Henderson*'s rejection by other courts and refusing to hold that the Commodity Futures Trading Commission Act had implicitly repealed in part the mail and wire fraud statutes). *But see United States v. Gallant*, 570 F. Supp. 303, 309 (S.D.N.Y. 1983) (following *Henderson* in disallowing dual prosecution for mail and wire fraud and copyright violations), *abrogated on other grounds by Dowling v. United States*, 473 U.S. 207 (1985).

[4] Ohle also argues that, even if the conspiracy to commit wire fraud allegations are upheld, the Government is not authorized to seek criminal forfeiture based on the proceeds of a conspiracy to commit wire fraud. However, this argument is based on a misreading of the complex statutory scheme at issue. 28 U.S.C. § 2461(c) allows the Government to seek criminal forfeiture when a defendant is charged with an offense for which any form of forfeiture is authorized. 18 U.S.C. § 981(a)(1)(c) authorizes civil forfeiture for "any offense constituting 'specified unlawful activity' (as defined in 18 U.S.C. § 1957(c)(7) of this title), or a conspiracy to commit such offense." "Specified unlawful activity" is defined by § 1957(c)(7) to include offenses listed in the federal RICO statute, 18 U.S.C. § 1961(1). Lastly, § 1961(1)(b) includes wire fraud within the definition of "racketeering activity." Ohle's argument fails to consider the phrase "or a conspiracy to commit such offense" in § 981(a)(1)(c), which has the effect of allowing criminal forfeiture of the proceeds of a conspiracy to commit wire fraud. *See United States. v. Evanson*, No. 05 Cr. 00805 (TC), 2008 WL 3107332, at *1 (D. Utah Aug. 8, 2008) ("[P]ursuant to Section 2461(c), the government may seek the criminal forfeiture of the proceeds of conspiracy to commit mail fraud and wire fraud if the indictment alleges those offenses."). The Government, therefore, is authorized to seek criminal forfeiture of the proceeds of a conspiracy to commit wire fraud, and Ohle's motion to dismiss the forfeiture allegations is denied.

jurors may not have been unanimous as to any one of the crimes charged, (3) assuring the

defendant has adequate notice of charged crimes, (4) providing the basis for appropriate

sentencing, and (5) providing the adequate protection against double jeopardy in

subsequent prosecution. *Olmeda*, 461 F.3d at 281 (*citing United States v. Margiotta*, 646

F.2d 729, 732-33 (2d Cir. 1981)).

The Court of Appeals for the Second Circuit has recognized that application of

the duplicity doctrine to conspiracy indictments presents "unique issues." *United States*

*v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980). In this Circuit, "it is well established that

[t]he allegation in a single count of a conspiracy to commit several crimes is not

duplicitous, for [t]he conspiracy is the crime and that is one, however diverse its objects."

*Aracri*, 968 F.2d at 1518 (internal citations and quotations omitted). "A single

conspiracy may be found where there is mutual dependence among the participants, a

common aim or purpose or a permissible inference from the nature and scope of the

operation, that each actor was aware of his part in a larger organization where others

performed similar roles equally important to the success of the venture." *United States v.*

*Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989). Each member of the conspiracy is not

required to have conspired directly with every other member of the conspiracy; a member

need only have "participated in the alleged enterprise with a consciousness of its general

nature and extent." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989). If the

Indictment on its face sufficiently alleges a single conspiracy, the question of whether a

single conspiracy or multiple conspiracies exists is a question of fact for the jury.

*Vanwort*, 887 F.2d at 383; *see also United States v. Szur*, No. S5 97 CR 108 (JGK), 1998

WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998). Accordingly, courts in this Circuit have

repeatedly denied motions to dismiss a count as duplicitous. *See United States v. Nachamie*, 101 F. Supp. 2d 134, 153 (S.D.N.Y. 2000) (collecting cases).

Bradley, pointing to *United States v. Muñoz-Franco*, 986 F. Supp. 70 (D.P.R. 1997), argues that Count Five is duplicitous on its face. We find Judge Rakoff's decision in *United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996), to be more instructive in this case.[5] In *Gabriel*, Judge Rakoff found that, although the count at issue contained boilerplate allegations of a single conspiracy, the subsequent paragraphs in the count were more consistent with two conspiracies than a single conspiracy. *Gabriel*, 920 F. Supp. at 503. As in *Muñoz-Franco*, the paragraphs describing the overt acts in the *Gabriel* Indictment were divided into two distinct sets. *Id.* at 503; *Muñoz-Franco*, 986 F. Supp. at 71. Finding that "on any but a superficial reading, [the Government] appears to actually allege two distinct conspiracies[,]" Judge Rakoff stated that if it were within his power he would dismiss the count at issue as duplicative. *Gabriel*, 920 F. Supp. at 504-05. "But the Court of Appeals has repeatedly cautioned that the determination of whether a conspiracy is single or multiple is an issue of fact 'singularly' well suited to determination by a jury." *Id.* Therefore, Judge Rakoff held that "[g]iven Count Six's boilerplate allegations of a single conspiracy, the Court cannot conclude on the basis of the pleadings alone that there is no set of facts falling within the scope of Count Six that could warrant a reasonable jury in finding a single conspiracy." *Id.*

---

[5] The Second Circuit has repeatedly emphasized that the determination of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury. *See United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995); *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990); *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989). Not only is *Gabriel* from this Circuit, but unlike the court in *Muñoz-Franco*, Judge Rakoff discusses the strong preference for juries to determine the question of whether multiple or single conspiracies exist and how this preference affects the pleading requirements. *See Gabriel*, 920 F. Supp. at 504-05.

Similarly, in the case at bar, Count Five contains "boilerplate allegations" of a single conspiracy. The Indictment alleges, "From in or about 2001 until at least in or about February 15, 2004, in the Southern District of New York and elsewhere, JOHN B. OHLE III, and WILLIAM BRADLEY, the defendants, together with Douglas Steger and Individual C, co-conspirators not named as defendants herein, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with others to defraud the United States and an agency thereof, to wit, the IRS of the United States Department of Treasury, and to commit offenses against the United States, to wit, violation of Title 18, United States Code, Section 1341 and 1343, and Title 26, United States Code, Section 7201." Indictment ¶ 80. Count Five then describes the two schemes involved: the referral fee fraud and Carpe Diem.

The Indictment's subsequent description of the overt acts indicates that Count Five may consist of multiple conspiracies. But, as in *Gabriel*, Count Five survives the facial test. The Government alleges that Bradley and Ohle, along with co-conspirators, are accused of participating in a conspiracy to "steal money by fraud, [and] pay no taxes." (Gov't Opp. 47.) The Indictment alleges that both schemes sought to obtain money through fraud, and, thereafter, defrauded the IRS by concealing those ill-gotten gains. Both schemes occurred at the same time—between mid-November 2001 and February 2002.[6] (Gov't Opp. 44.) Ohle is alleged to have participated in all the Count Five schemes. But, contrary to Defendants' argument, Ohle was not the only member of

---

[6] The only act alleged to have occurred prior to November 2001 is the embezzlement of Client E's trust, which the Indictment alleges began as early as 2000 and continued through 2003. Indictment ¶¶103-04. The fact that the embezzlement occurred over a significantly broader period of time than the referral fee fraud and the Carpe Diem fraud does not render it a distinct conspiracy. In *Gabriel*, the two conspiracies did not overlap in time at all, as the second set of criminal acts sought to cover up the first set. *Gabriel*, 920 F. Supp. at 503-04.

the conspiracy alleged to have participated in multiple frauds. Steger and Bradley are both alleged to have submitted false invoices to J&G as part of the referral fee fraud. Indictment ¶¶ 84, 85. Bradley is alleged to have shared his proceeds with Individual C, who was owed legitimate referral fees. Ohle urged Individual C "to take care of" Bradley; Individual C then gave Bradley a check for $4,000. Indictment ¶92. Ohle and Steger are also alleged to have obtained funds from three different clients through investments in the Carpe Diem hedge fund. Indictment ¶¶95-102. One of these clients was Client E. Ohle is alleged to have misappropriated almost $350,000 of Client E's funds, which had been run through Carpe Diem. After Client E began to make inquiries regarding his investment, Ohle enlisted Bradley to replace a portion of the funds that had been misappropriated. Indictment ¶104.

Bradley's role in aiding Ohle to replace a portion of Client E's funds, which had been unlawfully diverted, alleges a "mutual dependence and assistance" across the schemes. *See Vanwort*, 887 F.2d at 383. Individual C's payment to Bradley shows that each individual submitting invoices was not acting in a vacuum. Given that the two frauds occurred at the same time and had common participants, and that compensation was paid amongst the co-conspirators (not just between co-conspirators and Ohle) and across the two frauds, we find that the Indictment alleges a single conspiracy on its face. Furthermore, proceeding on the current Count Five would not undermine any of the policies underlying the duplicity doctrine.[7] *See Margiotta*, 646 F.2d at 732-33. Defendants' motion to dismiss Count Five as duplicative is denied.

---

[7] Courts have noted that much of the risk of prejudice created by a potentially duplicative charge can be cured through proper instructions at trial. *See Szur*, 1998 WL 132942, at *11 (Defendants "may properly request a multiple conspiracies jury instruction depending upon the evidence presented at trial."); *Murray*, 618 F.2d at 898 ("As we have stated in a related context, '(i)t is assumed that a general instruction on the

### c.   Severance

Federal Rule of Criminal Procedure 8(a) permits joinder of offenses if the offenses charged are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  Rule 8(b) permits joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendant may be charged in one or more counts together or separately.  All defendants need not be charged in each count."  Fed. R. Crim. P. 8(b).  Even if joinder is proper under Rule 8, a court may still sever pursuant to Rule 14(a) if it appears joinder would prejudice a defendant or the government.  Fed. R. Crim. P. 14(a).  "For reasons of economy, convenience and avoidance of delay, there is a preference in the federal system for providing defendants who are indicted together with joint trials."  *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003).

### i.   Count Five

Bradley and Ohle both move to sever Count Five of the Indictment.  "Though Rule 8(a) addresses joinder of offenses and Rule 8(b) concerns joinder of defendants, when a defendant in a multi-defendant action challenges joinder, whether of offenses or defendants, the motion is construed as arising under Rule 8(b)."[8]  *United States v. Stein*, 428 F. Supp. 2d. 138, 141 (S.D.N.Y. 2006); *see United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988).  The Court of Appeals for the Second Circuit has explained that a

---

requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.'").

[8] This Circuit is currently divided on whether Rule 8(a) or Rule 8(b) governs when a defendant in a multi-defendant case seeks to sever a count in which only he or she is charged.  *See United States v. Shellef*, 507 F.2d 82, 97 n.12 (2d Cir. 2007).  But what is clear is that when a defendant, such as Bradley, seeks to sever a count in which he and another defendant are charged, we apply Rule 8(b).  *See United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988).

"'series' exists if there is a logical nexus between the transactions." *United States v. Joyner*, 201 F.3d 61, 75 (2d Cir. 2001). Unlike Rule 8(a), "Rule 8(b) does not permit joinder of defendants solely on the ground that the offenses charged are of 'the same or similar character.'" *Turoff*, 853 F.2d at 1042. Joinder is proper only when the charged offenses are either (1) "unified by some substantial identity of facts or participants," or (2) "arise out of a common plan or scheme." *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989); *see also Feyrer*, 333 F.3d at 114; *Lech*, 161 F.R.D. at 256. We take "a common sense approach when considering the propriety of joinder under Rule 8(b)," *Feyrer*, 333 F.3d at 114, and ask whether "a reasonable person would easily recognize the common factual elements that permit joinder." *Turoff*, 853 F.2d at 1044. Determining whether joinder of two conspiracies is permitted often requires a fact specific analysis. *See United States v. Reinhold*, 994 F. Supp. 194, 199 (S.D.N.Y. 1998) (collecting cases).

The Government's most persuasive argument that the two conspiracies have a common purpose is found in its Surreply: "A significant aspect of implementation [of the HOMER conspiracy] involved Ohle's recruitment and funding of a nominee, or puppet, in the form of Individual A, whose third-party role Ohle needed to fund in order to make the HOMER tax shelter work. Ohle generated that funding through his scheme to obtain HOMER client referral fees, and other client fees, by fraud—the core aspects of Count Five." (Gov't Surreply 7.) The problem, though, is that these facts are not alleged in the Indictment. The Indictment alleges that "OHLE embezzled funds from a client, 'Client E,' and used some of the money to fund Individual A's participation in the HOMER tax shelter. In addition, OHLE obtained by fraud from Bank A referral fees related to the

HOMER tax shelter, the majority of which OHLE kept." Indictment ¶74. Based on the Indictment, Count Five is only alleged to have had a minor role in financing the HOMER conspiracy. Additionally, the money allegedly transferred to Individual A was related to Carpe Diem not to the referral fee scheme. Therefore, based on the language of the Indictment, we read Count Five to allege a conspiracy to commit fraud in order to obtain money—some of which was diverted to Individual A in order to fund his role in the HOMER conspiracy.

Courts have upheld joinder in situations where the criminal acts of one offense helped to finance the criminal acts of another offense. *See Turoff*, 853 F.2d at 1037; *United States v. Catapono*, 05 Cr. 229, 2008 WL 3992303 (E.D.N.Y. Aug. 28, 2008). In *Turoff*, the Court found that a "quid pro quo was exchanged between [the] participants," and that "these financial benefits were part and parcel of the tax fraud." *Turoff*, 853 F.2d at 1044. The court emphasized that "there is a key link between the two offenses—one scheme stemmed from the other—and that link provides a sound basis for joinder under Rule 8(b)." *Turoff*, 853 F.2d at 1044. Ohle is alleged to have used only a portion of the funds embezzled from Client E to finance Individual A's role in the HOMER conspiracy. The transfer of funds to Individual A's account does not provide a "key link" between the two conspiracies; rather, it appears to be an ancillary aspect of the Count Five conspiracy.

In *United States v. Lech*, then Judge Sotomayor found that "*Turoff* stands for the proposition that [defendants] may be tried together because they had specific knowledge of each other's activities, jointly participated in many of the acts alleged in the Indictment, and used that knowledge and participation as a springboard for the [other alleged offenses]." *Lech*, 161 F.R.D. at 257. The Indictment does not allege that Bradley

had any knowledge of the HOMER conspiracy or the transfer of funds to Individual A.[9]

Knowledge of the other conspiracy is not required, but it is an indicator of whether or not

there is a common scheme or purpose. *See United States v. Menashe*, 741 F. Supp. 1135,

1139 (S.D.N.Y. 1990) ("O'Toole's plan cannot be called 'common', since he is the only

one alleged to be aware of it. . . . .").

Furthermore, the referral fees scheme's object—to fraudulently obtain fees from

Bank A, a co-conspirator in the HOMER conspiracy—demonstrates that it did not have a

common purpose with the HOMER conspiracy. In *United States v. Rojas*, S4 01 Cr. 251

(AGS), 2001 WL 1568786 (S.D.N.Y. Dec. 7, 2001), the court found that a common

scheme could not exist where the goals of the conspiracy were antagonistic. In *Rojas*, the

Count One conspiracy, known as the LRO, sought to sell narcotics for financial gain, and

the Count Two conspiracy sought to rob the Count One conspiracy of its narcotics and

sell the stolen drugs for their own financial gain. The two conspiracies had at least one

defendant in common. The court concluded that the conspiracies did not have a common

goal and the similarity of facts did not support joinder. *Rojas*, 2001 WL 1568786, at *5

("[T]heir goals were antagonistic: for the Count Two Conspiracy to succeed, it would

have to harm the LRO by stealing the LRO's drugs.").

---

[9] In oral argument, the Government stated that "Mr. Bradley's own words in a deposition, which we will
seek to have admitted at trial, show that he had knowledge of aspects of the Count One conspiracy, that he
knew about the transaction, that he knew about the trust aspect of it, and that he knew that he was required
to profess that he had done legal services in connection with that transaction in order to get referral fees."
(Tr. at 51.) Although the Court of Appeals for the Second Circuit has not directly addressed the question of
whether joinder must be decided on the face of the Indictment, the Court recently "caution[ed] that the
plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations not
contained in the indictment." *United States v. Rittweger*, 524 F.3d 171, 178 n.3 (2d Cir. 2008). Regardless,
the proffered evidence would not alter our conclusion. At most, this evidence suggests that Bradley might
have had some knowledge of the illegality of HOMER. In *Lech*, the court found that the defendant had
"very little, if any, knowledge of the other schemes, and did not participate in them." *Id.* at 257. Similarly,
even if Bradley's deposition testimony would show some knowledge of HOMER, his knowledge of its
purpose appears to be marginal, if it existed at all, and there are no allegations that he had any role in that
conspiracy.

Although the instant case only involves defrauding a single co-conspirator, as opposed to the conspiracy as a whole, the referral fee scheme undermined the HOMER conspiracy by defrauding one of its co-conspirators.  In *United States v. Kouzmine*, 921 F. Supp. 1131 (S.D.N.Y. 1996), Judge Kaplan noted that because the two defendants had a falling out prior to the second conspiracy, "there is no colorable argument" that the two conspiracies were part of one single overarching scheme.  *Id.* at 1133.  In the instant case, the referral scheme's object of defrauding a HOMER co-conspirator of its financial gain from that conspiracy, demonstrates an animosity between the two schemes, analogous to the falling out in *Kouzmine*.

Nor do we find that the conspiracies are unified by a "substantial identity of facts or participants."  *Attanasio*, 870 F.2d at 815.  "It is well settled . . . that two separate transactions do not constitute a series within the meaning of Rule 8(b) merely because they are of a similar character or involve one or more common participants."  *Lech*, 161 F.R.D. at 256; *see also United States v. Van Berry*, No. 04 Cr. 269 (JBS), 2005 WL 1168398, at *5 (D.N.J. May 18, 2005) ("That the same participants were involved in crimes of a separate nature, however, (or at the very least that the defendants believed the same participants were involved in separate crimes) is not sufficient to connect otherwise distinct crimes."); *United States v. Giraldo*, 859 F. Supp. 52, 55 (E.D.N.Y. 1994) ("[D]efendants charged with two separate—albeit similar—conspiracies having one common participant are not, without more, properly joined.").

The Government argues that the two conspiracies share a substantial identity of similar facts because both conspiracies involve the HOMER tax shelter.  The Government further argues that if Count Five is severed, it will be forced to prove the

HOMER tax shelter twice.  We do not agree.  Severance of Count Five will not force the Government to prove "essentially the same facts" more than once.  *See Shellef*, 507 F.2d at 99-100.  The HOMER tax shelter plays an important role in both conspiracies but in different capacities.  The Government will need to provide evidence of HOMER to contextualize Count Five but it will not have to prove HOMER's illegality.  In trying the HOMER conspiracy, the Government will likely devote a substantial amount of time to the issue of the legality of the tax shelter, dissecting how HOMER worked and the role Ohle played in developing and operating it.  In contrast, the Government could prove its entire burden in Count Five—the fraud perpetrated through the referral fee scheme, the Carpe Diem scheme, and the embezzlement of Client E's funds—without ever proving or alleging the illegality of the HOMER tax shelter.

In the instant case, the similarity between the two conspiracies is marginal.  The courts in this Circuit have consistently required a far more substantial connection.  *See United States v. Butler*, No. S1 04 Cr. 340 (GEL), 2004 WL 2274751, at *4 (S.D.N.Y. Oct. 7, 2004) (finding the facts involved in the two counts to be "so closely connected that proof of the very same facts is necessary to establish each of the joined offenses"); *United States v. Ferrarini*, 9 F. Supp. 2d 284, 292 (S.D.N.Y. 1998) (finding a substantial connection because "evidence of those activities—and their unlawful nature—would be necessary at a separate trial on the false statement charges to prove the falsity of the defendants' statements that they were not engaged in fraudulent activity").  The most significant common factor is the HOMER tax shelter, but the fact that the Count Five conspiracy sought to steal proceeds from the HOMER conspiracy significantly decreases the relevance of this factor.  *See Rojas*, 2001 WL 1568786, at *5 (finding that the

antagonistic nature of the two conspiracies negated the significance of the fact that they involved the same narcotics). We find that the two conspiracies do not have a common scheme or plan, nor do they share a substantial identity of facts and participants; Defendants' motion to sever Count Five[10] is granted. [11]

### ii.   Severance of Counts Six through Eight

Ohle also seeks to sever Counts Six through Eight. Counts Six and Seven charge Ohle with personal tax evasion in 2001 and 2002, respectively. Count Eight charges Ohle with obstructing and impeding the due administration of the Internal Revenue laws pursuant to 26 U.S.C. § 7212(a). As we have already severed Count Five, Ohle is the only defendant remaining in the Indictment. Therefore, Rule 8(a) governs the question of whether Counts Six through Eight are properly joined with Counts One through Four. Rule 8(a), unlike Rule 8(b), permits joinder solely on the ground that the offenses charged are "of the same or similar character." Fed. R. Crim. P. 8(a); *see Turoff*, 853 F.2d at 1042.

Ohle's challenge to the joinder of Count Eight is without merit. Ohle is charged with obstructing and impeding the administration of the Internal Revenue laws through

---

[10] Ohle moves the Court to order a severance of Defendants pursuant to Rule 14. Ohle argues under *Bruton v. United States*, 391 U.S. 123 (1968), that he will be prejudiced by the admission of Bradley's proffer agreement. The Government has stated that it would redact the proffer agreement in order to ensure that it would not prejudice Ohle, including redacting any mentions of Ohle's name. Ohle protests that no such proposed redacted version of the agreement has been supplied. Prior to admission, the Court will inspect any proposed proffer agreement. If the proffer agreement cannot be adequately redacted in order to ensure that it does not unfairly prejudice Ohle, than the Court will exclude it. Ohle's motion to sever Defendants is denied.

[11] Ohle and Bradley both argue that the wire fraud allegations in Count Five should be dismissed because they fail to state a legally cognizable claim. These arguments rely heavily on the issue of repugnance, which is moot as the Court has severed Count Five. To the extent that issues remain as to whether Bank A had a property right in the referral fees, we need not reach that issue at this point. To find in Defendants' favor on this issue, the Court would have to determine that the HOMER tax shelter is illegal; and, therefore, any right Bank A had to the referral fees was based on an illegal agreement. This determination is not one the Court can or should make at this juncture. Defendants' motion to dismiss the mail and wire fraud allegations in Count Five is denied.

the design and implementation of the HOMER tax shelter.  Without question Count Eight is "based on the same act or transaction" as Counts One through Four.  Fed. R. Crim. P. 8(a).  Therefore, Count Eight is properly joined.

With regard to severing Counts Six and Seven, we find this to be a close question. "[T]ax counts can properly be joined with non-tax counts where it is shown that the tax offenses arose directly from the other offenses charged."  *Turoff*, 853 F.2d at 1043; *see also Shellef*, 507 F.3d at 87-88.  "The most direct link possible between non-tax crimes and tax fraud is that funds derived from non-tax violations either are or produce the unreported income."  *Turoff*, 853 F.2d at 1043.  "However, if the character of the funds derived do not convince us of the benefit of joining these two schemes in one indictment, other overlapping facts or issues may."  *Id.* at 1043-44.

The Government has alleged a relationship between the unreported income in Counts Six and Seven and the HOMER conspiracy proceeds.  However, the Government relies on allegations outside of the Indictment.  Although the Court of Appeals for the Second Circuit has not directly confronted the question of whether joinder must be decided on the face of the Indictment, the Court recently "caution[ed] that the plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations not contained in the indictment, just as the language of the Rule does not allow for the consideration of evidence at trial."  *United States v. Rittweger*, 524 F.3d 171, 178 n.3 (2d Cir. 1998).  Accordingly, we find that the Government's allegations regarding the relationship between the unreported income and the HOMER conspiracy proceeds cannot justify joinder.

17

Counts Six and Seven are alleged to be objects of the Count Five conspiracy. The unreported income includes money Ohle received from the referral fee fraud and Carpe Diem. (Gov't Mem. 72.) Thus, there is a "direct link" between the unreported income in Counts Six and Seven and the proceeds of the Count Five conspiracy. *See Turoff*, 853 F.2d at 1043. Given the close nexus between Counts Five, Six ,and Seven, we conclude that Counts Six and Seven should also be severed.

Defendants' motion to sever is granted as to Counts Five, Six, and Seven and denied as to Count Eight.

### d. Statute of Limitations

#### i. Count One

The applicable limitations period for a wire fraud conspiracy charge is generally five years. 18 U.S.C. § 3282; *see United States v. Scop*, 846 F.2d 135, 138 (2d Cir. 1988). However, "if the offense affects a financial institution," then a ten-year statute of limitations applies. 18 U.S.C. § 3293(2); *see United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998). Ohle does not contest that Bank A is a financial institution within the meaning of the statute. Rather, Ohle argues that §3293(2) does not apply because Bank A was an active participant in the fraud, not the object of the fraud, and not directly affected by the fraud.

In *United States v. Serpico*, 320 F.3d 691, (7th Cir. 2003), the Seventh Circuit specifically rejected the defendant's argument that a financial institution is not "affected" if it is an active participant in the offense. *Serpico*, 320 F.3d at 695. The Court concluded that the financial institution's active participation in the scheme did not negate the effect on the institution. *Id.* ("[W]e find it hard to understand how a bank that was put

18

out of business as a direct result of the scheme was not 'affected,' even if it played an active part in the scheme."). Ohle attempts to distinguish *Serpico*, by limiting the holding to apply only when the financial institution is both the object of the scheme to defraud and a participant in the scheme. (Ohle Reply Memo. 6-7, n.1.)

The statute applies a ten year period of limitations if the offense "affects" a financial institution. 18 U.S.C. § 3293(2). This Circuit has found that this language is to be read broadly. *See Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) ("[T]he statute is clear: it broadly applies to any act of wire fraud 'that affects a financial institution.'"). In *United States v. Bouyea*, the Court of Appeals for the Second Circuit found that the statute was applicable to a wholly owned subsidiary where the parent company, but not the subsidiary, was a financial institution. *Bouyea*, 152 F. 3d at 195. The Second Circuit rejected the defendant's argument that "the defrauding of a financial institution's subsidiary—leading to a reduction of the financial institution's assets—is insufficient as a matter of law to meet the 'affect[ing] a financial institution' requirement of §3293(2)." *Id.* In reaching this conclusion, the Court extensively quoted the Third Circuit's reasoning in *United States v. Pellulo*, 964 F.3d 193 (3d Cir. 1992). *Id.* Notably, *Bouyea* quotes the Third Circuit's conclusion that "[the defendant's] argument would have more force if the statute provided for an extended limitations period where the financial institution is the object of fraud. Clearly, however, Congress chose to extend the statute of limitations to a broader class of crimes." *Id.* (*quoting Pellulo*, 964 F.2d at 216).

*Bouyea* "easily reject[s]" the argument that the financial institution must be the object of fraud, requiring, instead, that the effect on the financial institution be "sufficiently direct." *Bouyea*, 152 F.3d at 195. The effect on Bank A was direct. Ohle

and his co-conspirators are alleged to have used Bank A to perpetrate the HOMER tax shelter "through the Bank's ostensible backing of the transaction, the use of its subsidiary as the 'trustee' in each HOMER shelter, and the use of Bank funds." (Gov't Opp. 16.) As Ohle argues himself, Bank A was an active participant in the fraud. As a result of this participation, Bank A was not only exposed to substantial risk but experienced actual losses. *Id.* Bank A paid over $24,000,000 in settlements to HOMER clients and over $4,200,000 in attorneys' fees defending the suits. *Id.* Ohle's argument that this effect is too remote is unpersuasive. In using Bank A as a central player in the HOMER conspiracy, Ohle and his co-conspirator's knew they were exposing it to risk if their fraud was uncovered. "[T]he whole purpose of §3293(2) is to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes." *Serpico*, 329 F.3d at 694-95. Through his alleged use of Bank A in the HOMER conspiracy, Ohle put Bank A at substantial risk. This risk resulted in millions of dollars of losses for the financial institution, and the losses were a direct and foreseeable result of the HOMER conspiracy. We find the ten year statute of limitations applies,[12] and Ohle's motion to dismiss Count One as time-barred is denied.[13]

### ii. Counts Two, Four, and Six

Ohle contends that Counts Two, Four and Six are also time-barred. Pursuant to Section 6531(2), a six year statute of limitations period is applicable to tax evasion

---

[12] We need not address the Government's additional arguments that Count One is timely, having concluded that the ten-year statute of limitations applies.

[13] Defendants also challenge Count Five as time-barred. The ten year statute of limitations also applies to Count Five. Bank A was the object of the referral fee scheme. (Gov't Opp. 48.) This scheme is alleged to have defrauded Bank A of over a million dollars. *Id.* Therefore, the Count Five conspiracy, which in part sought to defraud Bank A of money through the fraudulent referral fee scheme and did, in fact, defraud the bank of over a million dollars, affects a financial institution within the meaning of Section 3293(2). *See Bouyea*, 152 F.3d at 195; *Serpico*, 320 F.3d at 695.

offenses. 26 U.S.C. § 6531(2). The period begins to run upon the filing of the tax returns that underlie those counts. *See United States v. Habig*, 390 U.S. 222, 223 (1968). The initial indictment in this case was returned on November 13, 2008. The returns at issue were filed approximately six years and one month prior to the Indictment: October 17, 2002 (Count Two), October 21, 2002 (Count Four) and October 16, 2002 (Count Six). *See* Indictment ¶¶ 38, 70, 107. Section 6531 provides for a tolling of the limitations period for the time "during which the person committing any of the various offenses arising under the internal revenue laws is outside the United States or is a fugitive from justice." 26 U.S.C. § 6531. The tolling provision is applicable even if the defendant is outside of the country for business or pleasure trips. *United States v. Myerson*, 368 F.2d 393, 395 (2d Cir. 1966); *see also United States v. Marchant*, 774 F.2d 888, 892 (8th Cir. 1985). The Government states that it will prove at trial that Ohle spent at least two months outside of the country, which would result in the counts at issue being timely. Ohle's motion to dismiss Counts Two, Four and Six as time-barred is denied.

### iii.  Count Eight

Title 26, United States Code, Section 6531 sets forth the periods of limitation for criminal tax prosecutions. *See* 26 U.S.C. § 6531. The statute provides that, in general, criminal tax proceedings must be initiated within three years of the offense, but it carves out eight exceptions for which the statute of limitations is six years. *Id.* Section 6531(6) provides a six year statute of limitations "for the offense described in section 7212(a) (relating to intimidation of officers and employees)." 26 U.S.C. §6531 (6). Ohle urges a literal reading of the statute, which would apply the six year statute of limitations to

violations of Section 7212(a) related to intimidation of officers and employees but not to omnibus clause violations of 7212(a).

Numerous circuits have applied the six year statute of limitations to the omnibus clause of Section 7212(a). *See United States v. Kassouf*, 144 F.3d 952, 959 (6th Cir. 1998) ("There is nothing to indicate that Congress intended the parenthetical to be limiting rather than merely descriptive of § 7212(a). Similar parentheticals in other statutes have also been found to be descriptive rather than limiting."); *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997) (applying, without discussion, the six year period of limitations to the alleged violation of the omnibus clause of § 7212(a)); *United States v. Workinger*, 90 F.3d 1409, 1414 (9th Cir. 1996) ("In short, the structure of § 6531 makes it apparent that the parenthetical language in § 6531(6) is descriptive, not limiting."). In *United States v. Kelly*, this Circuit found that the district court's application of the six year period of limitations to an omnibus clause violation of Section 7212(a) was not plain error. *Kelly*, 147 F.3d 172, 177 (2d Cir. 1998). We find no reason to diverge from the persuasive reasoning of the courts that have previously addressed this issue.[14] Accordingly, we find that the six year period of limitations should be applied to the alleged violation of the omnibus clause of Section 7212(a). Ohle's motion to dismiss Count Eight as time-barred is denied.

---

[14] Ohle cites only one case where a court has declined to apply 6531(6) to omnibus violations of Section 7212(a). (Ohle Mem. 23-4); *see United States v. Connell*, No. CR-F 94-5052 (REC) (E.D. Cal., Feb. 6, 1995). Ohle does not cite specifically to *Connell*, nor the court's reasoning, but rather to the discussion of *Connell* in *United States v. Brennick*, 908 F. Supp. 1004 (D. Mass. 1995). *Brennick* declined to follow *Connell*, saying that the court "appeared to assume" that 6531(6) applied only to intimidation offenses. *Brennick*, 908 F. Supp. at 1017. *Connell* predates the Ninth Circuit decision in *Workinger*, where the Court found that the six year period of limitations did, in fact, apply to omnibus violations of Section 7212(a). *Workinger*, 90 F.3d at 1414.

### e. Venue

Defendants Ohle and Bradley allege that venue is not proper in the Southern District of New York and move to dismiss Count Five. Ohle also moves to dismiss the substantive tax offenses—Counts Two, Three, Four, Six and Seven—for lack of venue. The United State Constitution provides that a defendant has the right to trial in "the district wherein the crime shall have been committed." U.S. Const., Amend. VI.; *see also United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir.1989). Where "the acts constituting the crime and the nature of the crime charged implicate more than one location, venue is properly laid in any of the districts where an essential conduct element of the crime took place." *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005). The Government bears the burden at trial of proving venue by a preponderance of the evidence. *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1989). When the defendant is charged with more than one count, venue must be proper to each count. *Beech-Nut Nutrition Corp.*, 871 F.2d at 1188.

The Government need only allege that criminal conduct occurred within the venue, "even if phrased broadly and without a specific address or other information," in order to satisfy its burden with regard to pleading venue. *United States v. Bronson*, No. 05 Cr. 714 (NGG), 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007); *see also United States v. Szur*, 97 Cr. 108 (JGK), 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998). In each count of the Indictment, the Government alleges that the offenses occurred "in the Southern District of New York and elsewhere." *See* Indictment ¶¶ 40, 55, 72, 80, 107, 109. These allegations alone are sufficient to survive a pretrial motion to dismiss.[15] The

---

[15] *See Bronson*, 2007 WL 2455138, at *4 ("The Superseding Indictment alleges facts sufficient to support venue because it alleges that the criminal activity occurred 'within the Eastern District of New York and

question of whether there is sufficient evidence to support venue is appropriately left for trial.[16]  *Chalmers*, 474 F. Supp. 2d at 575.  Defendants' motions to dismiss based on venue are denied without prejudice to renewing those motions at the close of the Government's case.[17]

### f.   Sufficiency of Pleading (Count Eight)

In Count Eight, Ohle is charged with obstructing and impeding the due administration of the Internal Revenue laws pursuant to 26 U.S.C. § 7212(a).  Ohle alleges that Count Eight is insufficiently pled and applying Section 7212(a) in the instant case would render the statute unconstitutionally vague.  Count Eight, which tracks the language of the statute and incorporates specific allegations from previous paragraphs in the Indictment, is sufficiently pled and provides Ohle with fair notice of the charges against him.  *See United States v. Walsh*, 914 F.3d 37, 44 (2d Cir. 1999) ("[W]e have consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.") (internal citations and quotations omitted); *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975) ("[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.").

---

elsewhere.'"); *United States v. Chalmers*, 474 F. Supp. 2d 555, 574-75 (S.D.N.Y. 2007) (rejecting defendant's argument that the "allegation that the charged conduct took place 'in the Southern District of New York and elsewhere' is insufficient to support venue because it fails to indicate which specific criminal acts were committed in this District"); *Szur*, 1998 WL 132942, at *9 ("[O]n its face, the Indictment alleges that the offense occurred 'in the Southern District of New York and elsewhere,' which is sufficient to resist a motion to dismiss.").

[16] Bradley contends that he will suffer substantial hardship and prejudice as a result of a trial in New York because his family, including his daughter who has a congenital brain formation, lives in Louisiana. (Bradley Mem. 17-18.)  As Bradley is currently incarcerated in Georgia, these hardships are no longer relevant.

[17] Ohle also asserts that upholding venue would violate Ohle's Sixth Amendment right to be tried in "the district wherein the crime shall have been committed."  (Ohle Mem. 15.)  We deny the motion on this basis as well.

Ohle argues that under *United States v. Kassouf*, 144 F.3d 952 (6th Cir. 1998),

Section 7212(a) requires proof of a pending IRS action that the defendant corruptly

endeavored to obstruct; and, therefore, the Government has failed to allege a violation of

Section 7212(a).  (Ohle Mem. 25.)  At the outset we note that *Kassouf* was immediately

limited in its own circuit.[18]  The Court of Appeals for the Second Circuit, along with

many other circuits, has repeatedly affirmed convictions for violations of § 7212(a), or

otherwise failed to raise objections to § 7212(a) indictments, in which no IRS proceeding

or investigation was pending.  *See United States v. Wilner*, No. 07 Cr. 183 (GEL), 2007

WL 2963711, at *3 (S.D.N.Y. Oct. 11, 2007) (collecting cases).  Furthermore, *Kassouf* is

fundamentally at odds with this Circuit's broad interpretation of the omnibus clause.  In

*United States v. Kelly*, the Second Circuit held that the language of the omnibus clause is

extremely broad and "renders criminal 'any other' action which serves to obstruct or

impede the due administration of the revenue laws."  *Kelly*, 147 F.3d at 175.

Count Eight, which incorporates prior paragraphs of the Indictment, alleges

numerous specific acts of obstruction, including but not limited to undermining the

ability of the IRS to ascertain HOMER clients' true tax liabilities and determine whether

penalties should be obtained through the drafting of fraudulent opinion letters.

Indictment ¶110 (incorporating ¶17).  These allegations, which allege that Ohle

participated in a scheme to conceal his own income and the income of others from the

IRS, charge a violation of Section 7212(a) with sufficient specificity.  *See Wilner*, 2007

WL 2963711, at *6 (denying the motion to dismiss an indictment, which charged the

---

[18] In *United States v. Bowman*, 173 F.3d 595 (6th Cir. 1999), after limiting the applicability of *Kassouf* to its specific facts, *Bowman* held that Section 7212(a) was properly applied to the defendant, who provided false information to the IRS in an effort to stimulate an IRS investigation of other tax payers, despite the fact that there was no pending IRS action.  *Bowman*, 173 F.3d at 600.

defendant "with scheming to create a false paper trail of checks and divert income to a corporation in order to avoid taxes properly owing on income he himself earned as an individual (or similarly owed by other taxpayers)").

Ohle also argues that the statute is unconstitutionally vague as applied. The Second Circuit rejected a similar argument in *Kelly*. In *Kelly*, the court relied on the "well-reasoned opinion" of Judge Gertner in *United States v. Brennick*, 908 F. Supp. 1004 (D. Mass. 1995), to conclude that the court's broad interpretation of the statute did not run afoul of the constitutional doctrines of overbreadth and vagueness. *Id.* We similarly find that application of Section 7212(a) in the instant case does not render the statute unconstitutionally vague. Ohle's motion to dismiss Count Eight is denied.

### g.  Lack of Pre-Indictment Administrative Conferences

Ohle argues that the failure of the IRS and the DOJ to offer Ohle a pre-indictment conference merits dismissal of the Indictment. However, IRS guidelines do not provide for a pre-indictment conference "if the taxpayer is the subject of a grand jury investigation," as was the case here. IRM 9.5.12.3.1 (July 25, 2007). The United States Attorneys' Manual ("USAM") provides that, "If time and circumstances permit, the Tax Division generally grants a taxpayer's written request for a conference with the Division in Washington, D.C." USAM 6-4.214 (Sept. 2007). However, the Second Circuit has held that the provisions of the USAM "reflect executive branch policy judgments" and "do not confer substantive rights on any party." *United States v. Piervinanzi*, 23 F.3d 670, 682-83 (2d Cir. 1994); *see also United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (stating that "[internal department] guidelines provide no substantive rights to criminal defendants" in discussing DOJ Criminal Tax Manual). The Government claims

it decided not to offer Ohle a pre-indictment conference in order to prevent Ohle from dissipating assets subject to forfeiture before he was indicted and arrested. This decision does not provide a basis for dismissal of the indictment. *See United States v. Goldstein*, 342 F. Supp. 661, 666 (E.D.N.Y. 1972) (failure to offer pre-indictment conference in criminal tax case not grounds for dismissal of indictment because "such a conference is clearly not a matter of right").

### h. Request for Evidentiary Hearings

Ohle seeks a hearing on two issues: (1) whether grand jury subpoenas subsequent to the return of the initial Indictment were issued for the improper purpose of gathering evidence at trial; and (2) whether the Government improperly utilized two civil tax investigations to gather proof for the pending criminal trial.

Turning first to the issue of Grand Jury subpoenas, we find that there is no credible claim of improper use. The law is settled in this Circuit that "[i]t is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial." *In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985); *see also United States v. Dardi*, 330 F.2d 316, 336 (2d Cir. 1964). But "absent some indicative sequence of events demonstrating an irregularity, a court has to take at face value the Government's word that the dominant purpose of the Grand Jury proceedings is proper." *United States v. Raphael*, 786 F. Supp. 355, 358 (S.D.N.Y. 1992).

Ohle relies principally on *In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)*, 767 F.2d 26 (2d Cir. 1985). In *Simels*, the Government first issued a trial subpoena for certain evidence. The trial subpoena was challenged, and the

Government, instead of responding to that challenge, issued a Grand Jury subpoena for the exact same evidence. *Id.* at 29-30. In quashing the subpoena, the Second Circuit noted that the timing of the subpoena "casts significant light on its purposes." *Id.* at 29. Ohle argues that the timing in the instant case is suspicious because Grand Jury subpoenas were issued after the initial Indictment. But what Ohle fails to acknowledge is that subsequent superseding indictments were filed. Since the filing of the Second Superseding Indictment on August 11, 2009, not a single Grand Jury subpoena has been issued. Ohle has simply failed to point to any aspect of the Government's actions that is questionable, and, thus, we find that there is no reason to hold an evidentiary hearing with regard to the Grand Jury subpoenas.

Next, Ohle argues an evidentiary hearing is necessary to determine whether the evidence obtained through tax audits of Ohle should be suppressed. The Government may use evidence acquired in a civil action in a subsequent criminal proceeding, unless the defendant demonstrates that the use of such evidence would violate his or her constitutional rights or depart from the proper administration of criminal justice. *United States v. Kordel*, 397 U.S. 1, 11-13 (1970). In *Kordel*, the Supreme Court set forth certain circumstances where a defendant's right to due process may be violated, including when the Government brings a civil action solely for the purpose of obtaining evidence in a criminal prosecution. *Id.* at 12; *see also United States v. Teyibo*, 877 F. Supp 846, 856 (S.D.N.Y. 1995).

Although Ohle cites a number of legal propositions, he alleges no acts of bad faith on the part of the Government to support the contention that the Government conducted the civil tax proceedings in order to obtain evidence for the pending criminal trial. He

argues only that the timing of the two civil audits conducted in the midst of the criminal tax investigation is "suspicious" without alleging relevant dates or information obtained. Notably, Ohle does not contest the Government's statement that he had counsel during both of the audits, and that one of the audits was commenced prior to the criminal investigation. (Gov't Opp. 77 n.45.) Ohle has not raised any issues or pointed to any potential infringement of his rights that would warrant an evidentiary hearing. Ohle's motion for an evidentiary hearing is denied.

## II. Conclusion

Defendants' motions to sever Count Five, Count Six, and Count Seven are granted; Defendant Ohle's motion to sever Count Eight is denied. All remaining motions are also denied.

SO ORDERED.

Dated: Jan. 12, 2010
New York, NY

U.S.D.J.