

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

    -v-            :       **INDICTMENT**

JOHN B. OHLE III and       :      S3 08 Cr. 1109 (LBS)
WILLIAM E. BRADLEY,

                      :

           **Defendants.**

                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE

(The Mail and Wire Fraud and Personal Income Tax Fraud Conspiracy
– Defendants JOHN B. OHLE III and WILLIAM BRADLEY)

The Grand Jury charges:

### The Defendants, their Co-Conspirators and other Individuals and Entities

1.     At all times relevant to this Indictment, JOHN B. OHLE III, the defendant, was an attorney, certified public accountant, and resident of Wilmette, Illinois, and New Orleans, Louisiana.

2.     From in or about November 1999 through early 2002, JOHN B. OHLE III, the defendant, was employed by a national bank ("Bank A") in its "Innovative Strategies Group" ("ISG"), which maintained its principal office in Chicago, Illinois.  The ISG provided estate planning and tax shelter strategies for high net worth clients, including a tax shelter known as "Hedge Option Monetization of Economic Remainder" or "HOMER."  For

most of his tenure at ISG, OHLE supervised certain activities of the group, including the sales of HOMER, and was its lead salesperson.

3.      From in or about February 2002 until approximately 2004, JOHN B. OHLE III, the defendant, co-owned and operated Dumaine Group LLC ("Dumaine"), which maintained its principal office in Chicago, Illinois.  Formed in or about February 2002 by OHLE together with several former ISG employees who left Bank A as a result of its termination of the ISG's creation, sale, and implementation of tax shelters, including HOMER, Dumaine was involved principally in the creation, sale, and implementation of tax shelters for high net worth clients.

4.      At all times relevant to this Indictment, Jenkens & Gilchrist, P.C., ("J&G") was a law firm and professional corporation with offices in Dallas, Texas, and Chicago, Illinois, among other locations.  In or about late December 1998, Lawyer A, an attorney and certified public accountant, resigned together with several other attorneys from another Chicago law firm, and became a shareholder of J&G's newly-formed Chicago office. From in or about early January 1999 until on or about April 1, 2004, Lawyer A served as the managing shareholder of J&G's Chicago office and head of its Chicago tax practice. Lawyer A's practice centered around the creation, sale, and implementation of tax shelters.

5.      Bank B, a foreign bank with United States headquarters in New York ("Bank B"), implemented the financial transactions used in the HOMER tax shelter.

2

6.      At all times relevant to the Indictment, defendant WILLIAM E. BRADLEY was an attorney in private practice in Hammond, Louisiana, doing business as a sole practitioner under the name "Bradley Law Firm LLC." BRADLEY, whose primary practice area was personal injury law, became acquainted with defendant JOHN B. OHLE III during their preparation for the Louisiana bar examination.

7.      Douglas Steger, a co-conspirator not named as a defendant herein, was a resident of Northfield, Illinois. From approximately 1989 until approximately late 2001, Douglas Steger owned and operated American Financial Capital Corporation ("AmCap"), which was engaged in the business of raising money for hedge funds, including a Bermuda-based hedge fund with an office in Manhattan, New York ("Carpe Diem"). AmCap maintained a bank account at North Shore Community Bank, Wilmette, Illinois.

8.      Individual A, a co-conspirator not named as a defendant herein, was a childhood friend of JOHN B. OHLE III, the defendant. OHLE enlisted Individual A to participate in the HOMER tax shelter as the purported unrelated third-party "buyer" of certain assets, as described below.

9.      Individual B was an investment advisor who resided, at certain times relevant to this Indictment, in San Francisco, California. Individual B became acquainted with JOHN B. OHLE III, the defendant, when both worked in New Orleans, Louisiana. In late 2001, Individual B worked as an investment advisor, providing investment consulting services to clients.

3

10.   Individual C was a business associate of JOHN B. OHLE III, the defendant.   Individual C became acquainted with OHLE while both worked at Bank A. Individual C was the owner of JDC Group, Inc.   In or about February 2002, Individual C became a partner in Dumaine.

## The HOMER Tax Shelter

11.   In 2001, members of Bank A's ISG, including JOHN B. OHLE III, the defendant, together with other members of ISG, and Lawyer A at J&G, and Bank B, engaged in the design, marketing, and implementation of tax shelters, including the HOMER tax shelter.   During 2001, OHLE and others implemented 36 HOMER tax shelters for high net worth clients of Bank A and J&G.   In 2002, OHLE implemented two additional HOMER tax shelters through his newly-created business, Dumaine.

12.   JOHN B. OHLE III, the defendant, and others designed and marketed the HOMER tax shelter as a means for wealthy clients of Bank A and J&G to eliminate or reduce the amount of U.S. income taxes the clients would have to pay to the IRS, and to generate extraordinary fee income for Bank A and J&G, as well as for OHLE and his co-conspirators.   Rather than paying U.S. income taxes generally ranging from 20% to 35% of their taxable gains, HOMER clients could choose instead to pay total fees calculated as a percentage of the desired tax loss generated by the tax shelter.   The HOMER clients were required to pay fees generally totaling 6%, or 600 basis points, of the tax loss that the clients were seeking to generate through their respective HOMER shelters.   The fees were divided

4

among Bank A, J&G, Bank B, and Individual A, among others. OHLE and other ISG members earned bonuses based on, among other things, the amount of fees each generated through their sale of HOMER shelters.

13.    As part of their efforts to market, sell, and implement HOMER tax shelters, JOHN B. OHLE III, the defendant, other members of Bank A's ISG, and attorneys at J&G agreed to pay referral fees to third parties who referred a client who ultimately entered into a HOMER tax shelter. Generally, the referral fees were paid after the third-party referral sources sent invoices to J&G, leading it to pay the fees to the third parties based on the amounts stated in the invoices. J&G would also issue to the third parties, where appropriate, IRS Forms 1099-MISC, reflecting the payment of the referral fees as non-employee compensation to the third parties. When a referral fee was paid in connection with a particular HOMER tax shelter, it served to reduce the total fee that Bank A would otherwise be paid for that tax shelter. Pursuant to Bank A's code of conduct for employees, ISG members were not permitted to receive or accept referral or third-party fees, either directly or indirectly, in connection with the sale and implementation of the HOMER tax shelters or any other ISG tax strategies.

14.    J&G earned approximately $12.1 million in fees from the HOMER tax shelters, while Bank A earned approximately $5.2 million.

### The Conspiracy to Defraud

15.    JOHN B. OHLE III, the defendant, with the assistance of WILLIAM

BRADLEY, the defendant, and co-conspirators Douglas Steger, Individual A, and Individual

C, committed fraud by obtaining funds to which OHLE was not entitled, which funds OHLE

shared with BRADLEY, Steger, Individual A, and Individual C, and thereafter defrauded the

IRS by, among other things, failing to report those funds as income on OHLE's individual

income tax returns and aiding and causing others to file false income tax returns.  More

specifically, OHLE embezzled funds from a client, "Client E," and used some of the money

to fund Individual A's participation in the HOMER tax shelter.   OHLE thereafter obtained

a portion of the income received by Individual A for his participation in the HOMER tax

shelter. In addition, OHLE obtained by fraud from Bank A referral fees related to the

HOMER tax shelter, the majority of which OHLE kept.  Thereafter, OHLE defrauded the

IRS by concealing the receipt and disbursement of those ill-gotten fees and HOMER income;

by failing to report as income on his individual income tax returns those fees, as well as the

funds embezzled from Client E and the HOMER and other income; and by causing his co-

conspirators to file false individual income tax returns with respect to the ill-gotten referral

and HOMER income.   As a result, OHLE willfully evaded taxes on approximately

$2,900,000 in income in 2001 and approximately $3,600,000 in income in 2002.

6

## Statutory Allegations

16.    From in or about 2001 until at least on or about February 15, 2004, in the Southern District of New York and elsewhere, JOHN B. OHLE III and WILLIAM BRADLEY, the defendants, together with Douglas Steger, Individual A, and Individual C, co-conspirators not named as defendants herein, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with others to defraud the United States and an agency thereof, to wit, the IRS of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 18, United States Code, Sections 1341 and 1343, and Title 26, United States Code, Section 7201.

## Objects of the Conspiracy

17.    It was a part and object of the conspiracy that, from in or about 2001 through in or about 2004, JOHN B. OHLE III and WILLIAM BRADLEY, the defendants, and others, unlawfully, willfully, and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes owed by OHLE, BRADLEY, and others, in relation to their unlawful receipt of referral fee and other income.

18.    It was a further part and object of the conspiracy that, from in or about 2001 through in or about 2004, JOHN B. OHLE III and WILLIAM BRADLEY, the

defendants, together with others, unlawfully, knowingly, and intentionally having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property from Bank A and Client E by means of false and fraudulent pretenses, representations, and promises, which scheme and artifice to defraud affected a financial institution, to wit: (i) the creation and submission of false and fraudulent invoices to the J&G law firm for payment of third-party referral fees to which the purported service providers listed on the invoices were not entitled, in order that J&G would pay said referral fees to the unlawful financial benefit of OHLE, BRADLEY, and others; and (ii) the unlawful diversion and embezzlement of funds belonging to a Client E, a wealthy trust client of OHLE, and for the purpose of executing such scheme and artifice and attempting so to do, would and did place and caused to be placed in the mails various items, and transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes, and e-mails, in violation of Title 18, United States Code, Sections 1341 and 1343.

19.    It was a further part and object of the conspiracy that, from in or about 2001 through in or about 2004, JOHN B. OHLE III and WILLIAM BRADLEY, the defendants, and others, unlawfully, willfully, and knowingly, would and did attempt to evade and defeat a substantial part of the income taxes due and owing by OHLE and others, in violation of Title 26, United States Code, Section 7201.

**Means and Methods of the Conspiracy**

20.    Among the means and methods used by JOHN B. OHLE III and WILLIAM BRADLEY, the defendants, and their co-conspirators, to achieve the objects of the conspiracy were the following:

## I.    THE FALSE AND FRAUDULENT HOMER REFERRAL FEE INVOICES

### A.    The False and Fraudulent HOMER Referral Fee Invoices Related to Douglas Steger

a.    In or about December 2001, JOHN B. OHLE III, the defendant, contacted Douglas Steger and suggested that Steger prepare and submit to J&G two false and fraudulent invoices, seeking payment from J&G for referral fees related to two HOMER clients ("Client A" and "Client B," respectively) for whom referral fees would not otherwise have been paid by Bank A. Despite the fact that he did not refer either Client A or Client B to Bank A and was not otherwise entitled to referral fees in connection with those clients, Steger agreed to send the fraudulent invoices. Accordingly, pursuant to instructions provided by OHLE and unbeknownst to the two HOMER clients, Steger prepared and sent to J&G in Chicago two invoices — for $50,000 and $31,500, totaling $81,500 — that falsely and fraudulently represented that Steger was entitled to referral fees in connection with Client A and Client B's HOMER tax shelters. Consequently, J&G paid the invoices with two wire transfers for $50,000 and $31,500, to Steger's AmCap bank account. Steger thereafter transferred $81,500 to OHLE via a cashier's check, which was deposited in OHLE's personal

bank account at Hibernia National Bank, New Orleans, Louisiana.

        b.     On or about December 24, 2001, OHLE caused two invoices to be sent to J&G seeking $920,000 in referral fees for the purported referral to Bank A of two HOMER clients, Clients C and D. The invoices, sent on the purported letterhead of a business owned by Individual B, were in the respective amounts of $690,000 and $230,000.

        c.     On or about December 28, 2001, J&G paid the invoices via a $920,000 wire transfer to Individual B's business bank account in San Francisco, California.

        d.     In or about early 2002, OHLE enlisted Douglas Steger to arrange for and receive a transfer of the $920,000 being held by Individual B. Towards that end, OHLE caused Steger to hire an attorney to contact Individual B to arrange the transfer of the $920,000 to Steger's AmCap bank account, which occurred on or about January 15, 2002. In truth and fact, neither OHLE, Steger, nor Individual B or his business was entitled to any referral fees in connection with the HOMER tax shelters of Client C or Client D. In addition, OHLE instructed Steger to make false and fraudulent statements about the receipt and nature of the referral fees if asked about them.

        e.     In or about early 2002, on the instructions of OHLE, Douglas Steger disbursed the majority of the $920,000 in proceeds to OHLE, and to others specified by OHLE, in a manner designed to conceal OHLE's receipt of the referral fee income.

        f.     In or about February 2004, Douglas Steger, on the instructions and with the assistance of OHLE, filed a joint U.S. Individual Income Tax Return, Form

1040, for the tax year 2002, on which Steger falsely and fraudulently over-reported his income by including, as his income, the full amount of the $920,000 in proceeds received from Individual B, notwithstanding the fact that Steger was a conduit for OHLE, who ultimately received over $700,000 of those proceeds, with Steger keeping the remainder for his own benefit. Further, on the instructions and with the assistance of OHLE, Steger employed a tax shelter on his 2002 individual tax return to create false and fraudulent losses to offset the $920,000 in referral fees that Steger reported on his 2002 tax return. OHLE showed his opinion letter to Steger, who did not obtain an opinion letter for his own tax shelter.

**B.     The False and Fraudulent HOMER Referral Fee Invoices Related to Defendant WILLIAM BRADLEY**

21.     In or about December 2001, JOHN B. OHLE III, the defendant, contacted WILLIAM BRADLEY, the defendant, and requested that BRADLEY prepare and submit to J&G three invoices from the Bradley Law Firm for a group of family members ("Client Group 1") from the New Orleans area who were persuaded to participate in HOMER tax shelters by OHLE, among others.

22.     The three invoices sought payment from J&G for services purportedly rendered by WILLIAM BRADLEY, the defendant, in connection with the HOMER tax shelter entered into by Client Group 1. Despite the fact that he performed no services and was not otherwise entitled to referral fees in connection with Client Group 1's HOMER tax shelter or any other HOMER tax shelter, BRADLEY agreed to send the invoices.

11

Accordingly, pursuant to instructions provided by JOHN B. OHLE III, the defendant, and unbeknownst to Client Group 1, BRADLEY prepared three invoices — in the respective amounts of $32,625, $15,750, and $64,125, totaling $112,500 — that falsely and fraudulently represented that BRADLEY had rendered services for Client Group 1 in connection with its HOMER tax shelters. On or about December 26, 2001, BRADLEY faxed the three invoices, reciting purported "services rendered," from his office in Hammond, Louisiana, to J&G in Chicago, Illinois.

23.    Also on or about December 26, 2001, WILLIAM BRADLEY, the defendant, faxed two additional false and fraudulent invoices from Hammond, Louisiana to J&G in Chicago for services purportedly done by BRADLEY for two additional HOMER clients of Bank A ("Client Group 2"). Unbeknownst to Client Group 2, BRADLEY had prepared the two invoices — for $85,000 and $57,500, totaling $142,500 — that falsely and fraudulently represented that BRADLEY had rendered services for Client Group 2 in connection with its HOMER tax shelters. In truth and fact, BRADLEY had rendered no services to Client Group 2 in connection with their HOMER tax shelters and was not otherwise entitled to referral fees on those transactions.

24.    On or about December 28, 2001, in payment of the five false and fraudulent invoices sent by WILLIAM BRADLEY, the defendant, J&G caused a $255,000 wire transfer to be sent from J&G's bank account in Texas to BRADLEY's client trust fund account at Hancock Bank, Hammond, Louisiana.

12

25.    On or about December 28, 2001, WILLIAM BRADLEY, the defendant, issued from his client trust fund account a check payable to himself in the amount of $5,000, as part of his share of the $255,000 obtained by fraud.

26.    On or about January 2, 2002, WILLIAM BRADLEY, the defendant, issued from his client trust fund account two additional checks payable to himself totaling $20,000, as part of his share of the $255,000 obtained by fraud.

27.    On or about January 4, 2002, on the instructions of JOHN B. OHLE III, the defendant, WILLIAM BRADLEY, the defendant, sent a wire transfer in the amount of $46,000 from his client trust fund account to OHLE's bank account.

28.    On or about January 8, 2002, on the instructions of JOHN B. OHLE III, the defendant, WILLIAM BRADLEY, the defendant, issued a $184,000 check from his client trust fund account to JDC Group, Inc., an entity owned and controlled by Individual C, who was due a referral fee stemming from Client C's HOMER tax shelter. Thereafter, on or about December 18, 2002, at OHLE's insistence that Individual C "take care of" BRADLEY, Individual C gave a $4,000 check to BRADLEY.

29.    In or about early 2002, as a result of the $255,000 payment by J&G based on the five false and fraudulent invoices submitted by WILLIAM BRADLEY, the defendant, J&G was caused to issue a Form 1099-MISC to the Bradley Law Firm LLC reflecting the payment of non-employee compensation of $255,000.

13

## II.    THE CARPE DIEM FEES

30.    In conjunction with the employment of JOHN B. OHLE III, the defendant, prior to Bank A, OHLE established a business relationship with Client E. Over time, OHLE provided general tax and estate advice to Client E, who resided in, among other places, Manhattan, New York, and Atlanta, Georgia. In or about late 1999, Client E consulted with OHLE about the possibility of setting up a charitable remainder trust. As a result of these discussions, and in response to OHLE's advice, Client E created a charitable remainder trust, of which OHLE was the trustee. OHLE enlisted Individual B to provide OHLE with investment advice regarding Client E's trust funds.

31.    In late 2001, JOHN B. OHLE III, the defendant, approached Client E and her husband with the idea of investing in Carpe Diem, for which Douglas Steger was an independent salesman. Client E invested two separate amounts, one investment for $5 million under Client E's personal name and the other investment for $2 million in the name of Client E's trust.

32.    Additionally, JOHN B. OHLE III, the defendant, met with two other individuals regarding an investment in Carpe Diem. Both of these individuals were 2001 HOMER clients of Bank A ("Client F" and "Client G"). They each invested $1 million in Carpe Diem at OHLE's recommendation.

33.    Clients E, F, and G were each charged a 5% commission on the Carpe Diem transactions. Thus, the commissions for Client E's two investments were $250,000

and $100,000, respectively. The commissions for Clients F and G's investments were $50,000 each, which JOHN B. OHLE III, the defendant, caused to be wired by Carpe Diem to a personal bank account of OHLE's at Hibernia Bank in New Orleans, Louisiana, through Citibank in New York in early 2002. JOHN B. OHLE III, the defendant, told Client E that he was not going to receive any commissions with respect to her investments.

34.    Notwithstanding these assurances, JOHN B. OHLE III, the defendant, caused $300,000 to be wired from Carpe Diem's bank account in Bermuda, through Citibank in Manhattan, New York, to Individual B's business bank account in San Francisco, California, on or about December 3, 2001. On or about November 30, 2001, $50,000 was sent from Carpe Diem in Bermuda to a Carpe Diem official in New York, who caused the funds to be transferred to Douglas Steger in Chicago.

35.    JOHN B. OHLE III, the defendant, instructed Individual B to wire $125,000 to the personal checking account of Individual A (the third-party buyer in the HOMER tax shelter) on or about December 4, 2001, and to wire $169,800 to OHLE's personal bank account in New Orleans, Louisiana, on or about December 5, 2001. Individual B retained the remaining $5,000.

36.    On or about December 7, 2001, $347,834.01 of additional funds sent by JOHN B. OHLE, the defendant, to Carpe Diem from Client E's trust account was wired to Individual B's business bank account from Carpe Diem's Bermuda Bank account, through Citibank in Manhattan, New York. To persuade Carpe Diem to transfer those funds, which

belonged to Client E, to Individual B's account, OHLE lied to a representative of Carpe Diem.

37.    Of this $347,834.01, JOHN B. OHLE III, the defendant, caused Individual B to wire on or about December 10, 2001, $97,834 to OHLE's personal bank account in New Orleans, Louisiana, and $250,000 to Individual A's personal checking account. Individual A used the $375,000 received in total from OHLE through Individual B to purchase the Unitrust Beneficiaries' interests in the execution of the HOMER tax shelters.

38.    JOHN B. OHLE III, the defendant, failed to report on his 2001 income tax return the $300,000 in commission income from Client E's Carpe Diem investments and the $347,834 fraudulently obtained from Client E, among other items. OHLE also failed to report on his 2002 income tax return the $100,000 in commission income from Client F and G's Carpe Diem investments, among other items.

### III.    THE DIVERTED CLIENT E TRUST FUNDS

39.    In addition to the foregoing amounts diverted from the trust of Client E, from 2001 until at least in or about April 2003, JOHN B. OHLE III, the defendant, caused at least $3,000,000 in funds to be unlawfully diverted from Client E's trust account and used for OHLE's personal benefit, in part through an entity called Ohle Financial Group LLC. OHLE failed to report those unlawfully diverted funds on his income tax returns.

40.     From in or about January 2003 until at least in or about April 2003, upon learning in January 2003 that Client E and her attorney wished to discuss the finances of the trust, JOHN B. OHLE III, the defendant, with the assistance of WILLIAM BRADLEY, the defendant, replaced the funds that OHLE had unlawfully diverted from Client E's trust bank account in earlier years.

### Overt Acts

41.     The following overt acts, among others, were committed, and caused to be committed, in the Southern District of New York, and elsewhere, by JOHN B. OHLE III and WILLIAM BRADLEY, the defendants, and others in furtherance of the conspiracy and to effect its objects:

a.     On or about December 7, 2001, OHLE caused a $347,834.01 wire transfer from Carpe Diem's bank account at the Bank of Bermuda to be sent, through Citibank in New York, New York, to Individual B's bank account at Bank of America, San Francisco, California.

b.     On or about December 10, 2001, OHLE caused a $97,834 wire transfer from Individual B's bank account at Bank of America, San Francisco, California, to OHLE's personal account at Hibernia National Bank, New Orleans, Louisiana.

c.     On or about December 28, 2001, Steger faxed the two invoices for Clients A and B – reciting purported "services rendered" – from his home in Northfield, Illinois to J&G's Offices in Chicago, Illinois, causing J&G on or about December 31, 2001,

17

to make two wire transfers in the amounts of $50,000 and $31,500 to Steger's account in the name of AmCap at North Shore Community Bank, Wilmette, Illinois.

        d.     On or about December 31, 2001, pursuant to a discussion with OHLE, Steger issued from his AmCap account a check payable to cash in the amount of $81,500, and therewith purchased a cashier's check for $81,500 made payable to OHLE. STEGER subsequently provided said cashier's check to OHLE, which was deposited on or about January 7, 2002, into a bank account in OHLE's name at Hibernia National Bank, New Orleans, Louisiana.

        e.     On or about January 4, 2002, on OHLE's instructions, BRADLEY sent a wire transfer in the amount of $46,000 (OHLE's share of the $255,000 obtained by fraud) from BRADLEY's law firm bank account to a bank account of OHLE.

        f.     On or about January 14, 2002, BRADLEY wrote a $184,000 check (comprising the remainder of the $255,000) to JDC Group Inc, Individual C's company, from BRADLEY's law firm bank account at Hancock Bank, Hammond, Louisiana.

        g.     On or about January 15, 2002, OHLE received a $100,000 commission related to Clients F and G's investments in Carpe Diem via wire transfer into OHLE's personal bank account at Hibernia National Bank, New Orleans, Louisiana, from Carpe Diem's bank account at the Bank of Bermuda through Citibank, Manhattan, New York.

h.    On or about January 15, 2002, Steger received a $920,000 wire transfer into his AmCap bank account at North Shore Community Bank from Individual B's business bank account at Bank of America, San Francisco, California.

i.    On or about January 25, 2002, Steger wrote an $88,500 check made payable to OHLE's father, which was deposited into OHLE's bank account at Hibernia Bank, New Orleans, Louisiana.

j.    On or about February 18, 2002, Steger purchased a $620,000 cashier's check with funds from his AmCap bank account, which he deposited into his personal bank account at Glenview State Bank, Glenview, Illinois.

k.    On or about February 25, 2002, on OHLE's instructions, Steger wrote a $600,000 check made payable to "John Ohle" from Steger's personal bank account at Glenview State Bank, falsely describing the payment as a "personal loan" on the memo line of the check.  OHLE thereafter deposited the check into his own account at MB Financial, Chicago, Illinois.

l.    On or about February 26 and 27, 2002, on OHLE's instructions, Steger withdrew $9,000 in cash on each of the aforesaid days from his AmCap bank account and gave the $18,000 in cash to OHLE for use during a Hawaiian vacation he was then about to take.

m.    From in or about July 2002 to in or about October 2002, OHLE caused wire transfers in the total amount of $3,000,000 to be made from Client E's trust

account at Charles Schwab to an account in the name of Dalton Ventures LLC, MB Financial Bank, Chicago, Illinois.

n.    On or about October 16, 2002, OHLE filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for the calendar year 2001, on which he failed to report approximately $2,900,000 in income, and thereby substantially understated his true taxable income and tax due and owing for the 2001 tax year.

o.    On or about April 15, 2003, BRADLEY failed to file a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, on which he was required to report the $20,000 he received for his participation in the unlawful referral fee scheme.

p.    On or about October 15, 2003, OHLE filed a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, on which he failed to report income of approximately $3,600,000, and reported phony losses in order to eliminate the taxes on his reported income, and thereby substantially understated his true taxable income and tax due and owing for 2002.

q.    On or about October 15, 2003, OHLE caused a lawyer at a law firm in New York, New York, to issue a false and fraudulent opinion letter on the transaction used by OHLE to eliminate taxes due and owing on his 2002 U.S. Individual Income Tax Return.

r.        On or about October 27, 2003, Individual C filed a false and fraudulent U.S. Income Tax Return for an S Corporation, Form 1120S, for JDC Group, Inc., for the calendar year 2002, on which he reported the $184,000 received from BRADLEY, but, at OHLE's suggestion, offset the income with false expense deductions.

s.        On or about December 17, 2003, on OHLE's instructions and with his assistance, Individual A filed a false and fraudulent joint U.S. Individual Income Tax Return, for the calendar year 2002, (i) on which he reported the full amount of the HOMER fees he received as gross business receipts with no deduction or accounting for that portion of those funds that Individual A paid over to OHLE, and (ii) on which Individual A deducted phony tax shelter losses of $1,212,702.

t.        On or about February 15, 2004, on OHLE's instructions and with his assistance, Steger filed a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, (i) on which he reported the full amount of the $920,000 transferred to him as income, when, as Steger well knew, over $700,000 was income not to him but to OHLE, and (ii) on which he deducted phony tax shelter losses of $908,999.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Tax Evasion: 2001 Tax Year – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

42.     Paragraphs 1-16 and 20-41 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

43.     From on or about January 1, 2001, through in or about April 2003, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income taxes due and owing by OHLE to the United States of America for the calendar year 2001 by various means, including, among others, (a) concealing his receipt and disposition of income through the use of various nominees, including defendant WILLIAM BRADLEY; (b) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for the calendar year 2001, which return falsely omitted income of approximately $2,900,000, which falsity caused OHLE to substantially understate his taxable income and tax due and owing for the 2001 tax year.

(Title 26, United States Code, Section 7201.)

22

## COUNT THREE

(Tax Evasion:  2002 Tax Year – Defendant JOHN B. OHLE III)

The Grand Jury further charges:

44.    Paragraphs 1-16 and 20-41 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

45.    From on or about January 1, 2002, through on or about October 15, 2003, in the Southern District of New York and elsewhere, JOHN B. OHLE III, the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income taxes due and owing by OHLE to the United States of America for the calendar year 2002 by various means, including, among others: (a) concealing the receipt and disposition of income through the use of various nominees, including defendant WILLIAM BRADLEY; (b) preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for the calendar year 2002, which return (i) falsely omitted income of approximately $3,600,000; and (ii) falsely claimed losses from a fraudulent tax shelter, which falsities caused OHLE to substantially understate his taxable income and tax due and owing for the 2002 tax year; and (c) causing the issuance of a false and fraudulent opinion letter issued in connection with OHLE's tax shelter.

(Title 26, United States Code, Section 7201.)

23

## FORFEITURE ALLEGATION

46.    As the result of committing the conspiracy offense in violation of Title 18, United States Code, Section 371, alleged in Count One of this Indictment, JOHN B. OHLE III and WILLIAM BRADLEY, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to the following:

a.    At least $5,000,000 in United States currency,  in that such sum in aggregate is property representing the amount of proceeds obtained as a result of the conspiracy to commit the mail and wire fraud offenses contained in Count One, for which the defendants are jointly and severally liable;

b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1940 Chestnut Avenue, Wilmette, Illinois 60091, more particularly described as a single-family home owned by OHLE;

c.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 837 Royal Street, Unit K, New Orleans, Louisiana 70116, more particularly described as a condominium owned and controlled by OHLE and titled in the name of Dalton-Ohle Investment Property Trust;

24

d.      All United States currency funds or other monetary instruments credited to account number 9006623694 in OHLE's name at Hibernia National Bank, New Orleans, Louisiana;

e.      All United States currency funds or other monetary instruments credited to account number 5040000308 in OHLE's name at MB Financial Bank;

f.      One 2001 Upper Deck SP Legendary Cuts Player Cap Anson Baseball Card;

g.      Five PSA 10 2001 SP Authentic Tiger Woods Cards, more particularly described as: Signs of the Times Gold, numbered to 25; Rookie Card number 45 Gold Parallel, numbered to 100; Rookie Card number 45, numbered to 900; Tour Swatch; and Tour Swatch Gold, numbered to 25;

h.      1933 R338 Goudey "Sports Kings" #4 Red Grange PSA 7;

i.      1948 and 1960 Philadelphia Eagles Championship Programs and Tickets;

j.      One 1951 Chicago Bears Autograph Book;

k.      1968 Football Topps Test Team Sets (25);

l.      One 2000 Oklahoma Sooners Signed Helmet;

m.      Walter Payton Signed Football Cards (6);

n.      "Pistol Pete" Maravich Signed Sports Illustrated Cover;

o.      1971-1972 Topps Basketball Trios Stickers Complete Sets (26);

25

p.      1985 Star Basketball Bagged Team Sets (8);

q.      One "Pistol Pete" Maravich Signed 8x10 Photo;

r.      1984 Star Co. Basketball Sets (3) with Michael Jordan;

s.      1880's N78 Duke "Histories of Generals" Booklets (17);

t.      Gen. Robert E. Lee & Traveler in Original Box;

u.      Chicago Cubs Portraits Collection (22) by Andy Jurinko;

v.      One 1961 Roger Maris 61st Home Run Ticket Stub;

w.      Paul Waner Single Signature Baseball;

x.      Burleigh Grimes & Edd Roush Signed Portrait Baseballs;

y.      1948 Leaf Boxing PSA 8 Group with Joe Louis (22);

z.      1951 Topps Ringside #43 Ray Robinson PSA 8;

aa.     Muhammad Ali Fight Tickets (3);

bb.     1976 Ali vs Young Fight Program;

cc.     1976 Muhammad Ali vs Richard Dunn Full Ticket;

dd.     1977 Ali vs Shavers Fight Program & Full Ticket;

ee.     Joe DiMaggio Painted and Signed Home Plate;

ff.     Oversized Dr. Seuss Signed Original "Cat in the Hat" Drawing;

gg.     "Mushmouth" Fat Albert Animation Cel Signed by Bill Cosby;

hh.     Ted Knight's "Judge Smails" Captains Hat From "Caddy Shack";

ii.     Batman Movie Prop Badge;

jj.    George Bush Limited Edition Signed Yale Baseball Jersey;

kk.    Chicago Cubs Sign;

ll.    George Mikan's 50 Greatest Players Signed Lithograph;

mm.    Julius Erving Game Worn Shoes;

nn.    Karl Malone Game Used Road Jersey;

oo.    Shaquille O'Neal Game Used Home Jersey;

pp.    Complete Run of Original Super Bowl Tickets (1-35);

qq.    1979-80 "Pistol Pete" Maravich Boston Celtics Game-Worn Warmup Jacket;

rr.    1982 Final Four Full Tickets (2);

ss.    The Ultimate Mickey Mantle Single Signed Stat McPhail Ball;

tt.    1965 Very Rare Ali-Liston Stepin Fetchit Program;

uu.    1973 Muhammad Ali Broken Jaw X-Ray Signed by Ali and Norton;

vv.    Muhammad Ali's Personal Ticket to Ali-London Fight;

ww.    Payne Stewart-Worn Cap, Knickers and Socks with Copy of a Letter from His Wife;

xx.    Early 1990s Andre Dawson Autographed Game-Used Bat;

yy.    1998 Mark Grace Chicago Cubs Game-Used and Signed Bat with Team Letter;

zz.    Negro Leagues Single Signed Baseballs (8);

aaa.    1975 Muhammad Ali vs Chuck Wepner Fight-Worn Shoes;

bbb.    Late 1950s Bob Cousy Boston Celtics Game-Used Home Durene Jersey;

ccc.    1992-93 Larry Johnson Charlotte Hornets Game-Used Road Mesh;

ddd.    Jersey & 1992-93 Alonzo Mourning Game-Used Home Mesh Rookie Jersey (2);

eee.    1994-95 Karl Malone Utah Jazz Game-Used Home Mesh Jersey;

fff.    1994-95 John Stockton Utah Jazz Game-Used Home Mesh Jersey;

ggg.    1955 Harry Gallatin All-Star Game Uniform;

hhh.    Late 1970s George Gervin San Antonio Spurs Game-Used Home Mesh Jersey;

iii.    1986 Artis Gilmore All-Star Game-Used Uniform;

jjj.    Circa 1970 Elvin Hayes San Diego Rockets Game-Used Home Durene Jersey (Very Rare);

kkk.    Early 1980s Alex English Denver Nuggets Game-Used Home Jersey;

lll.    Late 1950s Slater Martin St. Louis Hawks Game-Used Home

28

Jersey;

mmm.    1994-95 Jason Kidd Dallas Mavericks Game-Used Home Rookie Jersey;

nnn.    Circa 1968 Cliff Hagan Dallas Chaparrals ABA Game-Used Home Jersey;

ooo.    2002 Donté Stallworth New Orleans Saints Game-Used Black Mesh Jersey;

ppp.    Late 1980s Emmitt Smith Florida Gators Game-Used Helmet;

qqq.    1968 Gaylord Perry San Francisco Giants Game-Used Road Flannel Jersey;

rrr.    7/28/91 Dennis Martinez Signed "Perfect Game" Game Ball (PSA/DNA);

sss.    Various TOPPS and TOPPS STICKER football, baseball, and basketball player cards for period 1978-1988;

ttt.    1999 Sammy Sosa Complete Run of Unused Home Run Tickets;

uuu.    1933 Gridiron Football Coin-Op Machine;

vvv.    1941 and 1943 Chicago Bears NFL Championship Game Programs (2);

www.    1950's "Fighting Irish" Pinball Game;

xxx.    1983 through 1986 Star Co. Basketball Card Complete Set

29

Collection (36);

yyy.    Cassius Clay Signed 1960 Olympic Program;

zzz.    1964 Clay vs Liston First Fight Site Program;

aaaa.    1965-1978 Muhammad Ali Fight Program Collection (7);

bbbb.    1972 Ali vs Patterson Fight Worn Trunks;

cccc.    Muhammad Ali Fight Worn Robe from the Thrilla in Manilla;

dddd.    Jimmie Foxx Single Signature Baseball;

eeee.    Tris Speaker Single Signed Baseball;

ffff.    "Superb" Mark McGwire Autographed Baseball Hoard (27);

gggg.    Chicago White Sox Portraits Collection (21) by Andy Jurinko;

hhhh.    William Wrigley Autographed Photo;

iiii.    1930's "Charlie Grimm's Cubs" Portrait Pennant;

jjjj.    1948 Charlie Grimm Chicago Cubs Complete Uniform;

kkkk.    Pre-1916 Eddie Collins Side-written Game Used Bat;

llll.    1920's Ki Ki Cuyler Game Used Bat;

mmmm.    1916-20 Ty Cobb Game Used Bat;

nnnn.    1950's Williams "Lucky Inning" Pinball Game;

oooo.    "Spectacular" 1957 Williams Deluxe "Official Baseball" Pinball

Machine;

pppp.    Negro League Old Timers Signed Jersey, Bat, and Poster;

qqqq.  1991 Score Mickey Mantle Autographed PSA-Graded Proof

Set (7);

rrrr.   High Grade 1951 Topps Ringside Boxing Near Set (82/96);

ssss.   Mickey Mantle Signed Replica Jersey;

tttt.    1938 World Series Signed Team Ball;

uuuu.  Roberto Clemente Single Signature Ball;

vvvv.  1965-68 Pete Rose Game Used Bat;

wwww.      Early 1980's George Brett Louisville Slugger Signed

Game Used Bat;

xxxx.  1984 Mike Schmidt Home Run Game Bat;

yyyy.  "Unbelievable" Willie Mays Game Used Sunglasses;

zzzz.   2 1987T FB Vending Boxes;

aaaaa. 96 1983T FB Cello Packs;

bbbbb.       1980T FB Wax Rack Pack;

ccccc. 1973T FB Vending Box;

ddddd.       1978T FB Vending Box;

eeeee. 1985T FB Grousey Rack Box;

fffff.   3 1981T FB Rack Packs;

ggggg.       Complete 1962 Topps FB Set GPA 7.90;

hhhhh.       Complete 1972 PSA Hockey Set GPA 8.32;

31

    iiiii. Various Superior Sports Auction Spring Items, purchased from "The Football Card Store" for $14,035.60, pursuant to invoice #3722;

    jjjjj. Approximately 26 sports cards purchased in August 2005 for $31,864.00 from "The Football Card Store,"pursuant to invoices #3746, 3747, and 3748;

    kkkkk. 1964 Philadelphia Set;

    lllll. Sports cards and other items purchased for $5,000 in or about September 2007 from "The Football Card Store" pursuant to invoices #6019 and 6016;

    mmmmm. Sports cards and other items purchased from Mint State Inc. for $32,000 in or about March 2002 pursuant to invoices #188 and 189;

    nnnnn. Sports cards and other items purchased from Mint State Inc. for $24,000 in or about April 2002 pursuant to invoices #240;

    ooooo. Sports cards and other items purchased from Mint State Inc. for $37,500 in or about August 2003 pursuant to invoices #1362, 1398, and 1401;

    ppppp. Sports cards and other items purchased in April and May 2004, from Mint State Inc. for $20,000 pursuant to invoice #1737;

    qqqqq. Sports cards and other items purchased from Mint State Inc. for $69,000 in or about March 2005 pursuant to invoices #2672, 2684, 2686, and 2711;

    rrrrr. Sports cards and other items purchased from Mint State Inc. for $8,938 in or about May 2005 pursuant to invoice #2720;

    sssss. Sports cards and other items purchased from Mint State

Inc. for $10,000 in or about January 2006 pursuant to invoices #3597 and 3600;

    ttttt. Sports cards and other items purchased from Mint State Inc. for

$30,000 in or about April 2006 pursuant to invoice # 3947; and

    uuuuu.  Sports cards and other items purchased from Mint State

Inc. for $7,842 in or about August 2006 pursuant to invoice #4264.

### Substitute Asset Provision

  47. If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

  (1) cannot be located upon the exercise of due diligence;

  (2) has been transferred or sold to, or deposited with, a third person;

  (3) has been placed beyond the jurisdiction of the Court;

  (4) has been substantially diminished in value; or

  (5) has been commingled with other property which cannot be subdivided

  without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any

other property of said defendants up to the value of the above forfeitable property, including

but not limited to the following: sports memorabilia collection of JOHN B. OHLE III, the

defendant, including items held in the entity names "Museum of Sports History," "Festivus

for the Rest of Us, Inc.," "Royal Collectibles LP," "JSJD Grantor Trust," and "Dalton

Ventures LLC."

(Title 18, United States Code, Section 981, and
Title 28, United States Code, Section 2461)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

========================

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

========================

**UNITED STATES OF AMERICA**

- v -

**JOHN B. OHLE III and**
**WILLIAM BRADLEY,**

        **Defendants.**

========================

## <u>INDICTMENT</u>

S3 08 Cr. 1109 (LBS)

(Title 18, U.S.C., § 371; Title 26,  U.S.C., § 7201)

 

PREET BHARARA
Acting United States Attorney

**A TRUE BILL**

_____
Foreperson

========================

_Indictment Filed_

_T. Maas, USMJ_

_2 C_
_4/1/10_