UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :

UNITED STATES OF AMERICA,              :     ECF

        - v. -                         :     S3 08 Cr. 1109 (JSR)

JOHN B. OHLE III, and                  :
WILLIAM E. BRADLEY,
                                       :

                        Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL


PREET BHARARA
United States Attorney for the Southern
District of New York


NANETTE L. DAVIS,
STANLEY J. OKULA, JR.,
Assistant United States Attorneys,

        — Of Counsel —

# <u>TABLE OF CONTENTS</u>

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    POINT ONE: THE EVIDENCE ESTABLISHED A
    SCHEME TO DEFRAUD BANK ONE OF MONEY . . . . . . . . . . . . . . . . . . . . 2

        A.     Governing Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    POINT TWO: THE EVIDENCE ESTABLISHED THE
    MEMBERSHIP OF OHLE AND BRADLEY IN A
    SINGLE CONSPIRACY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.     Governing Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    POINT THREE: VENUE ON COUNT TWO WAS
    PROPER IN THE SOUTHERN DISTRICT OF NEW YORK . . . . . . . . . . . . . 18

        A.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.     Governing Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        C.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    POINT FOUR: OHLE'S ATTACK ON COUNT THREE IS
    MERITLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        B.     Governing Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        C.     Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF AUTHORITIES

### FEDERAL CASES

American Principals Leasing Corp. v. United States, 904 F.2d 477 (9th Cir. 1990) .................................................................................................. 30

Duffie v. United States, 2010 WL 786532 (5th Cir. 2010) ............................................. 30

Erershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991) ............................................. 32

Griffin v. United States, 502 U.S. 46 (1991) .................................................. 27

Spies v. United States, 317 U.S. 492 (1943) ...................................... 22

Turner v. United States, 396 U.S. 398 (1970) ................................................ 28

United States v. al Ghazi, No. S3 07 CR 354(JSR), 2009 WL 1605741 (S.D.N.Y. June 9, 2009) ................................................................................ 3

United States v. Aleskerova, 300 F.3d 286 (2d Cir.2002) ................................ 3

United States v. Alessi, 638 F.2d 466 (2d Cir. 1980) ...................................... 13

United States v. Autuori, 212 F.3d 105 (2d Cir.2000) ...................................... 3

United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181 (2d Cir. 1989) ................ 15

United States v. Berger, 224 F.3d 107 (2d Cir. 2000) .................................... 12

Unites States v. Binstein, No. 94 Cr. 386 (JBS), 1996 WL 19132 (D.N.J. Jan. 3, 1996) ................................................................................ 30

United States v. Chalarca, 95 F.3d 239 (2d Cir. 1996) .................................. 22

United States v. Cusimano, 123 F.3d 83 (2d Cir. 1997) ................................ 13

United States v. Desena, 287 F.3d 170 (2d Cir. 2002) ...................................... 3

United States v. Downing, 297 F.3d 52 (2d Cir. 2002) .................................. 12

United States v. Finkelstein, 526 F.2d 517 (2d Cir. 1975) ............................ 15

United States v. Florez, 447 F.3d 145 (2d Cir.2006) ...................................... 3

United States v. Gambino, 59 F.3d 353 (2d Cir.1995) .................................................. 3

United States v. Geibel, 369 F.3d 682 (2d Cir. 2004) ............................................. 12, 13

United States v. Johnson, 323 U.S. 273 (1944) ........................................................ 22

United States v. Kaiser, 609 F.3d 556 (2d Cir. 2010) ............................................. 5

United States v. Kelly, 864 F.2d 569 (7th Cir. 1989) ................................................ 30

United States v. Kim, 246 F.3d 186 (2d Cir. 2001) ................................................... 26

United States v. Martino, No. S1 00 Cr. 389 (RCC), 2000 WL 1843233
        (S.D.N.Y. Dec. 14, 2000) .......................................................................... 23

United States v. Matthews, 20 F.3d 538 (2d Cir.1994) ............................................ 3

United States v. McDermott, 245 F.3d 133 (2d Cir. 2001) ........................................ 12

United States v. McDermott, 277 F.3d 240 (2d Cir. 2002) ........................................ 13

United States v. Ramirez, 420 F.3d 134 (2d Cir. 2005) ............................................ 25

United States v. Reed, 773 F.2d 477 (2d Cir. 1985) ................................................. 22

United States v. Rodriguez-Moreno, 526 U.S. 275 (1999) ................................... 22, 25

United States v. Rooney, 866 F.2d 28 (2d Cir. 1989) ............................................... 23

United States v. Root, 560 F. Supp. 2d 402 (E.D. Pa. 2008) .................................. 23, 24

United States v. Rosa, 11 F.3d 315 (2d Cir. 1993) .................................................. 12

United States v. Rosa, 17 F.3d 1531 (2d Cir. 1994) ................................................ 22

United States v. Rowe, 414 F.3d 271 (2d Cir. 2005) ............................................. 21, 22

United States v. Salmonese, 352 F.3d 608 (2d Cir. 2003) ...................................... 27, 28

United States v. Sanchez, 969 F.2d 1409 (2d Cir.1992) ........................................... 3

United States v. Stein, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) .................................. 23

United States v. Stephenson, 895 F.2d 867 (2d Cir. 1990) ....................................... 22

United States v. Stewart, 433 F.3d 273 (2d Cir. 2006) ................................................... 5

United States v. Strawberry, 892 F. Supp. 519 (S.D.N.Y. 1995) ...................... 23, 25, 26

United States v. Sureff, 15 F.3d 225 (2d Cir. 1994) ....................................................... 12

United States v. Svobada, 347 F.3d 471 (2d Cir. 2003) ................................................. 25

United States v. Washington, 48 F.3d 73 (2d Cir. 1995) ................................................ 13

United States v. Waters, 978 F.2d 1310 (2d Cir. 1992) ............................................. 29, 30

Yates v. United States, 354 U.S. 298 (1957) .................................................................. 27

## FEDERAL STATUTES

18 U.S.C. § 3237(a) ....................................................................................................... 22

26 U.S.C. § 465(b)(4) ..................................................................................................... 29

26 U.S.C. § 7201 ............................................................................................................ 22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :

**UNITED STATES OF AMERICA,**          :     **ECF**

   - v. -                                     :     **S3 08 Cr. 1109 (JSR)**

**JOHN B. OHLE III, and**              :
**WILLIAM E. BRADLEY,**

                                                    :

                            **Defendants.**     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

The United States respectfully submits this reply Memorandum of Law in opposition to defendants' motions for a judgment of acquittal or, in the alternative, for a new trial, pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure. For the reasons set forth below, defendants' motions should be denied.

### INTRODUCTION

In the course of facilitating the execution of a tax shelter called HOMER, defendant Ohle — together with the defendant Bradley and others — devised an elaborate scheme to defraud Ohle's employer, Bank One. In carrying out that scheme, Ohle and others defrauded Bank One and a trust client of Ohle's named Ecetra Ames out of millions of dollars, and then cheated on their own taxes by failing to report and pay taxes on those ill-gotten gains. Count One of the third Superseding Indictment (the "Indictment" or "Ind.") charged both Ohle and Bradley with conspiring between 2001 and 2004 to defraud Bank One and Ecetra Ames, to defraud the United States, and to commit

tax evasion with respect to the tax liabilities of Ohle and his co-conspirators, who were not HOMER clients.  The Indictment alleged that as a result of his scheme to defraud alleged in Count One, Ohle used proceeds of that fraud to fund the operation of the HOMER tax shelters.  Ind., ¶¶ 35, 37.  In addition, Ohle, Bradley, and their co-conspirators obtained money by fraud from Bank One, through the submission of false invoices for bogus referral fees related to the HOMER tax shelter, which fees they kept and failed to report to the IRS.  Id.  The Indictment also charged defendant Ohle with two counts of tax evasion as to the 2001 and 2002 tax years, with significant amounts of the unreported income deriving from the conduct charged in Count One.

On June 2, 2010, following a trial that spanned approximately three weeks, the jury returned guilty verdicts against Ohle and Bradley on all counts.  Both defendants now move for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative, a new trial pursuant to Rule 33.

## ARGUMENT

### POINT ONE

#### THE EVIDENCE ESTABLISHED A
#### SCHEME TO DEFRAUD BANK ONE OF MONEY

Count One charges defendants Ohle and Bradley with a conspiracy to defraud Bank One and the IRS.  In order to take advantage of the ten-year statute of limitations, pursuant to 18 U.S.C. § 3293, the Government must have proven that the Count One scheme "affected a financial institution," as this Court instructed the jury.  Because the evidence amply demonstrated that defendants Ohle and Bradley schemed to defraud Bank One of referral fees to which they were not entitled, the conviction on Count One should stand.

A.      **Governing Legal Principles**

This Court recently noted the following legal standards for deciding a defendant's motion

for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29:

> Pursuant to Fed.R.Crim.P. 29, a district court may set aside a guilty verdict only
> upon a finding that "the evidence [was] insufficient to sustain a conviction." Fed.
> R. Crim. P. 29.  A defendant making an insufficiency claim "bears a very heavy
> burden," United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002), and a jury's
> verdict must be upheld if any "rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt."  United States v. Autuori, 212
> F.3d 105, 114 (2d Cir.2000) (citation and quotation omitted).  When considering
> Rule 29 motions, a court must "view[] all of the evidence in the light most favorable
> to the government," United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir.2002),
> and "resolve all issues of credibility in favor of the jury's verdict." Desena, 287 F.3d
> at 177 (citation omitted).  In the context of Rule 29 motions, "[p]ieces of evidence
> must be viewed not in isolation but in conjunction," United States v. Matthews, 20
> F.3d 538, 548 (2d Cir.1994), and courts must be "mindful that the task of choosing
> among permissible competing inferences is for the jury, not a reviewing court."
> United States v. Florez, 447 F.3d 145, 155 (2d Cir.2006).

United States v. al Ghazi, No. S3 07 CR 354(JSR), 2009 WL 1605741, at *1 (S.D.N.Y. June 9,

2009).  The Court further noted the even more difficult standard for granting a motion for new trial

under Rule 33 of the Federal Rules of Criminal Procedure:

> Second, defendant argues, in the alternative, for a new trial pursuant to
> Fed.R.Crim.P. 33, which allows for a new trial "if the interest of justice so require."
> Fed.R.Crim.P. 33.  Motions for a new trial "are disfavored in this Circuit," however,
> United States v. Gambino, 59 F.3d 353, 364 (2d Cir.1995), and are thus granted only
> in "the most extraordinary circumstances," such as when there is "a real concern that
> an innocent person may have been convicted."  United States v. Sanchez, 969 F.2d
> 1409, 1414 (2d Cir.1992). In ruling on such a motion, the ultimate question is
> whether there is "competent, satisfactory and sufficient evidence" to support the
> jury's finding of guilt beyond a reasonable doubt.  Id.

al Ghazi, id. at *2.

B.   **Discussion**

Defendants contend that the evidence was insufficient to prove the existence of a scheme to defraud Bank One of funds, directly or indirectly.  In doing so, they ignore the plain import of the documentary evidence and the significant testimonial evidence — evidence that would permit a rational jury to convict on Count One.  That evidence, taken in the light most favorable to the Government, persuasively established that the referral fee scheme — concocted by defendant John Ohle and executed by him, defendant Bradley, and their co-conspirators — acted to deprive Bank One of fees that would otherwise have inured to its benefit.

On each of the HOMER tax shelter transactions, Bank One was paid a portion of the fee charged to the HOMER clients by J&G.  (GX 3-3, 3-8, 3-20, 2-42, 2-43.)  Sandra Burnside, legal assistant to Paul Daugerdas and Donna Guerin, the J&G partners  who worked with John Ohle in developing the HOMER tax shelter, testified about two spreadsheets maintained by J&G that tracked the HOMER tax shelter sales.  One, GX 2-42, was a document that Burnside  personally prepared "to keep track of" the HOMER clients, using figures provided to her by Daugerdas or  Guerin.  (Tr. 155, 189.)  That spreadsheet lists the fees to be paid to Bank One in each of the HOMER tax shelters, including each of the nine tax shelters for which bogus invoices were submitted.  The spreadsheet shows that each HOMER client was to be charged 4.4% of the tax loss by J&G, with 1.8% to be allocated to Bank One as its fee for the co-promotion of the HOMER shelters (with one exception – the Knoedler Archivum transaction, which was 0.8%).  These figures are consistent with Paul Ferguson's testimony that the clients were charged 5-6% of the tax loss, portions of which went to Bank One and J&G.[1]

_____

[1]   Thus, defendants' claim that "[t]here was no testimonial or documentary evidence that such a fixed percentage fee arrangement existed as between Bank One and J&G on all HOMER

The second spreadsheet, GX 2-43, lists the amounts actually paid to Bank One by J&G on each of the HOMER transactions.[2]  The figures on GX 2-43 are the same as those on GX 3-8, which

transactions" (Mem. at 4-5) is simply wrong.

[2]   Defendants claim that GX 2-43 was erroneously admitted by the Court as a business record.  However, as Sandra Burnside laid an adequate foundation, the Court correctly admitted the exhibit as a business record pursuant to Federal Rule of Evidence 803(6).  Burnside testified that the record was made by either her or Donna Guerin and as she did not recognize it as one that she had created she believed it was Guerin who made it: "It would have been myself or Donna Guerin [who created the spreadsheet.]. . .  Donna did spreadsheets as much as I did and if I didn't do it she did. It would be either Donna or myself."  (Tr. 165.)  The spreadsheet was one of a form that was used by J&G to track the implementation of the HOMER transactions at the time they were being implemented, using information from J&G's records.  (Tr. 165-66.)  Burnside testified as follows:

> Q:   Ms. Burnside, were you aware of tracking by Jenkins (sic) and Gilchrist about fees related to the  Homer transactions?
> A:   Yes.
> Q:   And was this spreadsheet related to such tracking?
> A:   Yes, that is what this looks like, yes.
> Q:   And it (sic) was the tracking done at or around the time of the implementation of the Homer transactions?
> A:   Yes, it would have been.

(Tr. 164-65).  Burnside further testified that it was a business record of J&G that was maintained in the ordinary course of J&G's business.  (Tr. 166.)  This testimony laid an adequate foundation for the business records exception under Rule 803(6), including the contemporaneity requirement. As the Second Circuit recently made clear, "The purpose of the rule is to ensure that documents were not created for 'personal purpose[s] . . . or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'  United States v. Freidin, 849 F.2d 716, 719 (2d Cir.1988).  We have stated that Rule 803(6) 'favors the admission of evidence rather than its exclusion if it has any probative value at all.'  United States v. Williams, 205 F.3d 23, 34 (2d Cir.2000)."  United States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010) (internal quotations omitted; alteration in original); see also United States v. Stewart, 433 F.3d 273, 316-17 (2d Cir. 2006) (phone logs admissible; "business records may be admitted notwithstanding the unavailability of the record's author, so long as a 'custodian or other qualified witness' testifies that the document was 'kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the [record].'") (quoting Williams, 205 F.3d at 24 (other citations omitted)).  Even if the Court were to conclude that the record was improperly admitted, its admission was harmless as the information therein is also included in GX 3-8, which was admitted through witness Deborah Price without objection by the defense.  (Tr. 241.)  GX 3-8 appears to have been inadvertently omitted from the Government's Admitted Exhibit List.

is a spreadsheet created and maintained by Deborah Price, an administrator for the ISG at Bank One. Price testified at trial about several spreadsheets she prepared that detailed the fees Bank One received from J&G on each of the HOMER transactions.  (GX 3-3, 3-8, 3-20).  For each of the nine HOMER tax shelter transactions in which Ohle, Bradley, and Steger submitted bogus referral fee invoices, the difference between the amounts listed as due to Bank One on Burnside's spreadsheet, GX 2-42, and the amounts actually paid to Bank One, GX 2-43, GX 3-3, and 3-8, equaled exactly or almost exactly the amount of the bogus invoices.[3]  This shows that, but for the bogus invoice amounts, Bank One would have received the higher amount of the fees as listed in Burnside's spreadsheet.

The Services Agreements, dated December 27, 2001,[4] and sent from Bank One to J&G on each of the HOMER transactions, logically reflect the amounts that Bank One actually received, net of referral fees.  Compare GX 2-1 through 2-9 with GX 2-43, GX 3-8.  The invoices sent by Bank One to J&G match the amounts listed in the Services Agreements, which specifically state that the fees for Bank One's services are independent of fees that might otherwise be charged in the

---

[3]  With four of the transactions, the amounts were identical (Gutterman, Elowe, Wilson, and Brody).  Of the other five bogus invoices, two were rounded up to the nearest $500 (Hoggins and Koerner).  The three Ducote invoices submitted by Bradley were approximately equal (off by $170, $910, and $440 respectively).

[4]  The five bogus invoices submitted by Bradley, GX 2-36-2-40, and the two submitted by Ohle (in the name of Invested Interest), GX 2-34 & 2-35, each were dated before the December 27, 2001 date on the Services Agreement and the December 28, 2001 date on the invoices from Bank One to J&G.  GX 2-1 - 2-9 (Services Agreements); GX 2-22 - 2-31 (invoices).  The two bogus invoices submitted by Steger were dated December 28, 2001.  GX 2-32, 2-33.  Remember however that the initial conversation between Steger and Ohle about the bogus invoices began prior to December 27, 2001, and no later than December 13, 2001, when Ohle had faxed to Steger the instructions on how to complete the bogus referral fee invoices.  A reasonable inference is that by the time the Services Agreement for Hoggins and Elowe were completed on December 27, 2001, Ohle knew the amounts of the referral fees that he would dictate that Steger charge on the bogus invoices.

-6-

transaction, thus suggesting that invoices for other fees such as referral fees would be billed separately, which was indeed the case.  The evidence is that Bank One sent Services Agreements and invoices to J&G that reflected the fees Bank One knew about.

This evidence, however, says nothing about the fees Bank One did not know about — the bogus referral fees that were paid on the basis of fraudulent invoices submitted by Ohle, Bradley, and their co-conspirators.  Nor does it answer the question as to how much Bank One's fees would have been had no bogus referral fees been submitted for payment.  Obviously, Ohle had to conceal his receipt of those fees from Bank One.  Ohle would not cause an invoice to be submitted from Bank One to J&G that included not only Bank One's fee but the bogus referral fee amount, as the difference would have been noted immediately by Deborah Price and others tracking the receipt of fees when J&G sent Bank One its fees net of the referral fee amount.  The glaring difference in amounts billed and amounts received would have caused immediate questions about the disposition of the missing funds — an inquiry Ohle was smart enough to avoid.  Even more obviously, had Ohle revealed his fraudulent referral fee scheme to Bank One, the amounts submitted to J&G in the nine Service Agreements and the invoices from Bank One to J&G would have not been reduced by the amounts in the fraudulent invoices.

Moreover, the defendants in their Memorandum completely ignore the testimony of co-conspirators Douglas Steger, John Manella, and Jay Gordon, which further shows that Bank One was defrauded of the bogus referral fee amounts.  Douglas Steger testified that Ohle recruited him to pitch tax shelters purveyed by Bank One, promising Steger a referral fee for each successful tax shelter sale.  (Tr. 1067-68.)  Ohle told Steger that Bank One paid referral fees in a set amount of 25 basis points of the amount of funds to be sheltered.  (Tr. 1068.)  One of the shelters was the HOMER

tax shelter being co-promoted by Bank One and J&G, which Steger learned about from Ohle in the December 2001.  (Tr. 1097.)  Ohle further advised Steger that there were tax shelter transactions for which no referral fee had been paid, id., and advised Steger initially on how to prepare a bogus invoice for the Elowe and Coleman transactions, see GX 20-15.  Ohle's handwritten instructions told Steger to include on the invoice "for services rendered in connection with the Elowe and Coleman [transactions.]"[5]  (Id.; Tr. 1099-1102.)  Shortly thereafter, in a phone call to Steger, Ohle further instructed Steger to separate the one invoice for the two transactions into two invoices and change the name from Coleman to a HOMER client, Graham Hoggins.  (Tr. 1099-1103.)  Steger then faxed the invoices to the ISG for payment, also on Ohle's instructions.  (Tr. 1104-05.)

John Manella testified that he received $184,000 as a referral fee for the Donald Wilson transaction, a client he referred to Bank One for the purpose of executing a HOMER transaction. (Tr. 377, 395-96.)  Manella further testified that Ohle told him Bank One paid referral fees for third parties who referred clients to the HOMER tax shelter.  (Tr. 388.)  Ohle also told Manella that the bank usually paid referral fees only to attorneys and accountants, and  because Manella was neither, he should try to find a stand-in to receive the fee for Manella.  (Tr. 389-90.)  Soon thereafter, before Manella had successfully found a stand-in, Ohle told Manella that he (Ohle) had found someone to be the stand-in — co-conspirator William Bradley.  (Tr. 390-92.)  Manella testified that Ohle determined the amount of the payment and that Manella received the check from Bradley.  (Tr. 378.) Manella further testified that Bradley knew that he was receiving the $184,000 payment as

---

[5]  Defendants' argument that Illinois law would have prohibited a split of legal fees by J&G with Bank One (Mem. at 12-13) only serves to buttress the conclusion that the payment of the bogus referral fees came out of the amounts due to Bank One and not J&G, as J&G — a law firm — would have been prohibited from paying the referral fees, whereas Bank One arguably was not similarly prohibited.

Manella's stand-in and that Manella paid Bradley for those stand-in services. (Tr. 436.)

Jay Gordon, then an attorney with Greenberg Traurig law firm in New York city, testified that he too was paid a referral fee on a HOMER transaction — for the referral of his client Rick Aversano. (Tr. 1546-47.) He testified that he was paid approximately $93,000 for his referral of Aversano to Bank One for a HOMER transaction. (Tr. 1547.) Consistent with the evidence regarding the referral fees paid on the bogus invoices, the difference between the amount listed as due to Bank One on the Aversano transaction on the Burnside spreadsheet, GX 2-42, and the amount Bank One actually received on the Aversano transaction, GX 2-43 and GX 3-8, was $93,500 — the approximate amount of the referral fee Gordon testified he was paid on the Aversano HOMER transaction. This evidence supports the conclusion that payments of third-party referral fees reduced Bank One's portion of the fees on the HOMER tax shelters Bank One co-promoted with J&G.

Although the defense tries to minimize Paul Ferguson's testimony (Mem. at 5-8), he — an ISG member who worked closely with John Ohle and who personally promoted the HOMER transaction (Tr. 63, 69) — testified that the HOMER clients paid fees of 5-6% of the tax loss to be generated through a HOMER tax shelter, and that those fees were split between Bank One, J&G, a subsidiary of Bank One that acted as trustee in the transaction, and Deutsche Bank for the options purchased as part of the transaction. (Tr. 90.) Ferguson also testified that his understanding, derived from a transaction he sold and a conversation with John Ohle, was that the payment of referral fees reduced the fees that Bank One received on the transaction. (Tr. 92-94.) Ferguson also testified on cross-examination that he knew that John Manella was getting a referral fee from the Wilson HOMER transaction. (Tr. 125.)

Thus, the evidence — viewed in its totality in the light most favorable to the Government

— established  that the payment of the bogus referral fees came from Bank One's portion of the client's HOMER fees with the result being that Bank One was defrauded by the defendants' illegal actions.         That defendant Ohle was intimately aware of the fees to be paid on each of the HOMER transactions and the financial impact of the fraudulent referral fee invoices on Bank One was also proven at trial.  Paul Ferguson testified that he was paid a salary and commission based on the amount of new business he brought in including fees on the transactions executed by the ISG, and that others in the ISG were similarly compensated.  (Tr. 94.)  He further testified that Ohle was paid a bonus based not only on Ohle's production but on the production of the members of his group.  (Tr. 95.)  HOMER client Donald Wilson testified that Ohle "described the HOMER shelter as something he [Ohle] and his team developed with the people at Jenkins (sic)."  (Tr. 374.)  Ohle personally led the pitches to a number of HOMER clients, including Donald Wilson (Tr. 352-355), John Koerner (Tr. 1774-76; GX 101-2, ¶ 2), Graham Hoggins (Tr. 1051-53; GX 19-2, ¶ 2), Scott Gutterman (Tr. 191-98), and David Ducote (Tr. 1731-34).  Deborah Price testified that John Ohle was a Regional Director of ISG, whose compensation was based not only on his sales but the sales of others in his group.  (Tr. 231-33; GX 3-5, 3-27.)  She further testified that, as to each of the nine HOMER transactions for which the bogus invoices were submitted, Ohle was the ISG employee to whom she would have turned for answers to any questions she had about the fees for those transactions.  (Tr. 240-41.)

Ohle was the driving force behind the false referral fee scheme, which was implemented in a way to conceal the truth from Bank One.  A rational jury could conclude from this evidence is that John Ohle was completely aware of the fee structure overall and the fees to be paid on each and every HOMER transaction.  A jury could reasonably find that Ohle constructed the fraudulent

referral scheme as he did because he knew (1) that Paul Daugerdas would approve the invoices without question as the funds were being paid out of Bank One's portion of the fees, and (2) that because J&G paid the referral fees directly to the third party referral sources, Bank One would never know if a fraudulent referral fee invoice was submitted to J&G.  Thus, in light of Ohle's intimate involvement with the HOMER tax shelter's design, marketing, and implementation, and the receipt of bonuses based on the fees received on the HOMER transactions, it was entirely reasonably foreseeable that Ohle knew exactly how the bogus referral fee payments impacted Bank One financially.

In sum, there is both compelling documentary evidence and testimonial evidence — from Sandra Burnside, Deborah Price, Paul Ferguson, John Manella, Doug Steger, Jay Gordon, Donald Wilson, Scott Gutterman, David Ducote, Graham Hoggins, and John Koerner — which viewed in the light most favorable to the Government, as the Court is required to do, proves beyond a reasonable doubt that the Government has met its burden to show that a conspiracy to defraud Bank One of money.

**POINT TWO**

**THE EVIDENCE ESTABLISHED THE MEMBERSHIP
OF OHLE AND BRADLEY IN A SINGLE CONSPIRACY**

Defendants Ohle and Bradley do not challenge the multiple conspiracy instruction delivered by the Court during its jury charge.  They maintain nevertheless that the evidence was insufficient to permit a rational juror to conclude that a single conspiracy existed.  This argument should be rejected.

**A.**     **Governing Legal Principles**

As the Second Circuit repeatedly has held, whether the Government's proof shows a single

conspiracy or multiple independent conspiracies "is a question of fact for a properly instructed jury." United States v. Berger, 224 F.3d 107, 114 (2d Cir. 2000); United States v. Rosa, 11 F.3d 315, 340 (2d Cir. 1993). Here, at the request of Ohle and Bradley, this Court charged the jury on their multiple conspiracies theory, and neither defendant objected to the content of the charge. Nor does either Ohle or Bradley suggest in this post-trial setting that the Court's instruction was improper. Accordingly, the only question that remains is whether the jury's finding that the Government had proven the single conspiracy charged in Count One was supported by sufficient evidence. It clearly was.

The jury's verdict that a single conspiracy existed cannot be disturbed unless the defendant demonstrates "that no rational trier of fact could have concluded that a single conspiracy existed based on the evidence presented." United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994). To prove a single conspiracy, the Government need show only that the defendant "agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Geibel, 369 F.3d 682, 688 (2d Cir. 2004).

A single conspiracy "may encompass members who neither know one another's identities, nor specifically know of one another's involvement." Sureff, 15 F.3d at 230; accord United States v. Downing, 297 F.3d 52, 56 (2d Cir. 2002). Nor is a single conspiracy transformed into multiple conspiracies "merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'" Geibel, 369 F.3d at 688 (quoting United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001) ("McDermott I")).

Finally, even if a variance exists between an indictment charging a single conspiracy and

-12-

proof of multiple conspiracies at trial, that alone does not upset a jury's verdict.  "It is the law of this Circuit that when a defendant is charged with a single conspiracy among multiple members, and the proof at trial shows that he conspired with some, but not all, of those members, the variance is subject to the harmless error rule."  United States v. McDermott, 277 F.3d 240, 242 (2d Cir. 2002) ("McDermott II"); see Geibel, 369 F.3d at 692-93.  Thus, to obtain relief from his conviction, a defendant must demonstrate not only that a variance exists between the indictment and the proof at trial, but also that the alleged variance resulted in "substantial prejudice."  Geibel, 369 F.3d at 692 (quoting McDermott II, 277 F.3d at 242).

Accordingly, setting aside a jury's determination that a single conspiracy existed will be warranted only upon a showing that the evidence in support of the conspiracy in which the defendant did not participate prejudiced him with respect to proof of the conspiracy to which he was a party, see United States v. Cusimano, 123 F.3d 83, 89 (2d Cir. 1997) — that is to say, that the jury convicted him "on evidence unrelated to his own alleged activity."  Geibel, 369 F.3d at 692 (quoting United States v. Washington, 48 F.3d 73, 80 (2d Cir. 1995)).  On the other hand, if the crimes of the various defendants were "not markedly different," with each defendant "[doing] essentially the same thing as his co-defendants had done," then no prejudice has been shown and the conviction should be affirmed.  United States v. Alessi, 638 F.2d 466, 475 (2d Cir. 1980); see also Cusimano, 123 F.3d at 90.

**B.    Discussion**

In the instant case, the proof supported the conclusion that there existed a single conspiracy that had at its core an agreement between Ohle, Steger, Bradley and others to fraudulently obtain funds from Bank One in a variety of ways and through "mutual interactions."  (Tr. 1840.)   The

-13-

conspiracy also embraced the separate but related object to defraud the IRS in connection with the underlying fraud scheme through false tax reporting or the failure to report.

As the proof showed, Ohle embarked on the scheme after learning that the HOMER tax shelter would be rolled out by Bank One in the latter part of 2001.  Ohle initially secured the agreement of childhood friend Ken Brown to act as a straw person (the "third-party purchaser") in the HOMER transactions and to split the profits from that role with Ohle.  In order to fund Brown's participation in HOMER, Ohle worked with Steger to unlawfully obtain funds from Ohle's trust client — the Ames family — through investments in the same New York-based hedge fund, Carpe Diem, for which Steger was a salesperson.  Unbeknownst to the Ames, Ohle and Steger arranged to receive a 5% fee for the placement of those investments.  Ohle also misappropriated $347,834 of the Ames' funds, which had been run through Carpe Diem at the direction of Ohle.  At Ohle's instructions, over $647,000 of the Carpe Diem fraud funds were directed through bank accounts in New York and then to the Bank of America account of Ohle nominee Jonathan Freedman.  Ohle directed that $375,000 of those funds be used to fund Brown's participation in the HOMER tax shelter.[6]

At the same time he was scheming with Steger to fraudulently obtain the funds to finance Ken Brown, Ohle was working with both Steger and Bradley to cause fraudulent referral fee invoices to be sent to J&G, in order to obtain a portion of Bank One's HOMER fees by fraud.  Ohle submitted two bogus invoices in the name of Invested Interest (for the Wilson and Brody HOMER transactions), which claimed fees for services that had not been rendered and referrals that had not been made.  Ohle also caused Steger to submit two false invoices and defendant Bradley to submit

---

[6]  Some of the Carpe Diem fraud funds also separately enriched Ohle and Steger, and none of those funds were reported on Ohle's tax returns

five false invoices, respectively, for referral fees related to seven HOMER clients.[7]  The invoices

all were submitted to J&G in or about December 2001.  Each false invoice resulted in the payment

of referral fees to Ohle, Steger, and Bradley, to the financial detriment of Bank One.  Ohle caused

Bradley to share his proceeds with co-conspirator John Manella.  Each of the co-conspirators

benefitted financially from this scheme, albeit Ohle much more than the others.

More particularly, the funds from Bradley and Steger's participation initially ran through

bank accounts under their control.  Bradley then retained or was paid $29,000 of the $255,000 in ill-

gotten referral fees, passing $184,000 to Manella, who was otherwise due legitimate referral fees

from the Wilson and Brody transactions because of Manella's referral of Wilson to Bank One (the

"Ohle Invoices").[8]  Bradley also directed $46,000 to Ohle.  Manella thereafter filed false tax returns

to evade the payment of taxes on those funds.  Bradley failed to properly report his receipt of the

$29,000 on his tax returns, and failed file a personal income tax return for 2002 — the year in which

_____

[7]  The Steger invoices were for the Elowe and Hoggins HOMER transactions.  The Bradley invoices were for the three Ducote family members' HOMER transactions, as well as for the Gutterman and Koerner HOMER transactions.

[8]  Manella's referral of Wilson to the HOMER transaction entitled Manella to receive referral fees, under the regime used by J&G and Bank One.  Manella testified that he and Ohle decided to keep Manella's name off the paperwork related to the referral fees and receive the fees through Bradley in part to conceal Manella's receipt of referral fees from his then-employer Frye Louis, Bank One, and Donald Wilson.  (Tr. 406-08, 418-20.)  The source for the referral fee payment to Manella was the funds Bradley received from his submission of false invoices.  Ohle in fact personally received most of the referral fees for Wilson, although Ohle had nothing to do with that referral, and in fact was barred by Bank One's policy from receiving any referral fees at all.  The fact that Ohle deprived Manella of additional referral fees that he otherwise arguably would have been paid does not defeat the existence of a conspiracy.  See Beech-Nut, 871 F.2d at 1192 1989) ("Though [defendant] Lavery asked the court to instruct the jury also that he could not be found guilty of conspiring with the suppliers if the jury found that the suppliers sought to defraud Beech-Nut, the court's refusal to give that charge was not error, for the requested instruction does not accurately reflect the law.  'That certain defendants were eager to cheat each other for a large slice of the spoils does not obscure the unifying means used by all of the to defraud the public. . . .'") (quoting United States v. Finkelstein, 526 F.2d 517, 522 (2d Cir. 1975)).

he received the most money.

Steger received the $81,500 from the Hoggins and Elowe invoices he submitted, and transferred that sum a week later to John Ohle's personal bank account at Hibernia Bank, at Ohle's instructions. Steger also received $920,000 from Ohle's Wilson/Brody false invoices, which Ohle transferred through Freedman's Bank of America bank account. Of those funds, Steger transferred $88,500 to Ohle's Hibernia account, and $620,000 to Steger's personal account, then transferred $600,000 to Ohle's personal account at MB Financial Bank, falsely characterizing it as a loan. At the end of the day, as a result of the false referral fee scheme, Ohle obtained over $830,000, Bradley obtained $29,000, Steger obtained $213,500, and Manella obtained $184,000.

Bradley and Steger needed Ohle to advise them on how to obtain the fraud proceeds and Ohle needed them to submit the false invoices in order to obtain the funds. None of the fraudulently-obtained funds were properly reported on the respective tax returns.

Bradley also assisted Ohle in the fraud on the Ames. In particular, after Ohle was called to account for the money taken during 2001 and 2002 from the Ames accounts, Ohle enlisted Bradley in 2003 to utilize a shell entity formed by Bradley and Ohle — North Shore Legal Financing — to route money back into the Ames account. See GX 101-7 (chart showing, among other things, routing of monies back into Ames accounts, through North Shore Legal Financing). The jury could properly view Bradley's assistance in this regard, for which he was paid approximately $10,000, as part of Bradley's awareness of the scope of the conspiratorial agreement and his continuing efforts to aid Ohle in executing the aims of the conspiracy.

That Bradley was not heavily involved in the Carpe Diem fraud does not negate the existence of a single conspiracy. The common aim or purpose was to help Ohle obtain money from Bank One

-16-

by fraud in connection with the HOMER tax shelter and to get paid by Ohle to provide that help, with no one properly paying taxes on the ill-gotten gains. The co-conspirators all benefitted financially from the frauds in which they participated and that were orchestrated by Ohle, thereby defrauding Bank One, the Ames, and ultimately the IRS.[9]

Finally, the fact that Ken Brown had no direct involvement with Bradley or Manella hardly translates, as Ohle suggests, into a conclusion that two conspiracies existed. The Ohle/Brown sphere of operation was tied to the referral fee sphere because the money Ohle and Steger stole from the Ames was used to fund Brown's participation in HOMER, thus allowing the HOMER transactions to take place. This, in turn, allowed Ohle to work with Steger, Bradley, and Manella, among others, to execute the referral fee sphere of operation.

In sum, the wide-ranging nature of the "steal money from Bank One and the Ames by fraud, pay no taxes" conspiracy was a reflection of the unbounded fraudulent creativity of Ohle and his co-conspirators, not any legal deficiency. The proof at trial, although reflecting certain different spheres of operation, also reflected mutual dependence and assistance among the defendants and their co-conspirators, and thus properly allowed the jury to conclude that a single conspiracy existed.

---

[9] An additional connection between the conspirators with respect to the tax fraud object was the use by Ohle, Brown, and Steger of the 1256 tax shelter. Ohle urged Brown and Steger to enter into those fraudulent transactions to evade the taxes on income that Ohle had them falsely report as their own rather than Ohle's, and on their own income. Also, as noted below, Ohle used his own 1256 transaction to evade taxes on millions of unreported income (from the HOMER referral fee fraud and the Ames embezzlement), as well as the wage and capital gains income he did report.

## POINT THREE

## VENUE ON COUNT TWO WAS PROPER
## IN THE SOUTHERN DISTRICT OF NEW YORK

Defendant Ohle challenges his conviction on Count Two, claiming that the Government

failed to adduce sufficient evidence to establish venue in the Southern District of New York.  Ohle

is wrong, as the evidence at trial demonstrated that Ohle committed or caused to be committed

various "affirmative acts of evasion" within the Southern District of New York.  Venue therefore

was proper in this District.

### A.    Background

Count Two of the third superseding Indictment charged Ohle with personal income tax

evasion for the 2001 year.  In particular, Count Two alleged that Ohle engaged in the following

affirmative acts of evasion, among others, in the Southern District of New York and elsewhere:

> (a) concealing his receipt and disposition of income through the use of various
> nominees; (b) preparing and causing to be prepared, signing and causing to be
> signed, and filing and causing to be filed with the IRS, a false and fraudulent U. S.
> Individual Income Tax Return, Form 1040, for the calendar year 2001, which return
> falsely omitted income of approximately $2,500,000, which falsity caused OHLE to
> substantially understate his taxable income and tax due and owing for the 2001 tax
> year.

Ind., ¶ 43.

In support of the foregoing allegations, the Government proved at trial that Ohle's unreported

income for 2001 totaled approximately $2,900,000, comprised in part of more than $1,600,000

embezzled from the Ames family.  One of the particular items of Ames-related income — a wire

transfer in the amount of $300,000 — stemmed from Ohle's efforts with co-conspirator Douglas

Steger to convince the Ames to invest $7,000,000 in the Carpe Diem investment in 2001 in order

to obtain a substantial commission from it.  Ohle's efforts to obtain that commission included a trip

-18-

by Ohle with Steger to Manhattan in 2001 to meet with Carpe Diem manager Edward Doherty at

Carpe Diem's offices and a telephone call from Ohle to Doherty in New York in which Ohle told

Doherty that the Ames wanted to write "one check" as part of the Ames' Carpe Diem investment,

in order to facilitate Ohle's receipt of his 5% "load" or commission.[10]  Ohle also met in 2001 with

Anthony and Ecetra Ames in Manhattan, where they maintained a home, concerning their potential

Carpe Diem investment.  (Tr. 679-80.)  The Ames' $7,000,000 investment in November 2001

yielded a $350,000 commission, which, unbeknownst to the Ames family or their representatives,

was divided by Ohle and Steger.  Steger received $50,000 in his bank account in Chicago (at

Chicago Investment Group) (Tr. 1091-94), while Ohle caused $300,000 to be sent from Carpe Diem

through New York City to the San Francisco bank account of Invested Interest (which account was

controlled by Ohle's acquaintance, Jonathan Freedman).  (Tr. 1962-65; GX 101-11.)

This $300,000 wire transfer (which was effectuated as a result of a telephone conversation

between Steger and New York-based Doherty) was routed from an entity called Paragon Trust,

which Carpe Diem set up in Bermuda to hold the Ames investment, and sent on to the Invested

Interests account through an account at Citibank in New York.  See GX 72-2-A2 (Bank of America

---

[10]  Doherty testified that Ohle's statement in this regard was made in the context of Carpe Diem's opening of a bank account to receive the Ames' investment.  Doherty's precise testimony in this regard was as follows:

> Q: When the Ames money was going to be sent to Carpe Diem or sent to be invested in the hedge funds, accounts related to Carpe Diem, there was a special account set up, was there not?
> A: Yes, there was.
> Q: How did that come about and why did that come about?
> A: Ohle said he wanted -- the client or clients wanted to write one check or make one payment and it was a way for him to receive the 5 percent load.

(Tr. 1010.)

-19-

wire transfer record showing routing of $300,000 wire transfer through Citibank in New York, New York); 101-7 (stipulation that Citibank official would testify that wire transfers were processed through New York, New York facility of Citibank).  As noted above, this $300,000 wire transfer constituted unreported income to him for the 2001 tax year.  Ohle benefitted personally from that $300,000 not only when he initially caused those funds to be sent to an account he controlled through his nominees Freedman and Steger, but, in addition, when he thereafter (1) caused $125,000 of the $300,000 be sent from the Invested Interest account to Ken Brown on December 4, 2001 to fund Brown's participation in the HOMER tax shelter transactions; and (2) caused $169,800 be sent on December 5, 2001 from Invested Interest to the Hibernia Bank account of John B. Ohle.

Similar steps were taken with respect to a second item of unreported income of Ohle's in 2001 — a $347,834 wire transfer of funds Ohle embezzled from the Ames using the Carpe Diem bank accounts.  Ohle directed that $347,834 be sent from the Ames Trust account at Schwab (San Francisco) through Chase Manhattan Bank in New York City, and on to the Paragon Trust bank account in Bermuda.  Indeed, Ohle personally authored a letter of authorization that he faxed to Schwab on November 27, 2001, which instructed Schwab to wire $347,834 that day from the Ames' Schwab account to an account at Chase in New York, New York, and thereafter credited to Bank of Butterfield and then on to Paragon Trust.  See GX 71-2-G3.

Edward Doherty of Carpe Diem was "surprised" when he learned that the $347,834 — which he considered an "over payment" of the Ames investment in Carpe Diem (Tr. 1010) — had reached Carpe Diem's Paragon Trust account in Bermuda.  Doherty could not recall specifically whether it was Ohle or Steger with whom Carpe Diem dealt about the overpayment.  However, Steger testified that he was not aware of the $347,834 wire transfer.  (Tr. 1126-27.)  Thus, a reasonable inference

from the evidence is that Ohle was the contact person in relation to the transfer.

Doherty testified that because Carpe Diem's receipt of the funds was not expected, Carpe Diem officials promptly informed either Ohle or Doug Steger that the "over payment" had arrived; in response, either Ohle or Steger provided instructions to Carpe Diem in order to effectuate the return of the funds.  In particular, Ohle or Steger instructed Carpe Diem to send the funds to an account (Invested Interest) other than the one from which the funds originated (the Ames Schwab account); the reason for this, according to Ohle or Steger, was that the originating account had purportedly been "closed."  (Tr. 1011.)[11]  As a result of this false information, Carpe Diem "returned" the $347,834 to the Invested Interest account on December 7, 2001.

Ohle benefitted personally from the $347,834 after it was sent to the Invested Interest account by Carpe Diem.  More specifically, Ohle caused $250,000 to be sent from the Invested Interest account to Ken Brown on December 10, 2001, in order to fund Brown's role in the HOMER transaction.  In addition, Ohle caused $97,834 to be sent on December 10, 2001 from Invested Interest to the "John B. Ohle" personal bank account at Hibernia Bank in New Orleans.  That account was used to fund numerous personal purchases by Ohle and his family members.  (GX 101-7.)

**B.**     **Governing Legal Principles**

The Sixth Amendment to the Constitution provides that a defendant has the right to trial in the "district wherein the crime shall have been committed." U.S. Const., Amend. VI; see United States v. Rowe, 414 F.3d 271, 277 (2d Cir. 2005); United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1188 (2d Cir. 1989).  When the defendant is charged with more than one count, venue

---

[11]   This reason, of course, was false, as the originating account had not been closed.

must be proper with respect to each count.  Id.  The Government has the burden of proving at trial

that venue is proper by a preponderance of the evidence.  United States v. Rosa, 17 F.3d 1531, 1541-

42 (2d Cir. 1994); United States v. Stephenson, 895 F.2d 867, 874 (2d Cir. 1990).

Venue for a particular crime may properly lie in more than one district.  United States v.

Rodriguez-Moreno, 526 U.S. 275, 281 (1999) ("[W]here a crime consists of distinct parts which

have different localities the whole may be tried where any part can be proved to have been done.")

(citation omitted).  Moreover, where "the acts constituting the crime and the nature of the crime

charged implicate more than one location, the Constitution does not command a single exclusive

venue."  United States v. Reed, 773 F.2d 477, 480 (2d Cir. 1985).  Indeed, 18 U.S.C. § 3237(a)

expressly provides that "any offense against the United States begun in one district and completed

in another, or committed in more than one district, may be inquired of and prosecuted in any district

in which such offense was begun, continued, or completed."  Accordingly, a defendant accused of

a crime may be prosecuted in any district where any part of such a "continuing offense" occurred.

United States v. Chalarca, 95 F.3d 239 (2d Cir. 1996); see generally United States v. Johnson, 323

U.S. 273, 275 (1944) (continuing offense doctrine applies "over the whole area through which force

propelled by an offender operates"); Rowe, 414 F.3d at 278-79 (re-affirming Johnson's "propelled

force" formulation).

Venue for tax evasion, in violation of 26 U.S.C. § 7201, lies in any district where an

"affirmative act of evasion" or attempted evasion was committed.  In Spies v. United States, 317

U.S. 492, 499 (1943), the Supreme Court explained the "affirmative act" requirement of an evasion

charge should be read broadly: "Congress did not define or limit the methods by which a willful

attempt to defeat and evade might be accomplished and perhaps did not define lest its efforts to do

so result in some unexpected limitation."  The Court provided examples of conduct from which an

"attempt to evade" could be inferred:

> By way of illustration and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.  If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.

Id. (emphasis added); see United States v. Strawberry, 892 F. Supp. 519, 521-22 (S.D.N.Y. 1995);

United States v. Martino, No. S1 00 Cr. 389 (RCC), 2000 WL 1843233, at *3 (S.D.N.Y. Dec. 14,

2000); United States v. Root, 560 F. Supp. 2d 402, 417 (E.D. Pa. 2008), aff'd, 585 F.3d 145 (3d Cir.

2009).

Thus, preparing or filing a tax return clearly would be an affirmative act of evasion satisfying

venue.  See, e.g., United States v. Rooney, 866 F.2d 28, 32 (2d Cir. 1989).  However, venue is by

no means limited to the district of preparation or filing.  Rather, any act of evasion in the district is

enough.  See United States v. Stein, 429 F. Supp. 2d 633, 645 (S.D.N.Y. 2006) (venue proper in

Southern District of New York, even though some relevant tax returns were prepared and filed

elsewhere, where Government alleged "preparation of fraudulent supporting documents, the creation

of financial entities and the implementing of tax shelter transactions through those entities, and the

concealment of the tax shelters from regulators" in this District); Strawberry, id. at 521, 524 (venue

proper where the Government alleged that defendant's attempts at tax evasion included receipt of

cash in this District); see also Martino, id. (venue was proper over tax evasion charges where

defendant sent faxes, placed phone calls and directed wire transfers to a bank within the district in

-23-

furtherance of her tax evasion scheme; in addition, use of New York bank account to receive unreported income suggested that venue is proper in Southern District of New York); Root, 560 F. Supp.2d at 417 (defendant's travel to district where business office was located, and maintaining in that office of memos relating to tax evasion scheme supported venue, despite the preparation and filing of returns in different district).

## C.   **Discussion**

Applying the facts to the foregoing venue principles, venue for Count Two was amply established.  First, Ohle traveled with Steger to New York to meet with Edward Doherty in order to establish the relationship that led to the Ames investment and the Ohle/Steger "commissions" of $300,000 and $50,000, respectively.  Second, Ohle met with the Ames in Manhattan to convince them to make the Carpe Diem investment.  Furthermore, Ohle caused his $300,000 commission to be directed to a nominee bank account (Invested Interest), which was an affirmative act of evasion that was alleged in the Indictment.  Significantly, this $300,000 commission — which constituted unreported income to Ohle — was wire- transferred through Citibank in New York.  Moreover, the sending of the commissions to Steger's Chicago Investment Group account and the Invested Interest account in San Francisco was done pursuant to directions provided by Steger, who was — viewing the facts in the light most favorable to the Government — acting on behalf of Ohle and himself.

In addition to the foregoing, venue was independently established through the Ohle instructions to route the $347,834 in embezzled funds on December 7, 2001 from Schwab to Chase Manhattan bank in New York, and then on to Carpe Diem in Bermuda.  What is more, when Ohle provided Carpe Diem with instructions to return the "over payment," the funds were transferred from Carpe Diem in Bermuda through Citibank in New York, and on to the Invested Interest

-24-

nominee account in San Francisco.

In sum, Ohle committed or caused to be committed various affirmative acts of evasion in connection with his efforts to get hundreds of thousands of dollars of embezzlement income into a nominee bank account.  Those acts, consisting of trips to and meetings in New York, telephone calls to New York, and wire transfers of funds to and through New York, plainly supported venue under the preponderance standard.[12]  United States v. Svobada, 347 F.3d 471, 483 (2d Cir. 2003) (venue appropriate in any district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur or (2) it is foreseeable that such an act would occur in the district of venue).

Contrary to Ohle's claim, the affirmative acts of evasion outlined above were not acts that were "merely preparatory" to the evasion offenses.  Rather, because the "affirmative act" requirement is an essential "conduct element," see United States v. Ramirez, 420 F.3d 134, 144 (2d Cir. 2005) (citing Rodriguez-Moreno, 526 U.S. at 279-80), each one of the alleged affirmative acts, standing alone, can serve as appropriate bases for venue.  Judge Parker's opinion in United States v. Strawberry, 892 F. Supp. 519 (S.D.N.Y. 1995), is instructive in this regard.  There, the defendants,  professional baseball player Daryl Strawberry and his agent, were charged in the Southern District of New York with income tax evasion based on Strawberry's receipt of cash appearance fees at promotional events, which cash was omitted from his income tax returns.  Both defendants moved to dismiss the tax evasion counts on venue grounds, arguing that they neither resided in the Southern District of New York nor had Strawberry's returns prepared, signed, or filed there.

---

[12]   In addition, the options used in the HOMER tax shelters were put on by Deutsche Bank in Manhattan.  (GX 4-1, 10-1-10-8.)

The district court rejected the defendants' venue challenges.  After reviewing the Supreme Court's opinion in <u>Spies</u> and the case law demonstrating that the "affirmative act" element of the tax evasion offense can be satisfied in myriad ways — including conducting business transactions in cash, maintaining no bank accounts, office ledgers, or receipts or disbursement journals, receiving and paying compensation in cash, possessing no credit cards, never acquiring attachable assets, and the use of false names — Judge Parker concluded that the indictment's allegations that "Strawberry's attempt to evade tax by means including the receipt of cash in the Southern District sufficiently allege an affirmative act of attempted evasion within the meaning of <u>Spies</u>, and thus, venue."  892 F. Supp. at 524 (citations omitted).

Judge Parker also squarely rejected the claim that, under <u>Beech-Nut</u>, the receipt of cash constituted "preparatory" acts that were insufficient to support venue, reasoning that because the receipt of cash by Strawberry with the intent to evade tax could amount to a Section 7201 violation, it was an appropriate predicate for venue.  <u>Id.</u> at 524-25.  Moreover, the court reasoned,

> in cases involving § 7201 offenses, courts have turned to <u>Spies</u>, not <u>Beech-Nut</u>, for guidance on venue and on the parameters of this offense.  These courts have found that conduct satisfying the <u>Spies</u> affirmative act requirement provides a proper basis for venue.  The rationale is that conduct satisfying <u>Spies</u> is not merely preparatory to a § 7201 offense, but part of it, because it actually transforms a misdemeanor offense of failing to file a return into a felony § 7201 offense of attempting to evade tax.

<u>Id.</u> at 525.

The rationale of <u>Strawberry</u> plainly applies here.  Ohle's acts with respect to Count Two were central to his personal income tax evasion offenses because they involved Ohle's trip to and other contacts with Carpe Diem representatives and the Ames in New York, as well as his diversion and transfer (through New York bank accounts) of the embezzlement income.  <u>See also</u> <u>United</u>

-26-

States v. Kim, 246 F.3d 186, 192 (2d Cir. 2001) (causing communications to be transmitted into and out of SDNY sufficient to support venue in fraud scheme, observing: "The fact that [the defendant] was not in Manhattan when he caused the wire transmissions does not eliminate the connection between [the defendant's] acts and the Southern District of New York for venue purposes").

In conclusion, Ohle's challenge to venue with respect to Counts Two should be denied.

## POINT FOUR

### OHLE'S ATTACK ON COUNT THREE IS MERITLESS

Ohle challenges his conviction on Count Three, the tax evasion count for the 2002 tax year, claiming that the evidence was insufficient to establish that he violated the tax evasion statute through his involvement in the Section 1256 tax shelter transaction. This challenge should be rejected for a number of reasons. First, because Ohle filed a false income tax return that failed to report millions of income, which was unaffected by the 1256 transaction, the conviction on Count Three should remain undisturbed even if the Court were to conclude — and it plainly should not — that the proof concerning the 1256 transaction was factually insufficient.[13] More fundamentally, the

---

[13]   Citing to Yates v. United States, 354 U.S. 298, 312 (1957), overruled on other grounds, Burks v. United States, 437 U.S. 1, 10 (1978), Ohle suggests that any insufficiency with respect to the attack on the Section 1256 transaction warrants overturning the conviction on Count Three. This is an incorrect statement of the law. As the Second Circuit explained in United States v. Salmonese, 352 F.3d 608, 624 (2d Cir. 2003), the Supreme Court in Yates considered a general guilty verdict on a Smith Act conspiracy with the twin objects of (1) advocating the overthrow of the United States government and (2) organizing, as the Communist Party of America, a society of persons to so advocate. The Court ruled that because the Smith Act's organization prohibition referred only to the creation of the Communist Party — an event indisputably occurring outside the applicable statute of limitations — the conspiracy conviction could not rest on that objective. 354 U.S. at 304-11. The Court rejected the Government's argument that the conviction could be affirmed on the advocacy objective, stating that a general verdict must be set aside where it "is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Id. at 312. In Griffin v. United States, 502 U.S. 46, 56-59 (1991), however, the Court clarified that the broad pronouncement of Yates applies only when there is legal error in one of the bases for conviction. The Court explained that by "legal error," it meant "a mistake about the law," not "a mistake

Court's jury instruction relating to the 1256 transaction, including language that arguably went beyond what was required for the Government to establish a lack of economic substance, did not prejudice Ohle in any manner.

## A.    **Background**

Ohle's tax evasion offense for the 2002 tax year had two basic components.  First, there was approximately $3,593,406 in unreported income stemming from embezzlements from the Ames CRUT and HOMER referral fee income.  (Tr. 1988) (Revenue Agent Catanzaro summarizing 2002 unreported income).  Second, in order to evade the taxes Ohle owed on approximately $1.025 million in wage income he received from Bank One as well as approximately $3,000,000 in income he received from Donald Wilson as a result of Ohle's sale to Wilson of a portion of Ohle's company, Dumaine Consulting, Ohle engaged in his own 1256 tax shelter transaction.  (Tr. 1503; GX 37-2.) Through that transaction, Ohle generated approximately $3 million in fraudulent capital losses and $1.2 million in fraudulent ordinary losses.  (Tr. 1629-31) (tax preparer Kurt Anderson testifying about effect of reporting of foreign currency losses on Ohle 2002 return).

Ohle paid just $42,000 — or 1% — for the $4.2 million in losses generated through his 1256 transactions.  (Tr. 1498-1504) (Kruse testimony that Ohle's risk was limited to $30,000 and $12,000 amounts he paid for his two transactions).  Ohle was aware that the amounts at risk in the 1256 transactions would be limited to the 1% amount that the participants paid to execute the transaction,

---

concerning the weight or the factual import of the evidence."  Id.  Indeed, where the error in a verdict is factual, as where one basis for conviction is "unsupported by sufficient evidence," a guilty verdict " 'stands if the evidence is sufficient with respect to any one of the acts charged.'"  Id. at 56-57 (quoting Turner v. United States, 396 U.S. 398 (1970)).  See Salmonese, 352 F.3d at 624.  Given the foregoing, a general verdict may be overturned only when there is legal insufficiency.

(Tr. 1496, 1499-1500,) which was a consequence of the prohibition put in place on separating, or "pull[ing] apart," the matched foreign currency trades in the 1256 transaction.  (Tr. 1499-1500) (Kruse testimony: "They were as a group of transactions that were not allowed to be separated."). Notwithstanding his awareness that the foreign currency contracts could, by design, not be separated or pulled apart, Ohle falsely represented to attorney and opinion letter writer Jay Gordon that the foreign currency contracts and options "can be transferred, sold, exchanged, or otherwise disposed of independently of each other," and that Ohle was not "protected against loss from [the foreign currency] contracts."  (GX 38-2) (Ohle representation letter).  Further, Ohle falsely represented that he had not entered into any "arrangement that voided the economic effect of the [foreign currency] contracts."  Id.  Based on these false representations, Gordon opined that Ohle's losses would not be limited by the "at risk" limitations contained in 26 U.S.C. § 465(b)(4).  Id. at 47 ("at risk" section of opinion letter).

As a result of Ohle's use of the fraudulent 1256 losses, the only tax he reportedly owed for 2002 was $5,022 in self-employment taxes.  (Tr. 1632.)

**B.**  **Governing Legal Principles**

In order to prevent taxpayers engaged in certain activities from deducting losses in excess of their actual economic investment therein, § 465(a)(1) provides that a taxpayer engaged in an activity to which § 465 applies — such as the 1256 transaction — may deduct "any loss from such activity for the taxable year . . . only to the extent of the aggregate amount with respect to which the taxpayer is at risk . . . for such activity at the close of the taxable year."  United States v. Waters, 978 F.2d 1310, 1315 (2d Cir. 1992).  As the Second Circuit explained in Waters, the general rule is that a taxpayer is at risk for the amount of cash invested in the activity and for amounts borrowed for

-29-

which the taxpayer is personally liable. § 465(b)(1), (2).  Section 465(b)(4) provides, however, that

a taxpayer "shall not be considered at risk with respect to amounts protected against loss through

nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." (Emphasis

added.)  Thus, "§ 465(b)(4) operates 'to suspend at risk treatment where a transaction is structured

— by whatever method — to remove any realistic possibility that the taxpayer will suffer an

economic loss if the transaction turns out to be unprofitable.'" Waters, 978 F.2d at 1316 (quoting

American Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990)); see also

Duffie v. United States, 2010 WL 786532, at *13 (5th Cir. 2010) ("Section 465 was added to the Tax

Code to combat tax shelters caused by nonrecourse financing and other situations in which taxpayers

were effectively immunized from loss").  Courts have not hesitated to uphold convictions where the

conduct involved tax fraud predicated on violation of the "at risk" rules.  United States v. Kelly, 864

F.2d 569 (7th Cir. 1989) (upholding false return convictions where tax shelter promoter was aware

of secret agreement to limit losses, rendering deductions claimed on returns violative of  "at risk"

rules); Unites States v. Binstein, No. CR. 94-386 (JBS), 1996 WL 19132 (D.N.J. Jan. 3, 1996)

(rejecting challenge to conviction based on deductions that were fraudulent because taxpayer was

not "at risk"), aff'd in pertinent part, 1996 WL 640895 (3d Cir. 1996).

**C.      Discussion**

Application of the plain words of § 465(b)(4) mandates swift rejection of Ohle's challenge

to his conviction on Count Three.  The only amount of money that Ohle placed "at risk" in

connection with his 1256 transactions was the $42,000 he paid to execute the transactions.  This

conclusion is supported not only by the testimony of John Kruse, but is completely consistent with

the testimony of Ken Brown and Doug Steger, whom Ohle shepherded into their own separate 1256

-30-

transactions.  Brown testified that Ohle told him that he was at risk only for the amount he put up for the transaction, which was $12,000.  (Tr. 566.)  Steger provided similar testimony, indicating that $9,000 was put up for his transaction and that his out-of-pocket exposure was zero, which was a consequence of Steger not putting up the money himself for his transaction.  (Tr. 1177-78.)  Why would Ohle have told Brown and Steger that their losses were limited to the amounts paid for the transaction if that were not the case?

Contrary to Ohle's suggestion (Mem. at 23), there was no possibility that the currency contracts would be separated.  Kruse testified that such a tack would not be allowed by the counter-party to the trades — Montgomery Capital.  That testimony makes complete sense, as Montgomery Capital was not only the counter-party on the 1256 transactions, but also acted as the agent for the taxpayers, operating under the name "Groh Asset Management," and was thus on both sides of the foreign currency contract.  If, as Kruse testified, Montgomery Capital (owned by Groh) was not going to allow the contracts to be separated, Groh had the power to enforce that understanding since he, in effect, was on both sides of the 1256 trades.

Ohle's contention that criminal liability cannot be predicated on a willful violation of the "at risk" rules contained in § 465 is unpersuasive.  In making this argument, Ohle ignores the cases such as United States v. Kelly and United States v. Binstein, which did not pause in finding criminal liability based on the provisions of § 465.  Instead, Ohle points to the "economic substance" doctrine, and certain Second Circuit cases that have applied that doctrine in the tax shelter context. What Ohle's argument fails to appreciate is that liability under the common law "economic substance" doctrine has nothing to do with statutory liability under the provisions of § 465.  That is precisely why the Court instructed the jury that it could premise liability for the 1256 tax shelter

deductions on a violation of the provisions of § 465 <u>or</u> the "economic substance" doctrine <u>or</u> the "primarily-for-profit" test derived from § 165(c)(2).  Thus, any uncertainly with respect to the "economic substance" test — and we submit that there is none — does not undermine Ohle's conviction based on the provisions of § 465.

Finally, Ohle's reliance on the discussion contained in the IRS agent's report (Mem. at 22) is wholly misplaced.  The task for determining the governing law was for the Court, and we respectfully submit that the Second Circuit's opinion in <u>Waters</u> contains the prevailing and correct view of the law, which was made part of the Court's instructions.  However, even if the Court were to apply the "worst case scenario" test emanating from the Sixth Circuit's opinion in <u>Erershaw v. Commissioner</u>, 949 F.2d 841, 845 (6th Cir. 1991), Ohle's argument would still fail because there is nothing in the record even hinting that an event such as counter-party failure or bankruptcy would have scuttled Ohle's 1256 transaction, or the others carried out by Kruse, Groh, and Ohle.  That is so because Montgomery Capital (through Roger Groh) was the counter-party on all the transactions, which were entered into by the taxpayers through Groh Asset Management (that is, Roger Groh). Stated another way, Groh was on both sides of the trades, and thus it was no lack of certainty that he would carry through on the prohibition he and others put in place with respect to separating any of the foreign currency trades.

In sum, Ohle's due process and other challenges to his Count Three conviction are without foundation.  Ohle told the 1256 participants that their risk of loss was limited to the amounts they were putting up, not the multi-million dollar amounts that were part of the inseparable, off-setting paper trades.  He said that for a reason: he knew with certainty that noone would be called to pay on those gargantuan contracts, which were put in place simply to drive the tax losses.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendants' motions for judgment of acquittal and new trial should be denied.

Dated: New York, New York
        August 16, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:       /s/ Nanette L. Davis
STANLEY J. OKULA, JR.
Assistant United States Attorney
(212) 637-1585
stan.okula@usdoj.gov
NANETTE L. DAVIS
Special Assistant United States Attorney
(212) 637-1117

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non registered participants on the above date.

By:    /s/ Nanette L. Davis
STANLEY J. OKULA, JR.
Assistant United States Attorney
(212) 637-1585
stan.okula@usdoj.gov
NANETTE L. DAVIS
Special Assistant United States Attorney
(212) 637-1117
nanette.l.davis@usdoj.gov