UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :

UNITED STATES OF AMERICA,       :

      - v. -                           :     S3 08 Cr. 1109 (JSR)

JOHN B. OHLE III, and              :
WILLIAM E. BRADLEY,

                                        :

                Defendants.    :

                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THE INCLUSION OF "HOMER" TAX SHELTER LOSSES AS RELEVANT CONDUCT UNDER THE SENTENCING GUIDELINES

**PREET BHARARA**
United States Attorney for the Southern
District of New York

**STANLEY J. OKULA, JR.,**
**NANETTE L. DAVIS,**
**Assistant United States Attorneys,**

    — Of Counsel —

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,            :

    - v. -                                  :     S3 08 Cr. 1109 (JSR)

JOHN B. OHLE III, and                :
WILLIAM E. BRADLEY,
                                     :

                   Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THE INCLUSION OF "HOMER" TAX SHELTER LOSSES AS RELEVANT CONDUCT UNDER THE SENTENCING GUIDELINES

The United States respectfully submits this reply Memorandum of Law in further support of its motion seeking to include the tax losses stemming from certain "HOMER" tax shelter transactions as relevant conduct under the United States Sentencing Guidelines.

**1.     The HOMER Approvals**

Ohle's suggestion (Memo at 3-4) that the approval of HOMER by others at Bank One translates into good faith on his behalf is unconvincing. The fact that others might have reviewed or signed off on the technical aspects of HOMER, or even the whole transaction,[1] hardly means that

---

[1] Fairly read, Deichmann's testimony does not support the conclusion that HOMER was "approved of at the highest levels of Bank One management," as Ohle maintains. Memo at 3. Deichmann's hearsay testimony was only that "someone above [him] at Bank One told [him that he] could go and talk to clients about HOMER." (9/17/10 Tr. 170). When asked who that was, Deichmann replied he was unsure, "[w]hether it is John Ohle or Trey Dye or somebody in the Innovative Strategies." Id. Moreover, because the specifics of Foley & Lardner's conclusions about the HOMER tax shelter are unknown, it is too much to argue that Bank One was given a clean bill of health as to HOMER. It is equally plausible that notwithstanding significant reservations about HOMER, Bank One made a business decision not to interfere with the completion of transactions that were already in progress.

those persons were fully informed of all the facts concerning the tax shelter, particularly those with respect to implementation and profit potential. One need only look as far as the recent Ernst & Young tax shelter fraud trial before Judge Stein, United States v. Coplan, et al., No. 07 CR 453 (SHS), to see that those responsible for the implementation of tax shelters transactions (including three E&Y tax partners there) could properly be found guilty of tax shelter fraud notwithstanding the claim by the defendants that the Ernst & Young accounting firm had signed off on the tax shelters at issue. The reason for this is plain: those on the ground in the sale and implementation of the tax shelter can plainly carry out fraud with respect to the transactions, even under the noses of highly competent professionals. And that was certainly the case here. Indeed, the proof at trial showed that Ohle alone was responsible for keeping from others within ISG (such as Deichmann, who accompanied him on many of the sales pitches) the critical fact that Ken Brown was entirely funded by Ohle. Also hidden from Deichmann and apparently everyone else at Bank One and Jenkens & Gilchrist ("J&G") was the fact that Ohle had extracted from Brown a promise to split the profits made by Brown as third-party purchaser in the HOMER transaction.

### 2. Ohle's Knowledge

Given Ohle's knowledge of the financial aspects of HOMER — after all, how could Ohle assure Ken Brown that he was guaranteed to make money as third-party purchaser unless Ohle understood the financials of the transaction? — and the leadership role he played within ISG, it strains credulity for Ohle to maintain that he was duped by J&G. That conclusion is also buttressed by the fact that Bank One's ISG received the draft J&G HOMER opinion letter, Gov't 9/17/10 Exhibit SD-1, which contained the false representations that HOMER clients Clouatre and Gutterman stated were included in their opinion letters and which they testified they did not make

and which they acknowledged they had no factual basis to make. (A copy of the excerpted pages of the draft opinion with the false representations is attached.). Those representations, of course, included one to the effect that the client believed he had a reasonable opportunity to make a profit. The indisputable evidence is that this was an economic impossibility because any profits on the options would be dwarfed by the price of admission for a HOMER tax shelter — the 6% all-in fee. Such fees, of course, must be considered. Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966). Finally, as Dr. David DeRosa pointed out, it was a simple proposition for one to learn the profit potential of the HOMER options — one needed only to call the foreign exchange desk at any bank, such as Deutsche Bank. Ohle certainly had access to David Parse of Deutsche Bank, and it stands to reason that as an architect of HOMER, he would have learned of the economics.[2]

Ohle's attempts to run away from the Court's suggestion that, at the very least, it could be inferred that Ohle consciously avoided learning of the crippling economics of HOMER, are also unconvincing. Given Ohle's position within ISG in general and with respect to the sale of the HOMER tax shelter in particular, his role in the development of HOMER, his contacts with Daugerdas of J&G, and his status as a tax professional (both as a CPA and tax lawyer), it is certainly a compelling inference that Ohle knew of the requirement that he satisfy himself that the transaction worked on all levels. Moreover, the inference is buttressed by Ohle's significant other tax fraud activities, including the other fraudulent tax shelter (1256) and his tax fraud with Brown and Steger.

---

[2] Indeed, Jeff Conrad, in his resignation letter, makes clear that he was working with someone at Bank One in the design of the HOMER tax shelter. See Memo at 4 (quoting DX D 0003752) ("We spent our first year fine tuning [HOMER]. . ."). That someone was not Paul Ferguson or Scott Deichmann. The most reasonable inference is that the person was ISG leader and Conrad colleague John Ohle.

### 3. Ohle's Use of Puppet Ken Brown

Ohle's suggestion that his insertion and control of Ken Brown did nothing to undermine the validity of HOMER hardly passes the laugh test. One hardly needs to cite any case for the proposition that the false portrayal of a party to a tax transaction as an "independent" investor would serve as a compelling basis to conclude that those engaged in such false portrayals intended to defraud the IRS. But the Supreme Court "by way of illustration, and not by way of limitation," set out examples of "affirmative willful attempts" to evade in Spies v. United States:

> keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and <u>any conduct, the likely effect of which would be to mislead or to conceal</u>.

317 U.S. 492, 499 (1943) (emphasis added). That is precisely why Ohle made the conscious decision to hide his corrupt dealings with Brown. For if Ohle thought that his funding of Brown and his profit sharing arrangement with him was all well and good, why did he fail to disclose that to anyone at Bank One or, apparently, J&G? The reason is plain: Ohle knew it was wrong.

Dated: September 24, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:    s/Stanley J. Okula, Jr.
STANLEY J. OKULA, JR.
NANETTE L. DAVIS
Assistant United States Attorneys
(212) 637-1585/(212) 637-1117
stan.okula@usdoj.gov
nanette.l.davis@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non registered participants on the above date.

      By:    s/Stanley J. Okula, Jr.
              STANLEY J. OKULA, JR.
              Assistant United States Attorney
              (212) 637-1585
              stan.okula@usdoj.gov