**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

**UNITED STATES OF AMERICA,**       :

   - v. -                        :      **S3 08 Cr. 1109 (JSR)**

**JOHN B. OHLE, III and**         :
**WILLIAM BRADLEY,**

                                    :

               **Defendants.**        :

                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>


 

**PREET BHARARA**
**United States Attorney for the Southern**
**District of New York**


**STANLEY J. OKULA, JR.,**
**NANETTE L. DAVIS,**
**Assistant United States Attorneys**

     **- Of Counsel -**

**TABLE OF CONTENTS**

I.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  The Defendants' Educational Background and Work History . . . . . . . . . . . . . . . . . . . . . 4

    B.  The Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.  The Superseding Indictment, Trial, and the PSRs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.  The <u>Fatico</u> Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.  Sentencing Guidelines Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.  Disputed Guidelines Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  Sophisticated Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.  Abuse of Trust/Use of Special Skill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.  Receipt of More than $1,000,000 in Gross Receipts from a Financial Institution . 14

        4.  Leader or Organizer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  3553(a) Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.  Ohle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.  The Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.  History and Characteristics of the Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        3.  The Need To Afford Adequate Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        4.  The Need To Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . . . . . 22

        5.  The Appropriate Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.  Bradley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

United States v. Ajiboye, 961 F.2d 892 (9th Cir.1992) ................................................................ 14

United States v. Atkins, 869 F.2d 135 (2d Cir. 1989) ................................................................ 20

United States v. Barrett, 178 F.3d 643 (2d Cir. 1999) ................................................................ 13

United States v. Bennett, 161 F.3d 171 (3d Cir.1998) ................................................................ 15

United States v. Booker, 543 U.S. 220 (2005) ................................................................ 10

United States v. Buck, 324 F.3d 786 (5th Cir.2003) ................................................................ 14

United States v. Burgos, 276 F.3d 1284 (11th Cir. 2001) ................................................................ 21

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) ................................................................ 10, 11

United States v. Edelkind, 467 F.3d 791 (1st Cir. 2006) ................................................................ 15

United States v. Elia, No. 09-2258, 2010 WL 3394187 (2d Cir. 2010) ................................................................ 12

United States v. Fitzgerald, 232 F.3d 315 (2d Cir. 2000) ................................................................ 6

United States v. Gallant, 537 F.3d1202 (10th Cir.2008) ................................................................ 14

United States v. Gordon, 291 F.3d 101 (2d Cir. 2002) ................................................................ 6

United States v. Hirsch, 239 F.3d 221 (2d Cir. 2001) ................................................................ 13

United States v. Hirsch, 249 Fed. Appx. 863, 2007 WL 2914214 (2d Cir. 2007) ................................................................ 14

United States v. Jackson, 346 F.3d 22 (2d Cir. 2003) ................................................................ 13

United States v. Jones, 460 F.3d 191 (2d Cir. 2006) ................................................................ 11, 12

United States v. Kohli, 110 F.3d 1475 (9th Cir. 1997) ................................................................ 15

United States v. Laurienti, 611 F.3d 530 (9th Cir. 2010) ................................................................ 14

United States v. Lewis, 93 F.3d 1075 (2d Cir.1996) ................................................................ 13

United States v. Manko, 979 F.2d 900 (2d Cir. 1992) ................................................................ 20

<u>United States v. McClatchey</u>, 316 F.3d 1122 (10th Cir. 2003) ............................................ 18, 19

<u>United States v. Oshatz</u>, 912 F.2d 534 (2d Cir,. 1990) ............................................. 20

<u>United States v. Petrillo</u>, 237 F.2d 119 (2d Cir. 2000) ............................................. 6

<u>United States v. Rubenstein</u>, 403 F.3d 93 (2d Cir. 2005) ............................................. 10

<u>United States v. Taylor</u>, 499 F.3d 94 (1st Cir. 2007) ................................................. 22

<u>United States v. Trupin</u>, 475 F.3d 71 (2d Cir. 2007) ................................................. 22

<u>United States v. Ture</u>, 450 F.3d 352 (8th Cir. 2006) ................................................. 17

<u>United States v. Wisniewski</u>, 121 F.3d 54 (2d Cir. 1997) ................................................. 16, 17

## STATUTES

18 U.S.C. § 3553(a) ............................................................. passim

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

UNITED STATES OF AMERICA,        :

  - v. -                         :       S3 08 Cr. 1109 (JSR)

JOHN B. OHLE, III and        :
WILLIAM BRADLEY,

                                 :

           Defendants.

                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this memorandum for the Court's consideration in connection with the sentencings of defendants John B. Ohle, III ("Ohle") and William Bradley ("Bradley"), which are scheduled for January 14, 2011.

On June 2, 2010[1], Ohle was convicted after trial of all three counts in the indictment against him, S3 08 Cr. 1109 (JSR).  Those three counts were conspiracy to defraud Bank One and the Internal Revenue Service (Count One), and personal income tax evasion for the 2001 and 2002 tax years (Counts Two and Three).  Bradley was convicted of the Count One conspiracy.  The proof at trial demonstrated that Ohle — a certified public accountant and attorney — concocted and presided over a multi-pronged, multi-year fraud scheme directed at his employer (Bank One), a long-time trust client (the Ames family), and the Internal Revenue Service ("IRS"), largely to finance a lavish lifestyle and to build a considerable sports memorabilia collection.  The proof at trial also established that Bradley assisted Ohle in defrauding Bank One through the submission of false invoices for fees to which Bradley was not entitled.

With all of the advantages conferred by a comfortable upbringing, a joint-degree education at Tulane University, and a solid start in the accounting and banking professions, defendant Ohle could have pursued a rewarding and productive life as a CPA, lawyer, or banker, with compensation in the top few percent of the general population. Instead, Ohle decided to line his own pockets and build his personal sports memorabilia collection through an elaborate pattern of fraud, resulting in significant financial harm to his victims and dishonor to his professions. Bradley, for his part, accepted Ohle's invitation to utilize Bradley's law practice for fraudulent gain, thereby misusing his professional status in order to help enrich Ohle and garner illicit proceeds himself.

Ohle took elaborate steps to orchestrate and execute the fraud scheme. He enlisted a lifelong friend (Kenneth Brown) to participate in the fraud scheme, with a promise to Brown of large profits in exchange for little more than the opening of a handful of bank accounts and the signing of paperwork sent to him by Jenkens & Gilchrist. Ohle enlisted business colleague Doug Steger to participate in the implementation and cover-up of the referral fee scheme, through use of Steger's company and the preparation of fraudulent referral fee invoices. Ohle enlisted his friend co-defendant William Bradley, a New Orleans-area attorney, to participate in the scheme through the preparation of blatantly false attorney invoices on Bradley's law firm letterhead. Through these efforts, Ohle obtained by fraud over a million dollars of fees from his employer, Bank One, a portion of which he shared with Bradley and his other co-conspirators.

Ohle also brazenly embezzled millions from his trust client, the Ames Family, and lied to attorneys and accountants hired by the Ames Family to investigate Ohle's defalcations. He evaded taxes based on the income fraudulently obtained from Bank One and the Ames Family. Ohle caused both Brown and Steger to evade their taxes through the filing of false tax returns and the utilization

of a fraudulent tax shelter he helped structure. Ohle personally utilized that same fraudulent tax shelter in order to evade taxes on almost $4 million in income. He expended enormous efforts to sell a tax shelter (HOMER) that generated over $100 million of tax losses that were fraudulent because, among other things, Ohle knew the clients were pursuing the transactions exclusively for tax losses and because Ohle had inserted Ken Brown as Ohle's straw person, or puppet, into the HOMER tax shelter. Ohle dragged his parents, father-in-law (John Keane Dalton), and family trusts into his fraud schemes by employing them as nominee owners of bank accounts and assets. He enlisted HOMER clients Gene Clouatre and James "Pepper" Rutland to sign false affidavits that Ohle provided to Bank One in order to obtain a more favorable severance package. And he caused to be created an elaborate set of back-dated corporate and trust paperwork in an outlandish attempt to blame co-conspirator Doug Steger for a significant part of the fraud on Bank One. As a result of Ohle's conduct, he caused significant financial losses to the victims of his frauds. And he did this all while holding himself out as a legitimate and trustworthy banker, CPA, and trustee. This conduct, and the resulting harm, is especially deserving of a significant prison sentence.

Bradley's conduct, while significantly more limited than Ohle's, similarly calls out for a prison sentence. That conduct included: the preparation of patently false attorney fee invoices for work he never performed; use of his position as a lawyer, and his attorney escrow account, to help execute the scheme; false and incomplete tax reporting of the monies he made during the scheme; assisting Ohle in moving funds through a shell company (North Shore Legal Financing) in a manner that aided Ohle's efforts to defraud the Ames and resulting in further false tax reporting by Bradley; and providing false and misleading deposition and trial testimony during a federal civil lawsuit brought by HOMER clients (the Ducote family) who had learned that Bradley had collected bogus

3

fees by claiming to have performed services on their HOMER tax shelter.

## I. **RELEVANT FACTS**[1]

### A. **Defendants' Educational Background and Work History**

Ohle received his joint MBA and law degrees from Tulane in 1993 and thereafter spent several years working as an accountant at KPMG. PSR ¶¶ 111, 117. Ohle's work at KPMG included a stint at that firm's prestigious Washington National Tax office. In or about late 1999, Ohle moved from KPMG to Bank One's Chicago office, where he served a supervisory position in what became known as the "Innovative Strategies Group," or ISG. PSR ¶ 116. Following Bank One's investigation of the tax shelter activities of Ohle and others at the ISG in late 2001 and early 2002, Ohle resigned from Bank One and, together with Paul Ferguson, John Manella, and Scott Deichmann, established Dumaine Consulting.

Defendant Bradley received his law degree in 1993 from Southern University Law Center, Baton Rouge, Louisiana, and from 1993 to 2008 was self-employed in his own law firm in Hammond, Louisiana. He handled primarily personal injury cases. PSR ¶¶ 118-19.

### B. **The Offense Conduct**

The facts concerning Ohle and Bradley's offense conduct will not be repeated herein at length, as those facts are comprehensively set forth in the PSRs and we are confident that, as a result of the numerous submissions made previously by the parties, the Court is thoroughly familiar with the record.

One incident, related to the referral fee fraud, is worth noting because it speaks volumes

---

[1] The facts described in this section are based on the Probation Department's Presentence Report ("PSR"), the trial record, the post-trial hearings (including the Fatico hearing), victim impact letters sent to the Court, documents that the Government has produced to the defendant in discovery, and Government interviews of various witnesses.

about Ohle. That incident revolved around Ohle's request to HOMER clients Clouatre and Rutland to sign affidavits that falsely indicated that Ohle had nothing to do with the introduction of Clouatre and Rutland to the Carpe Diem investment. Tr. 293 (Clouatre); 751-53 (Rutland). In fact, as Clouatre and Rutland acknowledged at trial, Ohle was the one who steered both of them to Carpe Diem and secretly collected a commission as a result, just as he secretly collected commissions when the Ames family was steered into Carpe Diem by Ohle.

The reason for Ohle's procurement of the false affidavits was plain: he was in the midst of negotiating a severance agreement with Bank One, and needed to deceive the bank into believing that he had not received any outside income while working at Bank One. Ohle made such a false representation to Bank One, thus securing a severance payment of approximately $1,200,000 in 2002. This income was part of the $4 million that Ohle subjected to his own fraudulent "1256" tax shelter transaction, thus evading his tax obligations for 2002.

Bradley used similarly deceptive means to conceal his fraudulent conduct. When testifying as a defendant in the Eastern District of Louisiana in <u>Ducote Jax Holdings v. Bradley</u>, 04 CV 1943 — a civil lawsuit brought by HOMER client David Ducote and family members — Bradley gave false and misleading testimony under oath to make it appear that he had done legitimate legal work in return for the $255,000 he received in payment for the false invoices he had submitted to the law firm of Jenkens & Gilchrist ("J&G").

### C. The Superseding Indictment, Trial, and the PSRs

As a result of their offense conduct (and Judge Sands's pre-trial rulings), the grand jury returned a third superseding Indictment charging both Ohle and Bradley with conspiracy to defraud Bank One and the IRS. Ohle was also charged with tax evasion for the 2001 and 2002 tax years.

The statutory maximum for Ohle's crimes is 15 years' imprisonment, while Bradley faces a five-year term.

On May 17, 2010, trial commenced against Ohle and Bradley. On June 2, 2010, after less than a half-day of deliberations, the jury returned a verdict of guilty on all counts.

In connection with the sentencing of Ohle and Bradley, the Probation Office has prepared a Presentence Investigation Report (the "PSR") for each defendant, which calculates the defendants' respective Sentencing Guidelines offense levels. As calculated by Probation, Ohle's final offense level is 36, calling for a Sentencing Guidelines sentence at the statutory maximum, 15 years' imprisonment. The breakdown of Ohle's Guidelines calculation is as follows:

- A base offense level of 6 pursuant to § 2B1.1(a)(2).[2] PSR ¶ 83.

- An increase by 18 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because the loss amount directly attributable to the defendant's criminal conduct was more than $2,500,000 but less than $7,000,000.[3] PSR ¶ 84.

---

[2]    Pursuant to United States v. Fitzgerald, 232 F.3d 315 (2d Cir. 2000), United States v. Petrillo, 237 F.2d 119 (2d Cir. 2000), and United States v. Gordon, 291 F.3d 101 (2d Cir. 2002), the fraud and tax losses are grouped (that is, added together) to determine the total loss figure. Gordon makes clear that, following the grouping of the tax and fraud losses, separate calculations under the tax (2T) and fraud (2B1.1) Guidelines should be conducted. The highest resulting calculation is thereafter applied. United States v. Gordon, 291 F.3d at 189 n.3. Under the tax Guidelines, Ohle's final offense level, as calculated by Probation prior to the Fatico hearing, is 34, based on the following: base offense level of 24, pursuant to U.S.S.G. § 2T4.1)(J), based on an aggregate loss of $6,106,641; a 2-level upward adjustment pursuant to U.S.S.G. § 2T1.1(b)(1), based on the failure to report criminal proceeds in the form of monies obtained during the referral fee fraud on Bank One; a 2-level upward adjustment for sophisticated means; a 2-level upward adjustment based on use of a special skill in the form of Ohle's accountancy skills; and a 4-level upward adjustment based on Ohle's role as an organizer and leader. Ohle is also arguably entitled to an additional 2-level upward adjust pursuant to U.S.S.G. § 2T1.9(b)(2) for encouraging others, in addition to co-defendants and conspirators, to violate the tax laws. That occurred, of course, when Ohle urged HOMER clients Gene Clouatre, James "Pepper" Rutland, and Scott Gutterman to enter into the fraudulent HOMER transaction.

[3]    The loss figure is based on the aggregate fraud offense losses of $1,954,334 and tax losses of $4,152,307, yielding a total loss of $6,380,833. The fraud loss is broken down as follows:

- An increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(9)(C) because the offense involved sophisticated means. PSR ¶ 85.

- An increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(14)(A) because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense. PSR ¶ 86.

- An increase of 4 levels pursuant to U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of criminal activity involving five or more participants. PSR ¶ 88.

- An increase of 2 levels pursuant to U.S.S.G. § 3B1.1(3) because the defendant abused a position of trust with respect to Bank One and the Ames, and used his special skill as a CPA in carrying out the offense. PSR ¶ 89.

- An increase of 2 levels pursuant to U.S.S.G. § 3C1.1 because the defendant obstructed justice by violating the post-indictment restraining order through his transfer of restrained sports memorabilia to MINT STATE's Rick Snyder, pursuant to a consignment agreement. PSR ¶ 90.

Ohle has no criminal history points. Thus, with a final offense level of 36, Ohle's Guidelines analysis, according to the final PSR, yields a final advisory Guidelines range of 188-235 months.

The Probation Department calculated Bradley's Guidelines as follows:

- A base offense level of 6 pursuant to § 2B1.1(a)(2). PSR ¶ 81.

---

$1,256,500 loss suffered by Bank One ($920,000 plus $255,000 plus $81,500, all obtained via false referral fee invoices, which figure is consistent with the preliminary order of forfeiture as to Ohle), and $697,834 in losses to the Ames family ($350,000 plus $347,834, obtained via the Carpe Diem fraud). The tax loss is broken down as follows: Ohle's 2001 tax losses ($1,168,404) plus Ohle's 2002 tax losses ($2,783,983), GX 101-11; Tr. 1985-87, plus $199,920, which is 28% of the $714,000 in fraudulently reported income of co-conspirators Ken Brown ($500,000) and Douglas Steger ($214,000). These figures for Brown and Steger were not included in the Ohle tax loss amounts. Brown's amount represents his split from the profit-sharing with Ohle regarding HOMER. Steger's amount was part of Ohle's gross income, but the $214,000 was backed out via a deduction given to Ohle in IRS Revenue Agent Catanzaro's calculations. See Exhibit A (extract of GX 101-11). Also part of the tax loss calculations, as relevant conduct, are the taxes due on $714,000 embezzled by Ohle from the Ames in 2000. That tax deficiency amount is $274,192. See Exhibit B (Revenue Agent's Report for 2000 and 2001).

- An increase by 12 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(G) because the loss amount directly attributable to the Bradley's criminal conduct was more than $200,000 but less than $400,000.[4] PSR ¶ 82.

- An increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(9)(C) because the offense involved sophisticated means. PSR ¶ 83.

- An increase of 2 levels pursuant to U.S.S.G. § 3B1.1(3) because the defendant abused a position of trust and used his special skill as an attorney in carrying out the offense. PSR ¶ 89.

Bradley has two criminal history points, based on his bribery conspiracy conviction in the Eastern District of Louisiana, thus putting him in criminal history category II. PSR ¶¶ 92-95; 128. Thus, with a final offense level of 22, Bradley's Guidelines analysis, according to his final PSR, yields a final advisory Guidelines range of 46-57 months. PSR ¶ 128.

### D. The Fatico Hearing

Following two days of sentencing hearings in September 2010, this Court issued detailed findings of fact and conclusions of law concerning Ohle's responsibility for additional tax losses attributable to the HOMER tax shelter. See Court's Order of October 25, 2010; Fatico Hearing Tr. at 3-4. In particular, this Court found that Ohle knew that the HOMER tax shelter was fraudulent and that he knowingly participated in the "promot[ion] of the sale" of that fraudulent shelter. Those findings were based on Ohle's central role in the Chicago-based Innovative Strategies Group of Bank One that sold HOMER, as well as Ohle's insertion of Ken Brown as a nominee, or puppet, in

---

[4] The loss figure for Bradley is based on the $255,000 total of the amounts contained on the false attorney invoices sent by Bradley to J&G using "Bradley Law Firm" letterhead. Those invoices fraudulently recited that they were based on purported services rendered by Bradley in connection with the Ducote family HOMER transactions. Bradley received the $255,000 in his attorney escrow account and thereafter transferred $184,000 to co-conspirator John Manella and $46,000 to an Ohle-controlled account. Bradley kept the remaining amounts. He was also paid approximately $9,000 by Manella, part in cash and $4,000 via check.

that tax shelter. Because the HOMER tax shelter resulted in the production of over $400 million of fraudulent capital losses and over $60 million of ordinary losses, see GX 2-42 (Burnside/Guerin chart of all HOMER figures, including losses), approximately $96.8 million of additional tax losses are added to Ohle's total tax loss figure. (This figure was arrived at by using a capital gain rate of 20% for the capital losses ($80,000,000) and 28% for the ordinary losses ($16,800,000), based on the presumptive Guidelines amount.) With the addition of $96.8 million in losses, the loss figure for Ohle is over $100 million, resulting in a 14-level increase in the overall loss adjustment figure, from 18 (pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because the loss amount directly attributable to Ohle's counts of conviction was more than $2,500,000 but less than $7,000,000, as noted above), to 32 (pursuant to U.S.S.G. § 2B1.1(b)(1)(N) because the loss amount directly attributable to Ohle's criminal conduct, including relevant conduct, was more than $100,000,000).[5]

Ohle's final adjusted offense level is therefore 43, with an attendant Guidelines range of life imprisonment. However, because the statutory maximum is 15 years, Ohle's Guidelines range is the statutory maximum of 15 years' imprisonment (180 months). See U.S.S.G. § 5G1.2(d).

---

[5] Because of the significant Guidelines Ohle faces, we do not think it necessary to detail, or the Court to make factual findings with respect to, other activity of Ohle that reflects on his character, such as the theft from Michael Noonan (which was the subject of certain Fatico hearing testimony), or the conduct that was the subject of our Rule 404(b) motion. That "other crimes" conduct involved the efforts to enlist Bank One "Scholar's Program" employee Tom Kane to obtain, without Bank One's knowledge, millions of dollars of additional commission fee income from Carpe Diem. See Docket No. 67, at 12-13.

## II.   SENTENCING GUIDELINES DISCUSSION

### A.   Applicable Law

We are distinctly aware of the Court's intimate familiarity and facility with the Sentencing Guidelines and the law of sentencing, particularly in this post-Booker age. We nonetheless think it helpful to review briefly the governing legal principles in this area.

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005); see United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." Booker, id. at 260 (citations omitted); see also id. at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence

"sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.

That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a).

In light of Booker, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  See Crosby, 397 F.3d at 103.  First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  Id. at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  Id.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  Id. at 113.  In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the

circumstances.  United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006).

**B.      Disputed Guidelines Adjustments**

In his submission to the Probation Department concerning the Presentence Report, Ohle has objected to several of the Guidelines adjustments noted above.  Although the final PSR contains comprehensive responses to Ohle's objections, we review briefly the legal and/or factual support for certain of those adjustments.

**1.      Sophisticated Means**

Ohle used bank accounts opened by, or controlled in the names of, others (including his father) in order to carry out the scheme.  In addition, Ohle caused phony invoices to be prepared by a number of individuals in order to carry out the fraud scheme, then caused the funds to be routed through different accounts in order to obtain and use the funds personally.  What is more, Ohle caused an elaborate series of false documents to be created by the Chicago law firm of Chuhak & Tecson in order to create the false impression that the money obtained by fraud through Steger, and thereafter routed to Ohle, represented an investment by Steger in Ohle's sports memorabilia business and a Florida real estate venture by Ohle's father and Steger.  Finally, Ohle caused an elaborate false accounting to be prepared for Ecetra Ames's attorney, making it appear that the monies he embezzled had been invested or loaned to certain entities.  The combination of these steps fully warrants the "sophisticated means" adjustment.  See United States v. Elia, No. 09-2258, 2010 WL 3394187, *2 (2d Cir. 2010) (adjustment appropriate where defendant used an elaborate combination of means to evade taxes, including the purchase of money orders at multiple locations; the structuring of investments in multiple deposits to avoid reporting requirements; the creation of phony loan documents; and numerous cash real estate investments; "Even if we assume for the

argument that these individual actions were not themselves 'sophisticated,' the coordination of these actions clearly involves sophistication."); <u>United States v. Jackson</u>, 346 F.3d 22, 25 (2d Cir. 2003) ("[E]ven if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together"); <u>United States v. Lewis</u>, 93 F.3d 1075, 1083 (2d Cir.1996) (holding, in a tax case, that the sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return").

### 2.     Abuse of Trust/Use of Special Skill

Ohle plainly abused his position of trust with respect to Bank One by organizing and executing the scheme to obtain the referral fees from Bank One by fraud.  Ohle's position as head of Bank One's Chicago-based ISG group conferred on him substantial discretion and authority, thus ensuring the success of the scheme.  Ohle also abused his position of trust with respect to his trust client, the Ames family, through his embezzlement of funds from the Ames Trust — of which Ohle was the trustee.

Ohle's argument that the "abuse of trust" adjustment is inappropriate because abuse of trust is "inherent" in his offense and thus "built into the offense level," <u>see</u> PSR at p. 45 (noting Ohle's objection to abuse of trust enhancement), is entirely meritless.  Ohle points to no case holding that "abuse of trust" is built into the fraud or theft Guideline.  This failure is unsurprising, as courts have routinely applied the "abuse of trust" adjustment in mail, wire, and bank fraud offenses.  <u>E.g.</u>, <u>United States v. Barrett</u>, 178 F.3d 643, 646 (2d Cir. 1999) (bank fraud defendant whose submission of fraudulent invoices to employer served to defraud bank where employer had accounts); <u>United States v. Hirsch</u>, 239 F.3d 221 (2d Cir. 2001) (mail fraud defendant who, while serving as broker,

defrauded clients); <u>United States v. Hirsch</u>, 249 Fed.Appx. 863, 2007 WL 2914214 (2d Cir. 2007) (abuse of trust adjustment upheld for wire fraud defendant, payroll tax preparer, who embezzled payroll taxes entrusted to defendant by clients). Courts that have addressed this precise issue have squarely held that "abuse of trust" is not built into the governing fraud Guideline or any specific offense characteristic. <u>See</u> <u>United States v. Laurienti</u>, 611 F.3d 530 (9th Cir. 2010) ("The enhancement is inapplicable only if the *base offense level* necessarily includes an abuse of trust, regardless whether the defendant's *offenses of conviction* include an abuse of trust") (italics in original); <u>United States v. Gallant</u>, 537 F.3d 1202, 1243 (10th Cir.2008) ("[I]t is well-established that an abuse of trust is not incorporated in the base offense level for fraud under § 2F1.1."); <u>United States v. Buck</u>, 324 F.3d 786, 792-93 (5th Cir.2003) (abuse-of-trust enhancement is permissible when the base offense level is under § 2F1.1); <u>United States v. Ajiboye</u>, 961 F.2d 892, 895 n.4 (9th Cir.1992) (second sentence of § 3B1.3 does not apply to base offense level for "Larceny, Embezzlement, and Other Forms of Theft" because that "provision of the Guidelines does not include 'an abuse of trust or skill' in it"). An abuse-of-trust enhancement for Ohle is more than justified in this case.

### 3. Receipt of More than $1,000,000 in Gross Receipts from a Financial Institution

Ohle challenges this Guidelines adjustment, arguing that Steger and others ultimately shared in the funds obtained from Bank One through the referral fee fraud. In making this argument, Ohle ignores the language of the Guidelines (and commentary), which is applied when a defendant derives more than $1,000,000 in "gross receipts" from a financial institution — here, Bank One — either directly or indirectly. The proof at trial adequately established that Ohle himself submitted and caused Steger and Bradley to submit phony invoices to J&G in connection with the HOMER

tax shelters.  This resulted in a loss to Bank One of $1,256,500, because the payment of those phony

invoices reduced the amount owed to Bank One as part of its share of the HOMER tax shelter fees.

Significantly, the proof also established that Ohle controlled where the fees were directed and who

received what portion of those fees.  Thus, even though Ohle ultimately shared some of the proceeds

with Manella ($184,000) and Steger ($214,000) and Bradley ($25,000), Ohle controlled the gross

amount that was received and exercised the power as leader of the scheme to decide who received

what amounts.  Given these facts, the adjustment is appropriate.  United States v. Kohli, 110 F.3d

1475, 1478 (9th Cir. 1997) ("the definition of 'gross receipts' encompasses funds controlled by the

defendant before he compensates his cohorts."); United States v. Edelkind, 467 F.3d 791, 801 (1st

Cir. 2006) (defendant fraudulently obtained financing for property using his wife's name but

controlled the gross receipts from the offense; enhancement under § 2B1.1 (b) (13) (A) appropriate,

reasoning that the "guideline may be applied where the defendant either controls (even though

indirectly) the fraud proceeds attributed to him . . . ."); United States v. Bennett, 161 F.3d 171, 193

(3d Cir.1998) (rejecting defendant's argument that he did not receive all the funds "individually"

because he subsequently transferred much of the money to consultants and others).[6]

### 4.    Leader Or Organizer

Ohle also challenges the application of the four-level sentencing enhancement for his having

been "an organizer or leader of a criminal activity that involved five or more participants or was

otherwise extensive" pursuant to U.S.S.G. § 3B1.1(a).

---

[6]   The inclusion of all the Bank One fraud proceeds as gross receipts of Ohle is consistent
with the tax calculations conducted by Agent Catanzaro, which included as Ohle's gross income the
$920,000 obtained via Invested Interest, the $255,000 obtained by fraud via Bradley, and additional
amounts.  Ohle was given a deduction for the amounts that he ultimately decided to share with co-
conspirators.  See Exhibit A.

This enhancement is plainly applicable. The Commentary to Section 3B1.1 indicates that when considering whether a defendant is an organizer or leader, a court should weigh the following factors: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 App. n.4.

Ohle easily satisfies these factors. For example, Ohle exercised decision-making authority over the whole referral-fee fraud, deciding which HOMER transactions would be the subject of false invoices and how much of the fruits would be shared with his co-conspirators. Ohle also decided the level of participation by the co-conspirators — that is, which phony invoices they would submit. Ohle also orchestrated the recruitment of accomplices, going so far as to enlist childhood friends and acquaintances (Brown and Bradley) as well as business acquaintances (Steger and Manella) to participate in the scheme. As Ken Brown testified, it was Ohle, his childhood friend, who called him out of the blue in the Summer of 2001 and essentially said, in connection with his successful enticement of Brown into the scheme, "You just hit the lottery." Tr. 531.

Ohle certainly had a claimed right to a share of the fruits of the fraud that was considerably more substantial than any of his co-conspirators.

In short, there is little question that Ohle organized and led the frauds on Bank One, the Ames family, and the IRS. See United States v. Wisniewski, 121 F.3d 54, 58 (2d Cir. 1997) (vacating sentence and finding that record supported enhancement under Section 3B1.1 because defendant was owner of company where money laundering took place, he participated in criminal

activity at the company, and he was a principal beneficiary of the conduct).

## III.     3553(a) Analysis

### A.     Ohle

Although the Guidelines are, of course, no longer binding, the Guidelines sentence in this case reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to Ohle's conduct. We respectfully submit that a significant term of incarceration is imperative in order to emphatically promote general deterrence.

#### 1.     The Nature and Circumstances of the Offenses

The crimes Ohle committed, including the relevant conduct, were significant in scope and duration. Simply put, Ohle was not involved in a single-episode error of judgment that caused harm to one victim. Rather, Ohle's crimes, of which he was the architect and leader, included three victims (Bank One, the Ames family, and the IRS), spanned over three years, and caused over $100,000,000 in aggregate financial harm.

Ohle's fraud on Bank One caused direct financial harm of over $1,000,000. Moreover, it goes without saying that tax offenses are serious, costly, and damaging to our nation's system of taxation. See United States v. Ture, 450 F.3d 352, 357 (8th Cir. 2006)("[t]he criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system."). The Internal Revenue Code, § 6151(a) sets forth the general rule of our voluntary federal tax system: "Except as otherwise provided, when a return of tax is required under this title or regulation, the person required to make such return, shall, without assessment or notice and demand from the Secretary, pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return."

The defendant is an attorney and CPA who should be held to the same, if not higher, degree of compliance with the law.  As a result of his position and attendant salary at Bank One, Ohle always had the means to pay his taxes, but he chose instead to spend his income elsewhere — principally on his sports memorabilia collection.  Undoubtedly some taxpayers might prefer to spend their income on things other than their tax obligations to the IRS and other tax authorities, but the fact remains that our system is based on voluntary compliance.

The seriousness of the defendant's conduct, the amount of taxes he personally evaded, the amounts he caused HOMER clients to evade, and his expenditure of money to support his life style, all support a significant prison sentence.  The defendant acted without regard to his responsibilities as a citizen, lawyer, and CPA to adhere to the laws of this country.  Moreover, his repeated criminal conduct was not born of any real economic necessity, deprived upbringing, or lack of formal education and opportunity; instead, it was the result of greed..

### 2.     History and Characteristics of the Defendant

While it is certainly appropriate for the Court to consider the defendant's good works, the Government respectfully submits that any credit given them must be balanced against the fact that his ability to perform many such good works resulted directly from the position in society that he achieved and the wealth that he accumulated as a result of the multiple frauds for which he is responsible.

Likewise, the Government submits that any testimonials to the defendant's character and honesty by his family and friends ought to be given little, if any, weight.  See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a

person rise to an elevated position in business if people did not think highly of him or her"). Whatever experience of the defendant these people have had, the trial and <u>Fatico</u> hearing evidence made clear that Ohle is someone deserving of no such esteem. While there are certainly cases where it can be said that a defendant's offense conduct was in some way aberrant or representative of so brief a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this is not such a case. For years of his professional life, the defendant lied, cheated, and stole his way through various schemes that defrauded victims out of $100 million and conferred upon him significant personal wealth and proceeds.

Even crediting any testimonials he submits at sentencing, the defendant, through his conduct in connection with Bank One, the Ames, and while at Dumaine Consulting (with the "1256" tax shelter), has shown that he is not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

In short, Ohle's good works are simply overwhelmed by the enormity of his criminal conduct, as described above.

### 3. The Need To Afford Adequate Deterrence

One of the critical factors the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). We respectfully submit that a substantial term of imprisonment is necessary to achieve the goals of general deterrence in this case.

The goal of general deterrence is warranted on two fronts. First, with respect to the Bank One/Ames fraud, it is important to send a clear signal that bank officials and trustees of trusts cannot fraudulently take, with impunity and without meaningful punishment, the funds they were entrusted

to safeguard.  Put simply, Ohle shamelessly abused the trust placed in him by Bank One and the Ames by takings millions from those victims by fraud.  A meaningful sentence is vitally important to deter such conduct by others.

With respect to the tax fraud activity, the jury's verdict and the Court's <u>Fatico</u> hearing findings make clear that this case is not about niceties or even aggressive interpretations of the tax law; instead, it is about fraud, plainly and simply.  We cannot emphasize enough that meaningful criminal sanctions are essential to stop frauds like those perpetrated by Ohle, particularly the HOMER tax shelter fraud, which amounts to nothing less than an assault upon the fiscal security of this country.  Civil proceedings and legislative efforts to rewrite the tax laws have proven largely if not completely ineffective in deterring sophisticated, concerted tax evaders like Ohle and his tax shelter co-conspirators.  In fact, attorneys in the Tax Division, our Office, and other parts of the country have pursued criminal and civil proceedings challenging abusive shelters for years.  While those efforts may have resulted in criminal convictions and, on the civil front, raised tax revenues for the country, they failed to stop those practices.[7]  Accordingly, substantial criminal sanctions are

---

[7]   The failure to deter the promotion and sale of fraudulent tax shelters may be attributable to the relatively light sentences imposed on certain shelter promoters in a previous generation of prosecutions, notwithstanding the gargantuan tax losses generated.  <u>See United States v. Atkins</u>, 869 F.2d 135 (2d Cir. 1989) (lead defendant sentenced by Judge Lasker, pre-Guidelines, to two years' imprisonment after being found guilty at trial of generating over $1.3 billion in fraudulent losses; co-defendant sentenced to four months; second co-defendant sentenced to probation); Steve Coll, "Tax Shelter Founder Atkins Is Sentenced to Two Years," *Washington Post*, March 12, 1988 ("Though Atkins faced a maximum of about 85 years in prison, his two-year sentence fell within the range of punishments handed out recently in comparable cases") (article attached as Exhibit C); <u>see also</u> <u>United States v. Oshatz</u>, 912 F.2d 534 (2d Cir,. 1990) (attorney/defendants sentenced pre-Guidelines to 40 and 28 months, respectively); <u>United States v. Manko</u>, 979 F.2d 900 (2d Cir. 1992) (pre-Guidelines sentence of five years in case involving over $500 million in false deductions); <u>but see</u> <u>United States v. Senft</u>, 84-1254 (2d Cir. 1986) (Sentinel tax shelter promoter Michael Senft sentenced by Judge Owen to 15-year pre-Guidelines term of prison, following trial and sentencing at which Senft continued to maintain that shelters were lawful).

essential to meaningfully attempt to put an end to these practices. Put starkly, only the real fear of a substantial prison sentence will deter fraudulent shelter promoters, salesmen, and facilitators from carrying on their activities.

Such an approach would be entirely consistent with the Guidelines, which specifically recognize that general deterrence is a vitally important goal in sentencing for criminal tax offenses, due to the relatively few criminal tax prosecutions that are brought. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch 2, pt. T, introductory cmt. See also United States v. Burgos, 276 F.3d 1284, 1289 n.6 (11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence").

Moreover, in tax prosecutions there is good reason to impose Guidelines sentences as opposed to the more lenient probationary sentences sought by tax evaders. As the Guidelines commentary further explains:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced.

Guideline Commentary, Section 2T1.1.

Our Circuit has echoed the Commission's observations, noting that, "[o]nly a limited number of criminal tax prosecutions are brought relative to the number of alleged violations.  *See* U.S. Sentencing Guidelines Manual ch. 2, pt. 2, introductory cmt."  United States v. Trupin, 475 F.3d 71, 76 n.6 (2d Cir. 2007) (seven- month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million fails to reflect seriousness of offense).  As the Trupin court aptly observed, a tax evader, is "in effect [stealing] from his fellow taxpayers through his deceptions."  Id. at 76; see also United States v. Taylor, 499 F.3d 94, 102 (1st Cir. 2007) (vacating sentencing of probation with one year in a halfway house for tax fraud offense where tax loss was $129,879 finding that "[w]hile tax fraud is not violent in nature, at its heart, it is theft, specifically theft of money to which the public is entitled").

In sum, general deterrence in cases like this can be accomplished only through a meaningful term of incarceration.

### 4.    The Need To Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences.  Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(7).  We attach for the Court's consideration a chart of sentences in other tax cases, including ones with comparable loss amounts. See Exhibit D.

Although we believe that there is utility in the Court considering what has happened in other cases, we hasten to note our acute awareness that, at best, such guidance can get the Court only so far.  Every case is unique; every individual defendant is unique.  We do not mean to suggest otherwise.  The reasons for referencing the other sentences are straightforward:  first, while we fully

recognize that what we believe to be an appropriate application of the Sentencing Guidelines leads to an advisory Guidelines range calling for a very substantial sentence, similar sentences have been meted out in cases involving comparable overall conduct and tax losses; and second, it is not uncommon for defendants who are less criminally culpable than Ohle to receive and serve lengthy sentences of incarceration.

### 5. The Appropriate Sentence

The Government submits that a sentence of 15 years is appropriate for defendant John Ohle. Although the sentence is at the statutory maximum for each of the counts of conviction, the sentence is only half of the Guidelines range. Such a sentence will best serve the ends of justice pursuant to 18 U.S.C. § 3553(a). Such a sentence is also commensurate with others charged with serious tax and financial institution crimes.

### B. <u>William Bradley</u>

Defendant Bradley's conduct, although less extensive than that of defendant Ohle, was serious. Far from being a one-time aberration, Bradley's conduct consisted of a repeated willingness to utilize his position as an attorney, and his attorney bank accounts, to knowingly assist others in fraudulent conduct for a cut of the take. He did so with the false invoice scheme; he did so in using the North Shore Legal Financing account to handle funds at Ohle's request; he did so with the Louisiana bribery scheme. He also willingly perjured himself in federal district court to conceal his illicit activities, and failed to fully and timely report the income derived from those activities.

Any argument that the defendant has been punished enough by the likely loss of his law license (Bradley's license to practice law is currently suspended, PSR ¶ 119) should be rejected. According to this logic, one who is professionally licensed should not be sent to jail for committing

the same crime that would justify a sentence of imprisonment for a less well-heeled and well-educated defendant. The Court should reject the notion that the professionally educated (like both defendants) should be sentenced more lightly than the poor and powerless because, for the former, the humiliation and shame of conviction alone is more devastating than it would be for those who have enjoyed fewer advantages in life. We respectfully submit that some term of imprisonment is warranted for both general and specific deterrence reasons, and would reflect the seriousness of defendant Bradley's fraudulent conduct. An attorney contemplating the potential fruits of fraudulent conduct should see and know that a jail term is its possible consequence. A term of probation, on the other hand, would serve to deter no one.

The Government, however, is sensitive to the defendant's family situation, and it is for that reason that we recommend a below-Guidelines range sentence — but one that includes a term of imprisonment.

**<u>CONCLUSION</u>**

The Government respectfully submits that, for the reasons explained above, Ohle should be sentenced to a term of imprisonment of 15 years and defendant Bradley should be given a sentence less than the Guidelines range, but one that includes a term of imprisonment.

Dated:   New York, New York
           January 7, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York


By:      s/Stanley J. Okula, Jr.
         STANLEY J. OKULA, JR.
         Assistant United States Attorney
         (212) 637-1585
         stan.okula@usdoj.gov
         NANETTE L. DAVIS
         Special Assistant United States Attorney
         (212) 637-1117
         nanette.l.davis@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non registered participants on the above date.

By:    <u>   s/Stanley J. Okula, Jr.     </u>
           STANLEY J. OKULA, JR.
           Assistant United States Attorney
           (212) 637-1585
           stan.okula@usdoj.gov